RECEIPT # 55384
AMOUNT $ 150
SUMMONS ISSUED N/A
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. M
DATE 4-20-04

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No._____

SUSAN SEARLE,

       Plaintiff

v.

TOWN OF SALISBURY, SALISBURY
POLICE DEPARTMENT, and LAWRENCE
STREETER,

       Defendants

NOTICE OF REMOVAL

04 CV 10791 RCL
MAGISTRATE JUDGE Bowler

TO THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS:

Now come the defendants pursuant to the provisions of 28 U.S.C. §§1441 and

1446, and hereby file notice of the removal of this action from the Superior Court of the

Commonwealth of Massachusetts, County of Essex, where it is currently pending, based

upon the following grounds:

      1.     This is an action in which the plaintiff alleges violations of their due

process rights under the Fourteenth Amendment to the U.S. Constitution, violations of

the Equal Pay Act, and violations of Equal Protection under the Fifth and Fourteenth

Amendments to the U.S. Constitution. The plaintiff seeks relief presumably pursuant to

42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. §§ 206(d), 216; and 42 U.S.C. §1983. See

Complaint, ¶¶ 69-76; 77-80; and 85-88, affixed hereto and incorporated by reference.

The plaintiff also asserts a state claim alleging gender discrimination in violation of G.L.

c.151B and G.L. c.214, § 1C. The plaintiff further asserts a violation of Massachusetts

Equal Rights Act, G.L. c.93, §§ 102, 103, a breach of contract claim, breach of covenant

of good faith and fair dealing, and intentional and negligent infliction of emotional

distress.  See Complaint, ¶¶ 61-68; 81-84; and 89-99, affixed hereto and incorporated by

reference.

    2.    This Court has jurisdiction over the plaintiffs' constitutional claims

pursuant to 28 U.S.C. §1441.

    3.    This Removal is timely, as the defendants were notified of this action on

March 31, 2004.

    4.    All defendants have consented to the removal of the matter to the United

States District Court for the District of Massachusetts.

SIGNED PURSUANT TO RULE 11 OF THE FEDERAL RULES OF CIVIL

PROCEDURE.

                    DEFENDANTS,
                    TOWN OF SALISBURY,
                    SALISBURY POLICE
                    DEPARTMENT, and LAWRENCE
                    STREETER,
                    By their attorney,

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the
above document was served upon the
attorney of record for each other party
by mail-hand on  4/20/04

David C. Jenkins (BBO# 251000)
Kopelman and Paige, P.C.
31 St. James Avenue
Boston, MA 02116
(617) 556-0007

218894/METG/0143



## COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS.

ESSEX SUPERIOR COURT
C.A. No.

| | |
|---|---|
| SUSAN SEARLE<br>    Plaintiff | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| TOWN OF SALISBURY, | ) |
| MASSACHUSETTS | ) |
| POLICE DEPARTMENT and | ) |
| LAWRENCE STREETER | ) |
|     Defendants. | ) |

**04c 10791 RCL**

## COMPLAINT AND DEMAND FOR JURY TRIAL

### PARTIES

1.    Plaintiff Susan Searle (hereinafter, "Searle") is an female and resides at 9 Prospect Street, Merrimac, Massachusetts.

2.    The Defendant Town of Salisbury, Massachusetts (hereinafter, the "Town of Salisbury") is a municipality organized under the laws of the Commonwealth of Massachusetts with a principal place of business located at Town Hall, 5 Beach Road, Massachusetts. The Town of Salisbury Police Department ("Salisbury Police Department") is an agency and/or department of the Town of Salisbury with a principal place of business at 14 Railroad Ave., Salisbury, MA.

3.    Defendant Lawrence Streeter (hereinafter, "Chief Streeter"), former Chief of the Salisbury Police Department, is a male and resides at 31 True Road, Salisbury, Massachusetts. At all times relevant, Chief Streeter was a supervisor of Searle.

## FACTS

4.      Plaintiff repeats and realleges the allegations of Paragraphs 1 through 3, *supra*, as if expressly set forth herein.

