UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 2004CV10791RCL

SUSAN SEARLE,
    Plaintiff,
v.

TOWN OF SALISBURY, SALISBURY
POLICE DEPARTMENT, and LAWRENCE
STREETER,
    Defendants

DEFENDANTS' STATEMENT OF
MATERIAL FACTS TO WHICH
THERE IS NO GENUINE ISSUE
PURSUANT TO LOCAL RULE 56.1

Defendants, Town of Salisbury (hereinafter, "Town"), Salisbury Police Department (hereinafter, "Department") and Lawrence Streeter (hereinafter, "Streeter") hereby set forth their Statement of Material Facts To Which There Is No Genuine Issue pursuant to Local Rule 56.1.

1. The defendant, Lawrence Streeter (hereinafter, "Streeter"), served as the Town's Police Chief from May 1989 until his retirement from the Town's employ on December 31, 2002. Streeter Affidavit at ¶1.

2. The plaintiff, Susan Searle (hereinafter, "Searle"), was hired by the Town of Salisbury (hereinafter, "Town") as a police dispatcher in its Police Department (hereinafter, "Department") in 1994, but later resigned sometime in 1996. She was later rehired as a dispatcher sometime in 1998, but was subsequently terminated from her employment effective January 31, 2002. Searle Deposition at 15, 76; Streeter Affidavit at ¶6.

3. At all times relevant, the Department was overseen by the Chief of Police and employed both full-time police officers and reserve and seasonal police officers (hereinafter, "reserve officers"), as well as police dispatchers. Streeter Affidavit at ¶2.

4. The term "special police officer" was a generic term that was used to refer to a variety of positions in the Department including seasonal police officers, dispatchers, matrons and

traffic/meter enforcers.  This was somewhat of a misnomer, however, as among this group only the seasonal officers were trained and certified as true "police officers," as that term is commonly understood, and only the seasonal officers were police academy trained and possessed the legal authority to make arrests.  Streeter Affidavit at ¶3.

5. The appointing authority for Department employees is the Town Manager who, at the time of Searle's termination, was Timothy P. McInerney.  Streeter Affidavit at ¶5.

6. At all times relevant, Richard Simmons (hereinafter, "Simmons") held the position of Inspector in the Department. Streeter Affidavit at ¶7.

7. In his capacity as Inspector, Simmons served as one of the Department's Internal Affairs investigators and was responsible for investigating allegations of employee misconduct within the Department.  Streeter Affidavit at ¶8.

8. As Inspector, Simmons did not possess any authority to hire, fire, promote, demote, transfer or discipline employees in the Department.  Streeter Affidavit at ¶9.

9. Successful completion of the full-time Police Academy was only one of the requirements to become a full-time police officer with the Town.  Streeter Affidavit at ¶10.

10. Successful completion of the part-time intermittent Police Academy was only one of the requirements to become a reserve police officer with the Town.  Streeter Affidavit at ¶11.

11. Reserve officers possessed the same powers of arrest as full-time police officers.  Streeter Affidavit at ¶14.

12. In addition to their regular police patrol shifts, full-time police officers regularly worked paid details which primarily consisted of construction and traffic details.  Streeter Affidavit at ¶12.

13. Reserve officers were utilized by the Department on an as needed basis to backfill full-time officer patrol shift vacancies and to fill details that could not be filled by the Department using full-time officers.  Streeter Affidavit at ¶13.

14. When filling full-time officer patrol shift vacancies, reserve officers were responsible for the same duties that the full-time officers were responsible for including, but not limited to, patrolling the community, responding to emergency calls for assistance, making arrests when necessary and, in general, maintaining the public safety and enforcing the laws of the Commonwealth. Streeter Affidavit at ¶14.

15. When working details, reserve officers were responsible, like full-time officers, for monitoring traffic control, maintaining the public safety, enforcing the law and, if necessary, making arrests and responding to emergencies that may arise at the site of the detail or throughout the community, if needed. Streeter Affidavit at ¶15.

