UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 2004CV10791RCL

SUSAN SEARLE,
    Plaintiff,

v.

TOWN OF SALISBURY, SALISBURY
POLICE DEPARTMENT, and LAWRENCE
STREETER,
    Defendants

AFFIDAVIT OF LAWRENCE
STREETER

Now comes the undersigned and hereby deposes and states as follows:

1.  My name is Lawrence Streeter.  I am currently the Chief of the Newton, NH Police

    Department.  Prior to taking my current position, I served as the Chief of the Town of

    Salisbury's (hereinafter, "Town") Police Department (hereinafter, "Department") from

    May 1989 until I retired from the Town's employ on December 31, 2002.

2.  During my time as Chief, the Department was overseen by me and employed both full-

    time police officers and reserve and seasonal police officers (collectively hereinafter,

    "reserve officers"), as well as police dispatchers.

3.  The term "special police officer" was a generic term that was used to refer to a variety of

    positions in the Department including seasonal police officers, dispatchers, matrons and

    traffic/meter enforcers.  This was somewhat of a misnomer, however, as among this

    group only the seasonal officers were trained and certified as true "police officers," as

    that term is commonly understood, and only the seasonal officers were police academy

    trained and possessed the legal authority to make arrests.

4.  Reserve officers possessed the same powers of arrest as full-time police officers.

5.  The appointing authority for Department employees is the Town Manager.  For the period of 2001-2002, Timothy P. McInerney held that position with the Town.

6.  Susan Searle was hired by the Town as a dispatcher in and around 1994, but later resigned sometime in 1996.  She was later rehired as a dispatcher sometime in 1998, but was subsequently terminated from her employment effective January 31, 2002.

7.  During my tenure as Chief, Richard Simmons (hereinafter, "Simmons") held the position of Inspector in the Department.

8.  In his capacity as Inspector, Simmons served as one of the Department's Internal Affairs investigators and was responsible for investigating allegations of employee misconduct within the Department.

9.  As Inspector, Simmons did not possess any authority to hire, fire, promote, demote, transfer or discipline employees in the Department.

10. Successful completion of the full-time Police Academy was only one of the requirements to become a full-time police officer with the Town.

11. Successful completion of the part-time intermittent Police Academy was only one of the requirements to become a reserve police officer with the Town.

12. In addition to their regular police patrol shifts, full-time police officers regularly worked paid details which primarily consisted of construction and traffic details.

13. Reserve officers were utilized by the Department on an as needed basis to backfill full-time officer patrol shift vacancies and to fill details that could not be filled by the Department using full-time officers.

14. When filling full-time officer patrol shift vacancies, reserve officers were responsible for the same duties that the full-time officers were responsible for including, but not limited

to, patrolling the community, responding to emergency calls for assistance, making

arrests when necessary and, in general, maintaining the public safety and enforcing the

laws of the Commonwealth.

15. When working details, reserve officers were responsible, like full-time officers, for

monitoring traffic control, maintaining the public safety, enforcing the law and, if

necessary, making arrests and responding to emergencies that may arise at the site of the

detail or throughout the community, if needed.

16. In order to work paid details for the Department during my tenure as Chief, the individual

had to have successfully graduated from the police academy and be a full-time or reserve

police officer with full police powers.

17. The only individuals I permitted to work details were full-time and reserve patrol officers

who had successfully completed their police academy training and who possessed full

police powers.

18. In addition to working patrols and details, reserve officers were also utilized on an as

needed basis to fill in for dispatchers.

19. The duties of a dispatcher included accepting initial communications into the Department

whether they were received in person, in writing or over the telephone.  After receiving

the initial communication, dispatchers were responsible for identifying and extracting the

critical information and generating a report in the Department's computer system

summarizing the matter.  That report was then forwarded to the appropriate police

personnel for action.  If the matter being reported was of a non-emergency nature, but

nonetheless required immediate attention in the dispatcher's judgment, the dispatcher was

responsible for radioing a police officer to come to the station to pick up the report and

handle it.  If the matter being reported was an emergency, the dispatcher was to radio an

officer and dispatch that officer to the location of the emergency.  After dispatching an

officer, the dispatcher was required to keep that officer apprised of all facts relevant to

the officer's safety and the officer's response to the call.  In addition, dispatchers were

responsible for performing computer searches in various police related databases.  They

were also required to maintain a log of the calls that they received which included all

information that was pertinent to the call and the action that was taken with respect to

same.  In essence, dispatchers served as the critical communication link between the

public and police officers and between police officers and the Department.

20. At all times relevant, the Department maintained a policy which required employees in

the police officer and dispatcher positions to wear a specified uniform.