5.      In or around 1990, Chief Streeter was appointed the Chief of Police of the Salisbury Police Department.

6.      In or around September, 1994, Searle began working as a full-time public safety dispatcher for the Police Department of the Town of Salisbury, Massachusetts (hereinafter, "Salisbury Police Department"). During most of her tenure at the Salisbury Police Department, Searle also served as a liaison between the Salisbury Police Department, the Women's Crisis Center in Newburyport, MA, and the Newburyport District Court as a legal advocate, assisting members of the public who sought to obtain restraining orders pursuant to M.G.L. c. 209A.

7.      In or around August, 1994, and throughout her tenure as a dispatcher, Searle was designated as a sworn "special officer" for the Salisbury Police Department. As a special officer, among other things, she handled all female prisoners and served as a matron.

7a.     In or around September, 1996, Searle left the Salisbury Police Department voluntarily.

8.      In or around 1994, Searle first approached Chief Streeter regarding her wish to perform lucrative traffic/construction paid details (hereinafter, "paid details") in Salisbury, thereby affording her an opportunity to earn additional income and to have greater responsibility. Searle would have received more pay for working paid details than she would have received for working a comparable number of overtime hours as a dispatcher.

9.      In response to her request, Chief Streeter laughed at Searle and told her to "forget about it."

2

10.     In or around March, 1998, at the request of the Salisbury Police Department, Searle returned to the Salisbury Police Department as a full-time dispatcher.

11.     Searle often worked overtime shifts throughout her tenure at the Salisbury Police Department, and she performed her job duties professionally. She regularly received praise for the quality of her work, and she received periodic increases in pay.

12.     Searle persisted from 1994 through approximately May, 2001, repeatedly inquiring of Chief Streeter about paid details. Chief Streeter consistently responded, "not gonna happen," or words to that effect, to her requests to handle paid details. Alternatively, Chief Streeter would ignore her requests.

13.     At one point, Chief Streeter said to Searle, in essence, "no woman in my department would ever do a detail, so shut up and get back to your job." He made similar comments about his refusal to permit females to perform paid details throughout Searle's tenure at the Salisbury Police Department.

14.     On many occasions, including after April, 2001, when Searle asked Chief Streeter to allow her and other female dispatchers to have the opportunity to obtain detail assignments, Chief Streeter would become angry and his face would redden. At times, including after April, 2001, he would respond, in words or substance, "It's never gonna happen." He would often walk away angry at Searle.

15.     Upon information and belief, from 1994 through at least January, 2002, Streeter did not permit any female employees of the Salisbury Police Department to perform paid details. Upon information and belief, Streeter permitted only male police officers and male dispatchers to perform paid details. Moreover, Streeter did not subject the male dispatchers to same comprehensive testing and training which the female dispatchers were forced to complete in

order to serve as dispatchers. Searle voiced her objections to this practice to Streeter repeatedly, including, without limitation, on or after April, 2001.

16.    Upon information and belief, from 1994 through at least July, 2001, Streeter did not sponsor, and refused to sponsor, any female employees of the Salisbury Police Department for attendance at the intermittent academy – an eight week course covering certain public safety procedures -- other than one Kristen Kozacka in 2000 and perhaps one other female, who briefly served as a part-time special officer. He did sponsor several males during that time, upon information and belief. At no time between 2000 and 2002, upon information and belief, did Kozacka or the other female perform any paid details.    Kozacka eventually resigned from the Salisbury Police Department.

17.    On many occasions, including at least one occasion on or after April, 2001, Searle asked Chief Streeter to sponsor her for the intermittent academy, but he always refused to do so. Searle sought to attend the intermittent academy because she wanted to receive all of the benefits that the male officers and male dispatchers received.

18.    At no time did Streeter and/or the Salisbury Police Department inform Searle that she needed to attend the intermittent academy in order to be able to perform paid details.

19.    During Searle's tenure at the Salisbury Police Department, she noted that the Salisbury Police Department, through Streeter, subjected females, including, without limitation, Searle, to humiliation and degradation in the presence of co-workers for violating the dress code, which only applied to females. Not until November, 2001, after the MCAD action was filed pertaining to Searle's allegations, did Chief Streeter require the male dispatchers to adhere to the same dress code as the female dispatchers.

20.     Throughout her tenure, Searle observed that the Salisbury Police Department required female dispatchers meet a higher standard of work performance than male dispatchers and male police officers. The Salisbury Police Department, through its officers, agents, servants or employees, including, without limitation, Streeter routinely degraded, belittled and insulted the female dispatchers, including, without limitation, Searle. Streeter often referred to women as "sluts," despite the protests of Searle and other female dispatchers.