16. In order to work paid details for the Department during Streeter's tenure as Chief, the individual had to have successfully graduated from the police academy and be a full-time or reserve police officer with full police powers.  Streeter Affidavit at ¶16.

17. The only individuals Streeter permitted to work details were full-time and reserve patrol officers who had successfully completed their police academy training and who possessed full police powers.  Streeter Affidavit at ¶18.

18. In addition to working patrols and details, reserve officers were also utilized on an as needed basis to fill in for dispatchers.  Streeter Affidavit at ¶18.

19. The duties of a dispatcher included accepting initial communications into the Department whether they were received in person, in writing or over the telephone.  After receiving the initial communication, dispatchers were responsible for identifying and extracting the

    critical information and generating a report in the Department's computer system summarizing the matter. That report was then forwarded to the appropriate police personnel for action. If the matter being reported was of a non-emergency nature, but nonetheless required immediate attention in the dispatcher's judgment, the dispatcher was responsible for radioing a police officer to come to the station to pick up the report and handle it. If the matter being reported was an emergency, the dispatcher was to radio an officer and dispatch that officer to the location of the emergency. After dispatching an officer, the dispatcher was required to keep that officer apprised of all facts relevant to the officer's safety and the officer's response to the call. In addition, dispatchers were responsible for performing computer searches in various police related databases. They were also required to maintain a log of the calls that they received which included all information that was pertinent to the call and the action that was taken with respect to same. In essence, dispatchers served as the critical communication link between the public and police officers and between police officers and the Department. Streeter Affidavit at ¶19.

20. At all times relevant, the Department maintained a policy which required employees in the police officer and dispatcher positions to wear a specified uniform. Streeter Affidavit at ¶20.

21. The dispatcher uniform included a white shirt, badge, police patch, seasonal neck tie and black or navy pants. Streeter Affidavit at ¶21.

22. The reserve officer uniform was substantially similar to the dispatcher uniform except they wore a blue shirt instead of a white shirt. Streeter Affidavit at ¶22.

23. On two (2) occasions, Searle asked Streeter if she could work paid details. In response, Streeter advised her that if she wanted to perform details, she needed to fill out an application to become a reserve police officer with the Department and go through the hiring process. Streeter Affidavit at ¶23; Searle Deposition at 151-52.

24. Searle did not possess any police academy training and did not have any police powers. Streeter Affidavit at 24; Searle Deposition at 118; 160.

25. At no time during her tenure did Searle ever submit an application to become a reserve police officer. Streeter Affidavit at 25; Searle Deposition at 160-62.

26. The reason she did not do so was because she had no interest in becoming a police officer and working the police patrols that would have accompanied same. Searle Deposition at 160-62.

27. Sometime during Searle's second tenure with the Department (1998-2001), Jennifer Skelton, a female, applied to the Department to become a reserve police officer, was hired by the Town in such capacity and was sent to the Police Academy by Streeter. Streeter Affidavit at 26.

28. Sometime during Searle's second tenure with the Department (1998-2001), Kristen Kozacka, a female meter enforcer employed by the Department, asked Streeter to sponsor her to attend the police academy. It was Streeter's understanding that she did so to enhance her resume and her ability to eventually obtain a police officer position with the Town or some other community. This request was granted by Streeter. Streeter Affidavit at ¶27.

29. All individuals that were employed by the Town as full-time police dispatchers were members of a collective bargaining unit for which the American Federation of State,

5

County and Municipal Employees, Council 93, Local 939 ("AFSCME" or "Union") served as the exclusive bargaining agent with respect to their wages, hours and other terms and conditions of employment. Streeter Affidavit at ¶28; Exhibit A at 4.

30. The rates of pay and other terms and conditions for individuals employed by the Town as full-time police dispatchers, including Searle, were set by the terms of the CBA. Exhibit A at 15.

31. To the extent there was any variation between the rates of pay full-time dispatchers received, the variations were based on the individuals' years of service with the Department as specified in Article 26 of the CBA. Exhibit A at 15.