21. The dispatcher uniform included a white shirt, badge, police patch, seasonal neck tie and

black or navy pants.

22. The reserve officer uniform was substantially similar to the dispatcher uniform except

they wore a blue shirt instead of a white shirt.

23. On two (2) occasions, Searle asked me if she could work paid details.  In response, I

advised her that if she wanted to perform details, she needed to fill out an application to

become a reserve police officer with the Department and go through the hiring process.

24. Searle did not possess any police academy training and did not have any police powers.

25. At no time during her tenure did Searle ever submit an application to become a reserve

police officer nor did she ever submit a request to me to sponsor her at the police

academy.

26. Sometime during Searle's second tenure with the Department (1998-2001), Jennifer

Skelton, a female, applied to the Department to become a reserve police officer, was sent

to the Police Academy by me and was hired by the Town in such capacity.

27. Sometime during Searle's second tenure with the Department (1998-2001), Kristen

Kozacka, a female meter enforcer employed by the Department, asked me to sponsor her

to attend the police academy. It was my understanding that she did so to enhance her

resume and her ability to eventually obtain a police officer position with the Town or

some other community. This request was granted by me.

28. All individuals that were employed by the Town as full-time police dispatchers were

members of a collective bargaining unit for which the American Federation of State,

County and Municipal Employees, Council 93, Local 939 ("AFSCME" or "Union")

served as the exclusive bargaining agent with respect to their wages, hours and other

terms and conditions of employment. The rates of pay and other terms and conditions for

individuals employed by the Department as full-time dispatchers, including Searle, were

set by the terms of the collective bargaining agreement between the Town and the Union.

A true and accurate copy of the July 1, 1998 – June 30, 2001 CBA between the Town and

the Union is attached to Defendants' Summary Judgment Memorandum as Exhibit A.

29. Reserve police officers, on the other hand, were essentially per diem employees who

were paid an hourly rate for actual time worked who were not entitled to receive fringe

benefits such as paid sick, vacation, bereavement or personal leave, longevity pay, health

insurance benefits, holiday pay, or sick leave buyback.

30. In addition to full-time dispatchers, the Town also employed a limited number of part-

time dispatchers. The part-time dispatchers were not members of the AFSCME

bargaining unit, but instead were essentially per diem employees who were paid an hourly rate for actual time worked who were not entitled to receive fringe benefits such as paid sick, vacation, bereavement or personal leave, longevity pay, health insurance benefits, holiday pay, or sick leave buyback.

31. The Town did not employ any full-time or part-time male police dispatchers while Searle was actively working there, i.e. prior to her being placed on administrative leave in July 2001.

32. To the extent that males performed any dispatcher functions during the time that Searle was actively working at the Department, the individuals who did so were reserve police officers.

33. Beginning in December 1996, I instituted a formal sexual harassment policy which I subsequently reviewed, revised and reposted in March 1998, December 1999 and in and around January 2001.  A true and accurate copy of the policy is attached to Defendants' Summary Judgment Memorandum as Exhibit B.

34. A copy of the policy and any subsequently revised versions were issued by the Department to all personnel, including Searle, and were posted in the main lobby of the Department.

35. A mandatory Department-wide professional behavior training that focused on various forms of potential harassment and sensitivity issues was given by the Department in approximately February 2001.

36. On or about July 4, 2001, Patrolman Eugene Scione (hereinafter, "Scione") filed a report with me alleging that Searle had been discourteous toward him.  I assigned this matter Internal Affairs to investigate.

37. On or about July 5, 2001, Sergeant Kevin Sullivan (hereinafter, "Sullivan") filed a report with me alleging that on or about that same date, Searle had failed to assign an officer to a call for service and further alleged that Searle was evasive and less than forthright when he questioned her about the incident.  I assigned this matter Internal Affairs to investigate.

38. On or about July 11, 2001, I received a report from the Town's Fire Chief regarding an allegation that Searle had negligently delayed relaying an emergency call to the fire dispatcher.  I assigned this matter Internal Affairs to investigate.

39. On July 24, 2001, Searle was interviewed by Simmons and Sergeant William Packer in connection with the complaints that were made against her by Scione and Sullivan.

40.  Searle's two (2) scheduled days off followed that interview (July 25 and July 26) and then on July 27, 2001, she called in sick.

41. As her reason for doing so, I was advised that Searle stated that she was traumatized by the complaints that Sullivan and Scione had made against her.

42. As a result of Searle's statements about being traumatized, I placed Searle on paid administrative leave that same day and referred her for a psychological fitness for duty evaluation.

43. On August 1, 2001, I met with Searle to discuss with her issues regarding her work performance.

44. At that meeting, I presented Searle with a three-ring binder that contained copies of various documents I had compiled regarding her performance over the years.