21.     During Searle's tenure, there were no female patrolmen in the Town of Salisbury Police Department.

22.     During the course of Searle's tenure, Chief Streeter made an effort to obtain various benefits for the male officers, such as computer equipment and extra overtime, without making any similar effort on behalf of the female dispatchers. Searle protested this unfair practice by voicing her objections to Streeter, but Streeter did not discontinue the practice.

23.     During the course of Searle's tenure, including  on or after April, 2001, Chief Streeter and Sgt. Sullivan failed to take steps to prevent male officers from verbally abusing female dispatchers over the police radio, despite the fact that the female dispatchers, including, without limitation, Searle, repeatedly brought this situation to his attention.

24.     From late 1999 or early 2000 through May 2001, Searle was subjected to various demeaning and insulting comments from Chief Streeter, often in the presence of her co-workers. He made demeaning comments about her looks and said other insults to her. In April or May, 2001, he told Searle that if her buttocks were any larger, he would need to purchase another dispatch chair. Searle told Streeter on numerous occasions that she objected to his harassing comments, but Streeter did not discontinue the practice.

25.    During her tenure, Searle did not observe Chief Streeter insult or humiliate male officers or male dispatchers in the presence of their peers.

26.    During the course of Searle's tenure, the Salisbury Police Department, through its officer, agents, servant or employee, Chief Streeter, treated males and females within the department differently in terms of wages and salaries in willful and continuing violation of the Federal Equal Pay Act, 29 U.S.C. 206(d) and 210, its Massachusetts counterpart, M.G.L. c. 149 §105A, Title VII, M.G.L. c. 151B and the Equal Protection Clause of the Fifth and Fourteenth Amendments to the United States Constitution. The Salisbury Police Department required females, including, without limitation, Searle, to adhere to waiting periods for pay raises, while males did not have to endure such waiting periods. The Salisbury Police Department hired new male dispatchers at the same rates of pay that the full time dispatchers received, without having to begin at the lower rate at which the women dispatchers were hired. The Salisbury Police Department afforded male dispatchers preference for open shifts ahead of full-time female dispatchers. As a result, the Salisbury Police Department paid female dispatchers, including, without limitation, Searle, less money and fewer benefits for equal work.

27.    On many occasions, Searle told Streeter that she objected to this practice of unequal pay and benefits, but Streeter did not discontinue the practice.

28.    In or around 1999, Searle grew concerned about the apparent shift away from quality police work to selfish concern about the amount each officer could earn in overtime and regular pay each year. Searle also noted a growing lack of respect shown by male officers to the female dispatchers on a daily basis. This derogatory attitude hampered Searle and the other female dispatchers in the completion of their duties.

29.    Searle raised these and other concerns to Chief Streeter, both orally and in writing, but he continually rebuked her. In response to one such effort on the part of Searle, Chief Streeter wrote, "Thanks Susan, but your opinion really isn't valued here. Thanks for trying however."

30.    In or around 2000, a full-time dispatcher at the Salisbury Police Department suffered injuries in a car accident, and was unable to work. In violation of the terms of the union contract, without affording proper notice or otherwise taking into account the current dispatchers, Chief Streeter altered the dispatch schedule in order to add two part-time male special officers as dispatchers, thereby eliminating opportunities for the female dispatchers to work overtime. At the same time, the two male special officers accumulated numerous overtime hours through a combination of dispatch shifts, construction details and patrol shifts. When Searle confronted Chief Streeter about the unfair situation, he said, in words or substance, "be glad that you still have a full time schedule."

31.    From approximately 2000 through July, 2001, including on or after April, 2001, Salisbury Police Department Inspector Richard Simmons, a close friend of Chief Streeter and the current interim Chief of the Salisbury Police Department, engaged in a pattern of sexual harassment of Susan Searle – a pattern which included, among other things, physical humiliation, offensive utterances, and other wrongful conduct which unreasonably interfered with Searle's work performance. The instances of distasteful and inappropriate conduct increased in 2001.

32.    On numerous occasions, including on or after April, 2001, Simmons attempted to place his hand down the front of Searle's uniform while she was sitting at her work station. Searle always verbally protested this conduct to both Simmons and Chief Streeter, and she moved Simmons' hand away.