32. In addition to their wages, full-time dispatchers also were entitled under the CBA to receive additional benefits such as paid sick, vacation, bereavement and personal leave, longevity pay, health insurance benefits, holiday pay, and a sick leave buyback benefit. Exhibit A at 11-15.

33. Reserve officers, on the other hand, were not covered by the CBA and were essentially per diem employees who were paid an hourly rate for actual time worked who were not entitled to receive fringe benefits such as paid sick, vacation, bereavement or personal leave, longevity pay, health insurance benefits, holiday pay, or sick leave buyback. Streeter Affidavit at ¶29; Exhibit A at 4.

34. In addition to full-time dispatchers, the Town also employed a limited number of part-time dispatchers. The part-time dispatchers were not members of the AFSCME bargaining unit, but instead were essentially per diem employees who were paid an hourly rate for actual time worked who were not entitled to receive fringe benefits such

as paid sick, vacation, bereavement or personal leave, longevity pay, health insurance benefits, holiday pay, or sick leave buyback. Streeter Affidavit at ¶30; Exhibit A at 4.

35. The Town did not employ any full-time or part-time male police dispatchers while Searle was actively working there, i.e. prior to her being placed on administrative leave in July 2001. Streeter Affidavit at ¶31; Searle Deposition at 160-61; 190.

36. To the extent that males performed any dispatcher functions during the time that Searle was actively working there, the individuals who did so were reserve police officers. Streeter Affidavit at ¶32; Searle Deposition at 160-61.

37. Beginning in December 1996, Streeter instituted a formal sexual harassment policy which he subsequently reviewed, revised and reposted in March 1998, December 1999 and in and around January 2001. Streeter Affidavit at ¶33; see Exhibit B at 6.

38. A copy of the policy and any subsequently revised versions were issued by the Department to all personnel, including Searle, and were posted in the main lobby of the Department. Streeter Affidavit at 34; Searle Deposition at 38; 116-17.

39. A mandatory Department-wide professional behavior training that focused on various forms of potential harassment and sensitivity issues was given in approximately February 2001. Streeter Affidavit at 35; see Searle Deposition at 114.

40. On or about July 4, 2001, Patrolman Eugene Scione filed a report with Streeter alleging that Searle had been discourteous toward him. Streeter Affidavit at 36.

41. On or about July 5, 2001, Sergeant Kevin Sullivan filed a report with Streeter alleging that on or about that same date Searle had failed to assign an officer to a call for service and further alleged that Searle was evasive and less than forthright when he questioned her about the incident. Streeter Affidavit at 37.

42. On or about July 11, 2001, Streeter received a report from the Town's Fire Chief regarding an allegation that Searle had negligently delayed relaying an emergency call to the fire dispatcher which Streeter assigned to Internal Affairs to investigate. Streeter Affidavit at 38.

43. On July 24, 2001, Searle was interviewed by Simmons and Sergeant William Packer in connection with the complaints that were made against her by Scione and Sullivan. Streeter Affidavit at ¶39.

44. Searle's two (2) scheduled days off followed (July 25 and July 26) and then on July 27, 2001, she called in sick. Streeter Affidavit at ¶40.

45. As her reason for doing so, Searle stated that she was traumatized by the complaints that Sullivan and Scione had made against her. Streeter Affidavit at ¶41.

46. As a result of Searle's statements about being traumatized, Streeter placed Searle on paid administrative leave that same day and referred her for a psychological fitness for duty evaluation. Streeter Affidavit at ¶42.

47. On August 1, 2001, Streeter met with Searle to discuss with her issues regarding her work performance. Streeter Affidavit at ¶43.

48. At said meeting, Streeter presented Searle with a three-ring binder that contained copies of various documents he had compiled regarding her performance over the years. Streeter Affidavit at ¶44.

49. The majority of the documents contained handwritten notes from Streeter to Searle pointing out or questioning why certain information was not present in the dispatcher log or why certain action was not taken by Searle, including not assigning officers to calls,

    not entering vehicle tow information in the log or not including other information in the log that should have been included.  Streeter Affidavit at ¶45.