45. The majority of the documents contained handwritten notes from me to Searle pointing out or questioning why certain information was not present in the dispatcher log or why

certain action was not taken by Searle, including not assigning officers to calls, not entering vehicle tow information in the log or not including other information in the log that should have been included.

46. On August 2, 2001, I issued Searle a memorandum summarizing the performance issues I discussed with her.  A true and accurate copy of that memorandum is attached to Defendants' Summary Judgment Memorandum as Exhibit C.

47. On or about August 8, 2001, while Searle was still on paid administrative leave and the results of the psychological exam were still pending, it came to my attention that, on or about July 22, 2001, Searle initiated a 209A restraining order process for her daughter while she was on duty as a dispatcher for the Department without authorization.  As a result, I sent Searle a memorandum advising her of these allegations and informing her that I had assigned Packer and Simmons to investigate the matter and that she would remain on administrative leave pending the outcome of the investigation.  I also indicated that, if substantiated, the allegation could affect her continued employment with the Town.  A true and accurate copy of that memorandum is attached to Defendants' Summary Judgment Memorandum as Exhibit D.

48. Under the Department's rules and regulations, dispatchers are not permitted to unilaterally initiate the 209A process, but instead must receive authorization from an officer to do so.

49. On or about August 13, 2001, Internal Affairs exonerated Searle in connection with the Fire Chief's complaint that she had failed to relay a call for emergency services to the fire dispatcher in a timely fashion.

50. On or about August 17, 2001, Internal Affairs substantiated the allegation of failure to assign an officer that had been filed against Searle by Sullivan.

51. On or about August 29, 2001, Searle filed a charge against the Town at the Massachusetts Commission Against Discrimination (hereinafter, "MCAD") in which she alleged that she had been discriminated against on the basis of her gender. A true and accurate copy of Searle's Charge of Discrimination is attached to Defendants' Summary Judgment Memorandum as Exhibit E.

52. Prior to filing her initial complaint at the MCAD, Searle had not complained to me, or to my knowledge, to any Town or Department officials about any discriminatory or harassing conduct.

53. On October 30, 2001, Searle was interviewed by Packer and Simmons in connection with the 209A investigation. Ultimately, Packer and Simmons concluded that Searle did in fact initiate the 209A process for her daughter while on duty as a dispatcher without prior authorization.

54. By letter dated November 27, 2001, the Town notified Searle that a hearing had been scheduled to determine if there was just cause to discipline her, up to and including termination of her employment, as a result of the various allegations identified in the letter. A true and accurate copy of the Town's notice of hearing is attached to Defendants' Summary Judgment Memorandum as Exhibit F.

55. On or about December 21, 2001, Searle filed a motion to amend her charge with the MCAD. A true and accurate copy of Searle's motion to amend is attached to Defendants' Summary Judgment Memorandum as Exhibit G.

56. On January 3, 2002, the disciplinary hearing on the charges identified in the Town Manager's November 27, 2001 letter was held.

57. I attended and testified at the hearing, but Searle elected not to and did not call any witnesses on her behalf.

58. By letter from the Town Manager dated January 30, 2002, Searle's employment was terminated. A true and accurate copy of the notice of termination is attached to Defendants' Summary Judgment Memorandum as Exhibit H.

59. On or about February 8, 2002, Searle, with the assistance of the Union, filed a grievance with the Town asserting that she had been terminated from her dispatcher position without just cause in violation of Article 25 of the CBA. A true and accurate copy of the grievance is attached to Defendants' Summary Judgment Memorandum as Exhibit I.

60. On or about March 21, 2002, the Union processed Searle's termination grievance to arbitration. A true and accurate copy of the Union's arbitration demand is attached to Defendants' Summary Judgment Memorandum as Exhibit J.

61. At present, Searle's termination grievance is still pending.

62. On or about March 31, 2004, Searle filed her Complaint in this matter against Defendants in this matter in Superior Court.

63. At no time did I ever refer to Searle or to any other female(s) in the Department as a "slut(s)" nor did I hear other individuals in the Department referring to Searle or to any other female(s) in the Department as a "slut(s)."

64. At no time did Searle ever complain to me about other individuals in the Department referring to her or to any other female(s) in the Department as a "slut(s)."

65. At no time did I ever observe Simmons engage in any of the inappropriate conduct that Searle has alleged in this lawsuit that he engaged in nor did Searle ever complain to me or, to my knowledge, to any Town or Department officials that Simmons had engaged in such conduct.

Signed under the pains and penalties of perjury this 28th day of July 2006.

/s/ Lawrence Streeter

Lawrence Streeter

288482v.2/60700/0143