33.    On several occasions, including, without limitation, on or after April, 2001, Simmons would relieve Searle of her duties at the dispatcher console while she took a break, and, upon her return from her break, he would remain seated and would plead with her to sit on his lap. Searle always verbally protested this conduct to both Simmons and Chief Streeter.

34.    Searle felt humiliated, embarrassed and ashamed by Simmons' wrongful conduct. Upon information and belief, at no time did the Salisbury Police Department take any steps to reprimand Simmons.

35.    In or around April, 2001, Searle heard Sergeant Kevin Sullivan of the Salisbury Police Department stating that no male officer would be laid off by the Town. He stated that the women would be laid off first because the men have careers.

36.    In June, 2001, Chief Streeter, while on his cell-phone, asked Searle, who was a union representative, why she was bothering to proceed with contract negotiations on behalf of the dispatchers because, according to Chief Streeter, there would be nothing left for "you girls" - referring to female dispatchers. He then laughed and told Searle that she was wasting her time, then labelled Searle's issues and requisitions "trivial".

37.    On July 24, 2001, Inspector Richard Simmons and Sergeant William Packer informed Searle that Officer Eugene Scione and Sergeant Sullivan had filed separate complaints against her, upon information and belief, falsely alleging that Searle had mishandled her dispatch duties.

38.    Upon information and belief, the complaints constituted an effort on the part of the Salisbury Police Department, through its officers, agents, servants or employees, to retaliate against Searle for, among other things, seeking equal treatment for males and females within the department and for accusing Simmons of engaging in sexual harassment toward her.

39.     On or about July 21, 2001, Searle last performed work on behalf of the Salisbury Police Department.

40.     On or about July 26, 2001, Searle forwarded a letter via certified mail to Chief Streeter responding to the unfounded and spurious allegations made against her.

41.     At or around that time, Searle was upset about an ongoing situation whereby, among other things, police officers in the Salisbury Police Department were responding rudely to her when, as a dispatcher, Searle was assigning them calls.

42.     On or about July 27, 2001, Searle called in sick and told an employee who took her call that she was traumatized by recent events, and she mentioned that she was going to see an attorney that day.

43.     On July 27, 2001, in an act of retaliation and without any basis therefor, Chief Streeter ordered Searle not to appear at the workplace for the next four days. Upon information and belief, Chief Streeter did so, in part, because Searle had told another employee that she had been traumatized and because Searle had mentioned to the employee that she was meeting with a lawyer.

44.     Upon information and belief, between July 27, 2001 and August 1, 2001, only *after* deciding to terminate Searle, Chief Streeter reviewed old records, logs and reports to compile a list of various allegedly wrongful acts which Searle had committed since 1998 in a wrongful effort to justify her termination.

45.     On or about August 1, 2001, Chief Streeter and Searle held a meeting arising out of Scione and Sullivan's allegations and her response thereto, in which she made further allegations of wrongful conduct within the department.

46.     At the meeting, Chief Streeter displayed a large three ring binder containing hundreds of pages of what he claimed to be incidents of wrongdoing on the part of Searle which were contained in her personnel file. Upon information and belief, Chief Streeter fabricated the contents of the binder in an effort to discriminate against, and retaliate against, Searle.

47.     Until that meeting, Searle was unaware of almost all of the incidents referenced in that three ring binder. The binder included at least one allegation pertaining to an incident which did not take place at the workplace during work hours. The binder also included incidents dating back to 1994, which was before she was rehired in 1998, and which could not have served, therefore, as a basis upon which she was terminated.  At that time, Searle requested a copy of her personnel file.

48.     At the time of the meeting, in an act of discrimination and retaliation, Chief Streeter even ordered Searle to visit a psychiatrist to see whether she was fit for duty.

49.     On or about August 1, 2001, Chief Streeter, without any basis or reason therefor, placed Searle on administrative leave, purportedly arising from an alleged 209A incident.

50.     Upon information and belief, the 209A incident was simply a pretext for Chief Streeter to attempt to dismiss or otherwise discipline Searle in a discriminatory and retaliatory manner.

51.     On or about August 29, 2001, Searle commenced a timely action with the Massachusetts Commission Against Discrimination.

52.     On September 20, 2001, not having received a copy of her personnel file as requested, Searle forwarded a letter to Chief Streeter via certified mail, return receipt requested, seeking a copy of her personnel file.