50. On August 2, 2001, Streeter issued Searle a memorandum summarizing the performance issues he discussed with her.  In the "conclusion" portion of the memorandum, Streeter wrote as follows: "By virtue of this correspondence, please be advised that continued performance issues, of the same, like or similar nature, as has been articulated herein, will lead to probable suspension and potential/possible employment termination."  Streeter Affidavit at ¶46; Exhibit C.

51. On or about August 8, 2001, while Searle was still on paid administrative leave and the results of the psychological exam were still pending, Streeter sent Searle a memorandum in which he advised her that it had come to his attention that, on or about July 22, 2001, she was alleged to have initiated a 209A restraining order process for her daughter while she was on duty as a dispatcher for the Department without authorization.  Streeter advised Searle that he had assigned Packer and Simmons to investigate the allegation and that she would remain on administrative leave pending the outcome of same.  He also indicated that, if substantiated, the allegation could affect her continued employment with the Town.  Streeter Affidavit at ¶47; Exhibit D.

52. Under the Department's rules and regulations, dispatchers are not permitted to unilaterally initiate the 209A process, but instead must receive authorization from an officer to do so.  Streeter Affidavit at ¶48; Searle Deposition at 92-100.

53. On or about August 13, 2001, Internal Affairs exonerated Searle in connection with the Fire Chief's complaint that she had failed to relay a call for emergency services to the fire dispatcher in a timely fashion.  Streeter Affidavit at ¶49.

54. On or about August 17, 2001, Internal Affairs substantiated the allegation of failure to assign an officer that had been filed against Searle by Sullivan. Streeter Affidavit at ¶50.

55. On or about August 29, 2001, Searle filed a charge against the Town at the Massachusetts Commission Against Discrimination in which she alleged that she had been discriminated against on the basis of her gender. Specifically, Searle alleged that she had been denied the ability to work details because she was a woman, that Streeter had made statements to the effect that women would never work details in the Department, that Streeter discounted her opinion because she is a woman, that she had been told by other members of the Department that women would be laid off before men because "men have careers" and that false complaints had been filed against her within the Department. Streeter Affidavit at ¶51; Exhibit E.

56. Prior to filing her initial complaint at the MCAD, Searle had not filed any complaints with the Town about Streeter's use of the word "sluts" nor had she advised Streeter or any Town officials that Simmons had been referring to her as a "slut", had attempted to place his hand down her shirt, had invited her to sit on his lap or that he had exposed himself to her. Searle Deposition at 205; 227-38; Streeter Affidavit at ¶53.

57. On October 30, 2001, Searle was interviewed by Packer and Simmons in connection with the 209A issue. Ultimately, Packer and Simmons concluded that Searle did in fact initiate the 209A process for her daughter while on duty as a dispatcher without prior authorization. Streeter Affidavit at ¶53.

58. Searle does not dispute that she obtained a 209A restraining order on behalf of her daughter without receiving the express permission of a police officer. Searle Deposition at 280-86.

59. By letter dated November 27, 2001, the Town notified Searle that a hearing had been scheduled to determine if there was just cause to discipline her, up to and including termination of her employment, as a result of the following stated allegations:

> You have had ongoing serious performance problems during your employment with the Department. Your infractions include, among other violations, failing to assign officers to calls, giving improper, inaccurate, or incomplete information to officers responding to calls, failing to completely and accurately fill out police logs, and insubordination. The Police Department recently sustained a complaint filed by Sergeant Sullivan that you failed to assign an officer to a call for service and that your answers were evasive when you were questioned about this. I am enclosing a chart that summarizes your disciplinary history with the Department.
>
> You have failed to comply with Police Department policy in the recording and issuance of an emergency G.L. c. 209A restraining order involving a family member.
>
> Despite numerous counseling sessions and several letters of formal counseling/reprimands, your performance problems have continued unabated. You are unable to carry out your duties in a competent, adequate manner.
>
> Exhibit F at 1.