53.    M.G.L. c. 149 § 52C requires the employer to produce a copy of the personnel file within five business days of a written request for same.

54.    On or about November 27, 2001, in an act of retaliation and before Searle received her personnel file, the Town served a letter upon Searle giving her notice of a Pre-Disciplinary Hearing because of certain alleged "ongoing performance problems" and her alleged failure to comply with purported Salisbury Police Department policies regarding 209A orders.

55.    On December 7, 2001, more than two months after the written request was made and shortly before the then scheduled pre-disciplinary hearing, Chief Streeter finally provided Searle, through her counsel, with a copy of her personnel file. Moreover, upon information and belief, Chief Streeter turned over the requested personnel file only on the eve of the disciplinary hearing so as to prevent Searle from having the opportunity to defend herself consistent with concepts of due process.

56.    The file includes hundreds of documents covering alleged incidents dating back to approximately 1994, none of which had ever been made part of Searle's personnel file during the course of her work at the Salisbury Police Department. Upon information and belief, Chief Streeter, or one at his direction, fabricated certain documentation to reflect nonexistent fact in a fraudulent effort to discriminate and retaliate against Searle.

57.    At no time did the Salisbury Police Department or Streeter take any remedial, corrective or disciplinary of any kind with regard to the ongoing acts of gender discrimination and sexual harassment in the workplace at the Salisbury Police Department, despite Searle's ongoing protests.

58.     On or about January 25, 2002, Searle sought to amend her complaint with the MCAD to allege further acts.  That motion remains pending.

59.     On or about January 31, 2002, the Salisbury Police Department wrongfully, and without any basis therefor, discharged Searle.

60.     On or about March 31, 2004, Searle withdrew her MCAD action so that she could commence her matter in this Court.

## COUNT I

## UNLAWFUL GENDER AND SEX DISCRIMINATION M.G.L. 151B

## and M.G.L. c. 214 §1C

61.     Plaintiff repeats and realleges each of the factual allegations in paragraphs 1 through 60 above and incorporates them herein by reference.

62.     Searle believes and therefore avers that the Salisbury Police Department, through its officers, agents, servants or employees, including, without limitation, Chief Streeter, unlawfully and knowingly made a distinction and/or discriminated against her in one or more term(s), condition(s) and privilege(s) of employment, including, without limitation, by (1) discriminating against her and other female employees of the Salisbury Police Department by compensating females less than males for equal work in positions requiring equal skill effort and responsibility under similar working conditions, without any justifiable cause or basis therefor, (2) continuously fostering, creating and encouraging a hostile work environment in which females were subjected to verbal abuse, humiliation and disparate treatment solely on the basis of their gender, (3) engaging in sexually discriminatory intimidation, ridicule and insults which are so sufficiently severe or pervasive that they alter the conditions of employment and create an abusive work environment, (4) repeatedly, continuously, intentionally and in a hostile and

intimidating manner harassing her through a pattern of unwelcome sexual conduct, both in words and actions, in an effort to degrade and humiliate Searle and in a manner which affected her performance and the terms and conditions of her employment, and (5) failing to take steps to cease the sexual harassment and gender discrimination after receiving notice thereof, (6) failing to permit her to attend an intermittent academy or to handle paid details as did male employees, and (7) retaliating against her for making claims of discrimination, a practice which is forbidden under M.G.L. c. 151B and/or M.G.L. c. 214 §1C.

63.     Searle complained about the wrongful, harassing and discriminatory conduct of Streeter, Simmons and other employees of the Salisbury Police Department to the Salisbury Police Department, through its officers, agents, servants or employees, including, without limitation, Chief Streeter, all to no avail.

64.     At the time of making her complaints to the Salisbury Police Department, Searle reasonably and in good faith believed that various officers, agents, servants or employees of the Salisbury Police Department, including, without limitation, Streeter and Simmons, were engaged in wrongful discrimination and harassment.

65.     Searle acted reasonably in response to that belief in opposing Defendant Salisbury Police Department's discriminatory practices, all of which are and were then forbidden under M.G.L. c. 151B and/or M.G.L. c. 214 §1C.

66.     Searle believes, and therefore avers, that the Defendant Salisbury Police Department terminated her employment solely on the basis of her sex and/or the Defendants' desire to retaliate for her claims of discrimination.