60. On or about December 21, 2001, Searle filed a motion to amend her charge with the MCAD. Specifically, Searle sought to add Streeter as a respondent to her discrimination charge and to raise additional allegations including claims that Streeter was discriminating against her on the basis of her gender in that female dispatchers received unequal pay in comparison to male dispatchers, that male dispatchers were not required to adhere to the dress code, that male dispatchers were being allowed to work details, but females were not and that the Town and Streeter were retaliating against her by bringing disciplinary charges against her. Exhibit G.

61. On January 3, 2002, the disciplinary hearing on the charges identified in the Town Manager's November 27, 2001 letter was held. While Streeter testified at the hearing, Searle elected not to and did not call any witnesses on her behalf. Streeter Affidavit at ¶56-57.

62. By letter from the Town Manager dated January 30, 2002, Searle's employment was terminated for the following stated reasons:

> It is clear that upon hiring her in 1998, the Police Chief had clear expectations of her duties and responsibilities. After being employed a short time, a number of sessions of informal counseling were documented. This included: arriving late for shifts, smoking in unauthorized areas, filing incomplete/improper reports, misusing her position to make a 209A for a family member, and failing to assign officers to calls.
>
> All of the above-mentioned well documented incidents support a decision to terminate Ms. Searle. However, the most disturbing charge against Ms. Searle is her repeated failure to assign officers to calls. Dispatchers do not hold authority to make decisions about assigning calls. Ms. Searle has a duty to assign calls to officers and other public safety personnel.
>
> By not assigning calls, Ms. Searle put the community at risk and posed a threat to public safety. Despite receiving repeated counseling on the importance of assigning officers to calls, Ms. Searle continues to fail to assign officers to calls. This, combined with her performance history and most recent violation of Departmental procedure in obtaining 209A orders, convinces me that Ms. Searle does not appreciate the great responsibility associated with her position. There is no basis to conclude that Ms. Searle's performance will improve, as she has been given numerous attempts to rectify her performance issues and failed to do so. Ms. Searle's performance problems have resulted in an unjustifiable risk to public safety.
>
> After reviewing the information presented at the hearing on January 3, 2002, I find that there is just cause to terminate Ms. Searle and agree with the recommendation of Police Chief Streeter. The effective date of termination is January 31, 2002.
>
> Exhibit H at 2.

63. On or about February 8, 2002, Searle, with the assistance of the Union, filed a grievance with the Town asserting that she had been terminated from her dispatcher position

without just cause in violation of Article 25 of the CBA. Streeter Affidavit at ¶59; Exhibit I.

64. On or about March 21, 2002, the Union processed Searle's termination grievance to arbitration. Streeter Affidavit at ¶60; Exhibit J.

65. At present, Searle's termination grievance is still pending. Streeter Affidavit at ¶61; Searle Deposition at 314-15.

66. On or about March 31, 2004, Searle withdrew her charge from the MCAD, pursuant to G.L. c. 151B, §9, and filed her Complaint in this matter against the Town and Streeter in Superior Court. See Complaint.

67. On or about April 21, 2004, Defendants removed the case to Federal Court pursuant to 28 U.S.C. §1446(d).

68. A review of the record in this matter does not reveal that Searle ever served the Town with a presentment letter pursuant to M.G.L. c. 258.

69. A review of the record does not reveal that Searle ever received the requisite right-to-sue letter from the Equal Employment Opportunity Commission in connection with her Title VII claims against Defendants or that if said agency failed to take action on her complaint, that she filed the instant action within the requisite time period.

DEFENDANTS,

TOWN OF SALISBURY, SALISBURY POLICE DEPARTMENT AND LAWRENCE STREETER,

By their attorneys,

/s/ David C. Jenkins

/s/ Joseph S. Fair
David C. Jenkins (BBO# 251000)
Joseph S. Fair (BBO#637818)
Kopelman and Paige, P.C.
 Town Counsel
101 Arch Street, 12th Floor
Boston, MA 02110
Dated: July 28, 2006                    (617) 556-0007

288355/60700/0143