67.    The Defendants, in breach of the terms of that employment contract, refuse and have refused to allow Ms. Searle to continue her employment with the Salisbury Police Department.

68.    As a direct proximate result of the discrimination and harassment, as alleged herein, Searle has suffered, and will continue to suffer, severe and substantial financial losses, emotional distress, mental anguish, physical injury, lost wages, harm to reputation and other damages.

**WHEREFORE**, the Plaintiff, Susan Searle, demands judgment against the Defendants for damages sustained, together with interest, costs and attorneys' fees, and such other damages as this Court may award.

## COUNT II

### UNLAWFUL GENDER AND SEX DISCRIMINATION
### Title VII of the Civil Rights Act of 1964
### 42 U.S.C. §2000e-2(a)(1)

69.    Plaintiff repeats and realleges each of the factual allegations in paragraphs 1 through 68 above and incorporates them herein by reference.

70.    Searle believes and therefore avers that the Salisbury Police Department, through its officers, agents, servants or employees, including, without limitation, Chief Streeter, unlawfully and knowingly made a distinction and/or discriminated against her in one or more term(s), condition(s) and privilege(s) of employment, including, without limitation, by (1) discriminating against her and other female employees of the Salisbury Police Department by compensating females less than males for equal work in positions requiring equal skill effort and responsibility under similar working conditions, without any justifiable cause or basis therefor, (2) continuously fostering, creating and encouraging a hostile work environment in which

females were subjected to verbal abuse, humiliation and disparate treatment solely on the basis of their gender, (3) engaging in sexually discriminatory intimidation, ridicule and insults which are so sufficiently severe or pervasive that they alter the conditions of employment and create an abusive work environment,(4) repeatedly, continuously, intentionally and in a hostile and intimidating manner harassing her through a pattern of unwelcome sexual conduct, both in words and actions, in an effort to degrade and humiliate Searle and in a manner which affected her performance and the terms and conditions of her employment, (5) failing to permit her to attend an intermittent academy or to handle paid details as did male employees, and (6) failing to take steps to cease the sexual harassment and gender discrimination after receiving notice thereof, and (7) retaliating against her for making claims of discrimination, a practice which is forbidden under Title VII.

71.     Searle complained about the wrongful conduct of Streeter, Simmons and other employees of the Salisbury Police Department to the Salisbury Police Department, through its officers, agents, servants or employees, including, without limitation, Chief Streeter.

72.     At the time of making her complaints to the Salisbury Police Department, Searle reasonably and in good faith believed that various officers, agents, servants or employees of the Salisbury Police Department, including, without limitation, Streeter and Simmons, were engaged in wrongful discrimination and harassment.

73.     Searle acted reasonably in response to that belief in opposing Defendant Salisbury Police Department's discriminatory practices, all of which are and were then forbidden under Title VII.

74.     Searle believes, and therefore avers, that the Defendant Salisbury Police Department terminated her employment solely on the basis of her sex and/or the Defendants' desire to retaliate for her claims of discrimination.

75.     The Defendants, in breach of the terms of that employment contract, refuse and have refused to allow Searle to continue her employment with the Salisbury Police Department.

76.     As a direct proximate result of the discrimination and harassment, as alleged herein, Searle has suffered, and will continue to suffer, severe and substantial financial losses, emotional distress, mental anguish, physical injury, lost wages, harm to reputation and other damages.

**WHEREFORE**, the Plaintiff, Susan Searle, demands judgment against the Defendants for damages sustained, together with interest, costs and attorneys' fees, and such other damages as this Court may award.

## COUNT III
### FEDERAL EQUAL PAY ACT
### 29 U.S.C. §§206(d), 216

77.     Plaintiff repeats and realleges each of the factual allegations in paragraphs 1 through 76 above and incorporates them herein by reference.

78.     Searle believes and therefore avers that the Salisbury Police Department, through its officers, agents, servants or employees, including, without limitation, Chief Streeter, unlawfully and knowingly made a distinction and/or discriminated against her in one or more term(s), condition(s) and privilege(s) of employment, including, without limitation, by continually and willfully discriminating against her and other female employees of the Salisbury Police Department by compensating females less than males for equal work in positions requiring equal skill effort and responsibility under similar working conditions, without any