1

UNITED STATES DISTRICT COURT

ESSEX, SS            DISTRICT OF MASSACHUSETTS
                     CA No.  2004CV1079IRCL


* * * * * * * * * * * * * *
SUSAN SEARLE,                 )
          Plaintiff,          )
                              )
     vs.                      )
TOWN OF SALISBURY, SALISBURY  )
POLICE DEPARTMENT, and        )
LAWRENCE STREETER             )
                              )
        Defendants.           )
* * * * * * * * * * * * * *

          The deposition of SUSAN SEARLE,
a witness called on behalf of the Defendants,
provisions of Rule 30 of the Massachusetts Rules of
Civil Procedure, before Carmen Branson, Court
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Law offices of
Kopelman and Paige, P.C., 31 St. James Avenue,
Boston, Massachusetts 02116, on Thursday, June 16,
2005, commencing at  10:25 a.m.

APPEARANCES:

PAUL J. KLEHM, ESQ.
Law Offices of James B. Krasnoo
23 Main Street
Terrace Level
Andover, MA  01810
(For the Plaintiff)

JOSEPH S. FAIR, ESQ.
Kopelman and Paige, P.C.
31 St. James Avenue
Boston, MA  02116
(For the Defendants)

92

1     A.  I think I was going to add that Ann Jones --

2     Q.  I believe you said when you researched in

3  '98 she came on as a part-time person?

4     A.  Yes.

5     Q.  But other than Harrison, Richard, Powierza,

6  Jones and Searle, there weren't any other

7  dispatchers?

8     A.  No.

9     Q.  Are you familiar with 209As?

10    A.  Yes.

11    Q.  Can you describe the process with respect to

12 a dispatcher, what process a dispatcher follows for

13 209A request?

14    A.  Well a dispatcher would -- first of all

15 obviously file an incident first.

16    Q.  Okay.

17    A.  And nine out of ten times an officer has

18 gone to respond to this incident.  And sometimes they

19 bring all the parties back.  And the victim who is in

20 need of a 209A which is a protective order, the

21 dispatcher will provide her with a little packet and

22 she has to fill out a statement, an affidavit, and

23 once that is all complete, the dispatcher will call

LEAVITT REPORTING, INC.

1    an on-call advocate and they are part of the rapid

2    response team and that rapid response team is the

3    Salisbury Police Department team affiliated with the

4    Women's Crisis Center.

5                 They are advocates for domestic issues.

6    You page one.  Someone is usually oncall and they

7    come into the station, hopefully soon, and help them

8    fill it out.  Explain, you know, how it is done.

9    They give that to the dispatcher, sometimes the

10   officer is still in the building and sometimes he's

11   not.  But they will give that back to the dispatcher,

12   she will call the on-call judge.  If it is after the

13   hours of 4 p.m. Monday through Friday.  Then there is

14   an on-call judge and he will respond back to her

15   call.  She provides him with the information.

16        Q.  We are still talking about when you say she,

17   the dispatcher?

18        A.  The dispatcher provides the judge with the

19   information.  Sometimes he'll ask if the officer is

20   still around in the building, and the dispatcher

21   provides Board of Probation information to the judge.

22   He wants to see if there is a pattern.  So that's

23   always done.  And then the judge determines whether

LEAVITT REPORTING, INC.

94

1    he will or will not issue an order.

2         Q.  Now, the packet that you referred to, who

3    makes the determination as to whether or not the

4    victim receives a packet to fill out to apply for the

5    209A?

6         A.  The officer that brought the instance in.

7         Q.  What if it is a walk-in situation if there

8    is no officer, then what happens?

9         A.  Then the dispatcher will get the packet and

10   provide it to the person.

11        Q.  So you provide it to the person, the person

12   then completes the information including the victim's

13   statement?

14        A.  Yes.  Yes.

15        Q.  And then he resubmits that victim's

16   statement to the dispatcher, correct?

17        A.  Yes.

18        Q.  And then at that point the dispatcher then

19   calls the on-call judge?

20        A.  Correct.

21        Q.  And does the walk-in situation, is it the

22   dispatcher that makes the determination then at that

23   point to call the on-call judge?

LEAVITT REPORTING, INC.

95

1      A.  A walk-in situation, someone reports that

2   there has been an instance of domestic violence or

3   there has always been one and now there will be a

4   restraining order or talk to an officer.  You call an

5   officer in.

6      Q.  Can a dispatcher contact the on-call judge

7   without first giving prior approval from an officer

8   to do so for a 209A?

9      A.  No.  For a walk-in case to the department?

10      Q.  Correct?

11      A.  Why would she want to.  If someone walked in

12   and said I want a restraining order, a dispatcher

13   wouldn't just call the judge, no.

14      Q.  Somebody would have to look first --

15      A.  Correct.

16      Q.  -- and the information that is provided by

17   the victim, correct?

18      A.  Yes.

19      Q.  And authorize the dispatcher to call the

20   on-call judge, is that right?

21      A.  Yes.

22      Q.  And that person that reviews the information

23   and gives the authorization is a police officer,

LEAVITT REPORTING, INC.

96

```
1   correct?

2        A.  It could be the dispatcher's supervisor.

3   Yes, it could be a police officer.

4        Q.  The dispatcher supervisor is a police

5   officer?

6        A.  Always.

7        Q.  And then at that point, the information is

8   then given to the dispatcher and the dispatcher makes

9   the necessary call, correct?

10       A.  Yes.

11       Q.  To the judge, that is?

12       A.  Right.

13       Q.  At what point does the board of probation

14  check get made?

15            MR. KLEHM:  Objection.

16       A.  Prior to calling the judge.

17       Q.  And again, sticking with the walk-in

18  scenario, would the Board of Probation check be done

19  before or after authorization to call the on-call

20  judge has been given by the police officer?

21       A.  The board of probation would be done after

22  the packet was filled out.

23       Q.  Yes.
```

1       A.  And the next step would be to do a BOP,

2  board of probation.

3       Q.  Who tells the dispatcher to do a BOP?

4            MR. KLEHM:  Objection.  Go ahead.

5       A.  The dispatcher knows they have to do a BOP,

6  a restraining order.

7       Q.  You only do the BOP once you have been told

8  by an officer to initiate the 209A procedure?

9       A.  I guess.  Each shift is different.  Each

10  officer does it differently.  Some don't even get

11  involved.

12       Q.  They don't get involved in what?

13       A.  In the process of the 209A.  They are aware

14  of it.

15       Q.  Somebody instructs you to initiate the 209A

16  procedure, is that correct?

17            MR. KLEHM:  Objection to form, go

18  ahead.

19       A.  Somebody.  I am aware of the situation.  I

20  call an officer in.  If there isn't one in.  I say

21  this is what's going on.  She looks for the 209A.

22  Call an advocate and get a packet.  Sit and talk with

23  them for a few minutes to get some information.


LEAVITT REPORTING, INC.

98

1   Sometimes they don't even do a report.  They just

2   want to make sure that is what she needs or she wants

3   and they are off.  Sometimes they stay and sometimes

4   they don't.

5       Q.  So but the initial decision to start the 209

6   process is made by a police officer, is that correct?

7       A.  I would have to say, yes.

8       Q.  If the information gets provided by the

9   victim, the police officer looks at the information

10  to see if a 209A is even justified?

11      A.  Sure.  Yes.

12      Q.  Because there may be circumstances under

13  which while they want a 209A it is not an appropriate

14  situation, is that fair to say?

15      A.  Correct.  Some people don't qualify for a

16  209A.

17      Q.  And that determination is made by a police

18  officer.

19          MR. KLEHM:  Objection to the form.

20      A.  Yes.

21      Q.  And not by a dispatcher, correct?

22      A.  Yes.

23          MR. KLEHM:  Objection to the form.

LEAVITT REPORTING, INC.

99

1       Q.  So if someone were to walk in to you as a

2   dispatcher and say they want a 209A, you wouldn't

3   just automatically run a Board of Probation check

4   without first checking with the officer?

5       A.  Correct.

6       Q.  And it wouldn't be until after the officer

7   indicated that a 209A was warranted that you would

8   now begin the 209A process, correct?

9       A.  Correct.

10      Q.  And that would include a Board of Probation

11  check, correct?

12      A.  Yes.

13      Q.  And calling the on-call advocate, correct?

14      A.  Yes.

15      Q.  And calling the on-call judge, correct?

16      A.  Correct.

17      Q.  And a private citizen cannot obtain a 209A

18  without a police officer assisting them or going down

19  to court, is that correct?

20      A.  A private citizen coming in off the street?

21      Q.  Yes.

22      A.  No.  They would have to come in and notify

23  the police department and go directly to the court.


                    LEAVITT REPORTING, INC.

100

1       Q.  And an emergency situation would be after

2    the courts are closed, the only way would be through

3    coming into a police department and first speaking to

4    a police officer, correct?

5       A.  That's correct.

6       Q.  Now on your second go-around with the

7    department, at that point were the dispatchers

8    represented by a union?

9       A.  We were just commencing.  They are just

10   beginning a union.

11      Q.  And that union was the American Federation

12   of State County and Municipal Employees, Counsel 93

13   Local 939?

14      A.  Yes.

15      Q.  And was there eventually a Collective

16   Bargaining Agreement that came into being between the

17   town and the union?

18      A.  Yes.

19              (Bargaining Agreement marked Exhibit

20   No. 4 for identification.)

21      Q.  I am showing you a document that has been

22   marked as Exhibit 4 which on its face is an agreement

23   between the Town of Salisbury and Local 939,

LEAVITT REPORTING, INC.

114

1   conversation was.  But it was his response to

2   whatever I was talking about, was like it was of no

3   value.  It didn't matter.  Why was I even talking.

4       Q.  Do you recall though any of the specifics of

5   what was said between you and Officer Sforza during

6   that exchange or incident?

7       A.  No, I don't.

8       Q.  Do you recall what, if anything, happened

9   after you submitted the report to the Chief

10  concerning this?

11      A.  I believe it was in a short time we had that

12  sensitivity class.  It was very soon after that.  And

13  my thought was, well this is good timing.

14      Q.  Did you at the time were you of the belief

15  that the reason for the training or I should say that

16  the training was given as a result of your complaint

17  to the Chief about Officer Sforza?

18      A.  I was never told that it was.  I was never

19  told that it was addressed.  That the issue was

20  addressed.  There was after my making Chief Streeter

21  aware of that, there was never responses that I will

22  fix it or I won't fix it.  There was nothing.

23      Q.  My question was whether or not at the time

LEAVITT REPORTING, INC.

118

1      Q.  And you considered this a complaint to the

2   Chief concerning the way you were being treated, is

3   that fair to say?

4      A.  I guess it would be an informal complaint,

5   yes.

6      Q.  So in that regard you wanted it to be

7   detailed in terms of how you were being treated to

8   the Chief, correct?

9              MR. KLEHM:  Objection, to the form.  Go

10  ahead.

11     A.  Yes.

12     Q.  Thank you.

13              You have never attended a police

14  academy?

15     A.  That's correct.

16     Q.  And as a police officer whether you are full

17  time police officer or a part-time police officer,

18  you need to attend a police academy in order to be a

19  police officer, is that fair to say.

20              MR. KLEHM:  Object to the form.

21     Q.  To be police officers of police officer, it

22  is your understanding you need to attend a police

23  academy?

LEAVITT REPORTING, INC.

151

1      A.   None of them.

2      Q.   So the conversations between '94 and '96 to

3   your recollection would have occurred with just you

4   and the Chief present?

5      A.   Yes.

6      Q.   Now jumping from '98 to 2002, did you ask

7   the Chief why that wasn't going to happen with

8   respect to you working details, of course.

9      A.   I think that I did ask him why but I knew he

10   wasn't going to respond to me, but I didn't give up.

11      Q.   Were you ever given a reason as to why you

12   weren't going to work details?

13      A.   No.  He did say at one time that you will

14   need to go to the intermittent academy.  You need to

15   go to the academy.  I said fine.  Send me to the

16   intermittent academy.

17      Q.   And the academy or the intermittent academy

18   that you are referring to, is that the police

19   academy?

20      A.   It is intermittent police academy.  It is

21   not for full time police officers.  It is

22   intermittent academy.

23      Q.   So the full time police officers have their

LEAVITT REPORTING, INC.

152

1    own full time police academy, correct, that they have

2    to go to?

3        A.  Yes.

4        Q.  And the intermittent police academy is a

5    police academy that individuals who want to become

6    special police officers have to go to, correct?

7        A.  Correct.

8        Q.  And you hadn't attended either, correct?

9        A.  Yes.

10       Q.  And so the Chief indicated to you that you

11   would need to attend the intermittent academy, is

12   that what he said to you?

13       A.  Yes.  Whether he said the academy or used

14   the word intermittent, I don't remember.

15       Q.  But you recall him telling you that you had

16   to attend the academy?

17       A.  Right.

18       Q.  And you understood that as being the police

19   academy of some sort, correct?

20       A.  Yes.

21       Q.  And do you recall anything else in terms of

22   what was stated to you by the Chief in response to

23   your questions about working details?

LEAVITT REPORTING, INC.

155

1   to work details?

2        A.  No.

3        Q.  Have you now told me everything you can

4   recall about your conversations with the Chief with

5   respect to your request to work details?

6        A.  I believe so, yes.

7        Q.  Now for the academy, do you know what the

8   process was for attending the academy?

9        A.  All your department just had to speak for

10  you to go.  The Chief would recommend you to the

11  academy.

12       Q.  Was there some sort fill out paperwork or an

13  application?

14       A.  Sure.  There was a little bit of paperwork

15  to fill out, yes.

16       Q.  Did you ever fill out that paperwork?

17       A.  Actually I at one time filled out an

18  application and I put it in the Chief's box.  I never

19  got a response or heard about it.  It was what I

20  expected.

21       Q.  Do you recall when you submitted that

22  application to the Chief?

23       A.  No, I don't.


                    LEAVITT REPORTING, INC.

160

1    special police officers?

2        A.  Yes.

3        Q.  Earlier when we were talking about special

4    police officers, were you including dispatchers as

5    part of that conversation or were you referring to

6    what I was referring to as part time police officer?

7                MR. KLEHM:  Objection to the form of

8    the question.

9        A.  I agreed with your interpretation of the

10   special officer as being a part time special police

11   officer.

12       Q.  So to the extent that we had those

13   conversations earlier, you weren't including

14   dispatchers in the mix unless we were referring to

15   them as dispatchers, correct?

16       A.  Correct.

17       Q.  Now dispatchers are also technically

18   considered a special police officer?

19       A.  Yes, they are sworn officers.

20       Q.  But they don't have any police powers, is

21   that correct?

22       A.  They don't go on patrol.  They aren't

23   patrolmen.

LEAVITT REPORTING, INC.

161

1      Q.  They don't attend the academy?

2      A.  No, they don't attend the full time police

3   academy.

4      Q.  They don't attend the intermittent police

5   academy?

6      A.  In that department none attended the

7   intermittent police academy.

8      Q.  Now with respect and I am refer to them for

9   sake of clarity to part time police officers.  Were

10  there any part time police officer positions that

11  came up during either tenure, during either of your

12  tenures with the department?

13     A.  Yes.

14     Q.  Did you make any efforts to apply for those

15  positions?

16     A.  Yes.  That's when I submitted my application

17  for him to sponsor me for the academy.

18     Q.  And you submitted that application at a time

19  when there was a vacancy for a part-time police

20  officer position?

21     A.  Yes.

22     Q.  So in effect were you looking to change your

23  job at that point?


                 LEAVITT REPORTING, INC.

162

1      A.  No.  No.  I was looking to go to the

2   intermittent academy.

3      Q.  So you weren't seeking to become a part time

4   police officer in sort of the traditional sense, is

5   that correct?

6      A.  Correct.

7      Q.  You weren't interested in becoming a part

8   time police officer to go out on the patrols and

9   things of that type?

10     A.  Correct.

11     Q.  You were just trying to fulfill the

12   requirement that the Chief had given you that you

13   have to go to the academy so you could work details?

14     A.  Correct.

15     Q.  So getting back to my question, you weren't

16   applying then by virtue of that application to become

17   a part-time police officer?

18     A.  Correct.

19     Q.  And you never submitted any other

20   applications to become a part time police officer,

21   did you?

22     A.  No, I did not.

23     Q.  Now are you familiar with an individual by

LEAVITT REPORTING, INC.

185

1      A.   Short leave to long sleeve.

2      Q.   There was a difference in the shirt?

3      A.   As the season changed, right.

4      Q.   Who was required?

5      A.   Anybody sitting at the dispatch desk.

6      Q.   Now the dispatch uniform the same as the

7  police officer uniform?

8      A.   No, it was not.

9      Q.   So they were different?

10     A.   Yes.

11     Q.   How were they different?

12     A.   The shirt was white and not navy.

13     Q.   The police officers shirts are navy?

14     A.   Yes.

15     Q.   And the dispatchers are white?

16     A.   Yes.  With the navy trim.

17     Q.   And now you contend that -- is there some

18  sort that the males that work in dispatch weren't

19  required to wear the same uniform is that what you

20  are alleging here?

21     A.   Correct.

22          MR. KLEHM:  Objection.

23     Q.   The males that you are referring to, are

LEAVITT REPORTING, INC.

186

1    these the male part time officers that were covering

2    dispatch?

3        A.  Yes.

4        Q.  What did they wear when they worked

5    dispatch?

6        A.  They wear their regular police uniform.

7        Q.  When they worked in dispatch, they wore

8    their police officer uniforms?

9        A.  Yes.

10       Q.  Now you have alleged in your complaint that

11   the police subjected you and other females to

12   humiliation and degradation for violating the dress

13   code.  How did this occur?

14       A.  He would berate you.  If your tie wasn't on,

15   for anything like that.  He would kind of mock you.

16   Make an issue of it.  Continually play it up.

17       Q.  Can you give me an example?

18       A.  Because that would be the only out of

19   uniform that someone would be.  Their tie wouldn't be

20   on.  Just kind of hollaring and yelling at you in

21   front of everyone.

22       Q.  What would be said?

23       A.  You are out of uniform.  You are out of

LEAVITT REPORTING, INC.

190

1       A.   No.

2       Q.   At some point did the department hire male

3   dispatchers?

4       A.   Hire them as dispatchers?

5       Q.   As dispatchers, correct.

6       A.   No. Not while I was there.

7       Q.   Now you allege that sometime in November of

8   2001 the Chief began requiring male dispatchers to

9   adhere to the same dress code?

10       A.   Could you repeat what month that was.

11       Q.   November of 2001?

12       A.   Yes.

13       Q.   Now to the extent that you are referring in

14   your complaint to male dispatchers, there weren't any

15   males that were hired as dispatchers at that time as

16   I understand your testimony, is that correct?

17       A.   Yes.

18       Q.   So the to the extent that you are saying

19   male dispatchers, you are referring to the male

20   police officers who are filling in as dispatchers, is

21   that correct?

22       A.   Correct.

23       Q.   Now at that time you were on paid

LEAVITT REPORTING, INC.

194

1   chastised?

2       A.  I don't know.

3       Q.  You made mention of the female dispatchers

4   being a good group of efficient dispatchers?

5       A.  Yes.

6       Q.  That's your personal assessment of the

7   female dispatcher's work performance?

8       A.  My personal assessment, yes.

9       Q.  Is this during which tenure of your time

10  with the department are you referring to?

11          MR. KLEHM:  Objection.  You can answer.

12      A.  My second tenure.

13      Q.  So it would be fair to say it is your

14  opinion that the female dispatcher during your second

15  tenure were a good group of efficient dispatchers?

16      A.  Both groups, yes.

17      Q.  And in comparison to the male dispatchers,

18  did you consider them to be performing equally as

19  competently as the males?

20          MR. KLEHM:  Objection to the form.  You

21  can answer.

22      A.  My own opinion?

23      Q.  Yes.

LEAVITT REPORTING, INC.

195

1       A.   No.

2       Q.   Did you think that they were performing

3  above what the males were performing?

4       A.   Did I think the females were performing

5  above?

6       Q.   Above the male officers who were performing

7  dispatch duties?

8       A.   Totally different manner.

9       Q.   I am not sure I understand.  What do you

10  mean?

11      A.   The guys had a long way to go when it came

12  to being efficient dispatchers.  Every aspect of the

13  word dispatch in that department.  Every job aspect.

14  But they were new to it.

15      Q.   How did you think your performance as a

16  dispatcher rated in comparison to the male

17  dispatchers during your second tenure?

18      A.   My performance, there was no -- I was a very

19  good dispatcher.

20      Q.   You considered yourself your work

21  performance to at least be equal to that of the male

22  dispatcher?

23      A.   At least, yes.

LEAVITT REPORTING, INC.

196

1       Q.  If not better?

2       A.  Yes.

3       Q.  Did you, in fact, think that your

4  performance was better than the male dispatcher

5  during the second tenure?

6       A.  Yes.

7       Q.  Was that true throughout your second tenure?

8       A.  Yes.

9       Q.  All the way up to the last day that you

10  worked?

11       A.  Yes.

12       Q.  What about the other female dispatchers.

13  Based on your own personal experience and

14  observations, did you feel that the other female

15  dispatchers were as good as though male dispatchers?

16       A.  Yes.

17       Q.  Did you think that their performance was

18  better than the male dispatchers?

19       A.  Yes.

20       Q.  And was that the case throughout your

21  tenure, your second tenure from '98 to 2000 to the

22  last day that you worked 2001?

23       A.  Yes.

LEAVITT REPORTING, INC.

199

1      A.  Being talked down to in a degrading manner.

2  Chastised or spoken to in the degrading, in a

3  demeaning way.  I have had it happen to me.  I have

4  seen it happen.  I have seen it happen to others.

5      Q.  With respect to yourself, could you describe

6  for me the occasions when this happened to you?

7      A.  I will describe the Chief telling me he's

8  probably going to have to buy a new dispatch chair if

9  I got any fatter.

10      Q.  Where did that conversation take place?

11      A.  In dispatch.

12      Q.  Did you say anything back to him?

13      A.  I am sure I did.

14      Q.  Do you recall what you said?

15      A.  I don't.

16      Q.  Do you recall if the Chief said anything

17  else?

18      A.  No.  That was probably it.

19      Q.  Do you recall if anybody else was present at

20  that time?

21      A.  Denise Richard.

22      Q.  Anybody else?

23      A.  Probably Inspector Simmons.

LEAVITT REPORTING, INC.

200

1      Q.  Do you recall him being there though?

2      A.  He's always there.

3      Q.  Anybody else?

4      A.  No.  I don't recall anybody else.

5      Q.  Do you recall any other occasions where you

6  personally were degraded or belittled or insulted?

7           MR. KLEHM:  At the police station?

8           MR. FAIR:  Correct.

9      A.  I have been.  This would be the Chief again

10  regarding my ethnic background.  Just being kind of

11  inside demeaning with regard to my ethnic background.

12     Q.  Specifically what did he say to you?

13     A.  Oh gosh.  Always putting down the Italians.

14  Calling them Ginnies, always negative when regarding

15  the Italians.  Just to get a rise out of me.  It was

16  kind of the norm.  That's how he --

17     Q.  Anything else that you recall?

18     A.  One time I got a new pair of reading

19  glasses.  They were kind of cute.  They had polka

20  dots all over them.  He told me I looked like a

21  simple retard.  Things of that nature.  And I would

22  have to say Inspector Simmons would have been there.

23  He normally did that for Inspector Simmons.  It was


                    LEAVITT REPORTING, INC.

204

1       Q.   Did Chief Streeter ever call you a slut?

2       A.   No.

3       Q.   What about Inspector Simmons.  Did he ever

4   call you a slut?

5       A.   Yes.

6       Q.   And when did that occur?

7       A.   Often.  Inspector Simmons called me that,

8   but they always referred to women as that, by the

9   word slut.

10      Q.   Who was they?

11      A.   Inspector Simmons and Chief Streeter.

12      Q.   Anyone else in the department?

13      A.   No.

14      Q.   Referring to what women?

15      A.   Any women, all women.

16      Q.   And Inspector Simmons, do you recall when he

17  referred to you as a slut?

18      A.   I don't.  It did happen a couple of times.

19      Q.   Do you recall who was present?

20      A.   It was either just myself.  I don't know if

21  Denise was present.

22      Q.   To the best of your recollection, when

23  Inspector Simmons called you a slut, it was just you

LEAVITT REPORTING, INC.

205

1    and Inspector Simmons?

2        A.  I would think that he would call me that for

3    someone else's benefit.  I am thinking someone else

4    was there.

5        Q.  Do you recall who?

6        A.  No.

7        Q.  Do you recall if the Chief was ever present?

8        A.  If Simmons said the word to me?

9        Q.  If Simmons called you a slut in Chief

10   Streeter's presence?

11       A.  No.

12       Q.  Is that you don't recall or?

13       A.  No.  He never said it in front of Chief

14   Streeter.

15       Q.  And Chief Streeter called you a slut?

16       A.  Never referred to me as that.

17       Q.  He would use it in your presence referring

18   to other women, is that what you are saying?

19       A.  Correct.

20       Q.  Did you ever complain to anyone with the

21   town concerning the Chief's reference to women as

22   sluts?

23       A.  No.


                    LEAVITT REPORTING, INC.

207

```
 1        Q.  Are you aware of Inspector Simmons other

 2   than yourself calling anyone else a slut?

 3        A.  Yes.

 4        Q.  Who?

 5        A.  Denise Richard.

 6        Q.  Anybody else?

 7        A.  I believe Judy McLean.

 8        Q.  Who's Judy McLean?

 9        A.  M-C-L-E-A-N.

10        Q.  He called her a slut?

11        A.  I believe so.

12        Q.  And you believe so.  Were you are present

13   when that occurred?

14        A.  Yes.

15        Q.  Do you recall when that occurred?

16        A.  No.

17        Q.  Was that first tenure our second tenure?

18        A.  Second.

19        Q.  Did the Chief ever direct any derogatory

20   comments toward you?  Any of them other than we have

21   already covered the word slut.  Did he call you any

22   other names, derogatory names?

23        A.  No, just with respect to outgrowing my chair
```

LEAVITT REPORTING, INC.

208

1  in dispatch.  I can't think of any other derogatory

2  names.

3      Q.  Do you recall directing any oral derogatory

4  comments towards the female dispatchers other than

5  referring to them as sluts?

6      A.  No, I do not.

7      Q.  What about with Inspector Simmons with

8  respect to you, did he ever call you any other

9  derogatory names besides slut?

10     A.  No.

11     Q.  Did you ever hear him refer to any other

12  female dispatchers in the department by a derogatory

13  name other than slut?

14     A.  I don't believe so, no.

15     Q.  What did you say to Inspector Simmons when

16  he called you a slut?

17     A.  I asked him to leave dispatch quickly.

18     Q.  And what happened?

19     A.  He did.

20     Q.  You said it was more than one occasion when

21  he called you a slut?

22     A.  Yes.

23     Q.  What happened on that other occasion?

227

1    recollection, I am talking about you testified about

2    Chief Streeter making derogatory comments to you

3    about your physical appearance?

4        A.   That would have happened in my second

5    tenure.

6        Q.   That did not occur in the first tenure?

7        A.   I do not recall it occurring in my first

8    tenure.

9        Q.   During your complaint you referenced

10   Inspector Simmons engaged in a pattern of sexual

11   harassment against you.  Are you familiar with that

12   allegation?

13       A.   Yes, I am.

14       Q.   What's the basis of that allegation?

15       A.   It would have been physical.  And the

16   physical part of it would have been him standing

17   behind my chair in dispatch and attempting to put his

18   hand down my shirt.

19       Q.   Approximately how many occasions did that

20   occur on?

21       A.   A dozen.

22       Q.   And those would have been during your first

23   tenure or second tenure?

228

1      A.  My second tenure.

2      Q.  And do you recall during what period of time

3  in your second tenure that those occurred?

4      A.  I do not.  I would have to say not

5  immediately in my return in 1998.

6      Q.  Did any of those incidents occur -- strike

7  that.

8              At any point in time did those

9  incidents stop occurring during your second tenure?

10     A.  No, they did not.

11     Q.  So up until July 24, 2001, the last day you

12  worked, those were still occurring?

13     A.  Yes, they were.

14     Q.  And was anybody present with you and

15  Inspector Simmons when those incidents occurred?

16     A.  No, they weren't.

17     Q.  Did all of those incidents occur in the

18  dispatch area?

19     A.  Yes, they did.

20     Q.  What exactly occurred?

21     A.  Inspector Simmons would come into dispatch

22  often and on many occasions while in dispatch he

23  would be standing behind me within the console area

LEAVITT REPORTING, INC.

229

1    and he would put his hand down my shirt, attempt to.

2    I would prevent him from succeeding, yet if I were to

3    get up, he would have succeeded just my physically

4    getting up would have assisted him in furthering down

5    my shirt.

6        Q.  You said you prevented him.  How did you

7    prevent him?

8        A.  On different occasions I have punched him.

9    I have slapped him.  I always had my hand on my hand

10   on his hand pulling it in the opposite direction.  It

11   was always physical, and then when he would stop or

12   when I would be able to pull his hand away, he would

13   start to leave dispatch and I would say your best bet

14   is to leave, because I will kick your ass.  I have

15   said that to him.

16       Q.  Do you recall anything else that occurred

17   between you and Inspector Simmons?

18       A.  He on a few occasions, maybe three, four,

19   five occasions in dispatch, he would ask me to sit on

20   his lap.  And he would be sitting because he would

21   have relieved me a few minutes earlier to go out and

22   have a cigarette.

23       Q.  Where would he be sitting?


LEAVITT REPORTING, INC.

230

```
 1        A.   In my dispatch chair.

 2        Q.   And when did these incidents take place?

 3        A.   When?

 4        Q.   When.

 5        A.   I don't have specific dates.

 6        Q.   Approximately?

 7        A.   After 1999 up until the time that I was

 8   physically last there.

 9        Q.   And was there anybody present when those

10   incidents occurred other than yourself and Inspector

11   Simmons?

12        A.   No.

13        Q.   Do you recall -- getting back to the attempt

14   to put his hand down your shirt.  Do you recall when

15   that first incident occurred, first time it occurred?

16        A.   I would have to say the year 2000.

17        Q.   And what about the requesting that you sit

18   on his lap, when did that first occur?

19        A.   1999.

20        Q.   Anything else that you can recall with

21   respect to your allegation that Inspector Simmons had

22   engaged in a sexual harassment of you?

23        A.   One time.  And it wasn't long before I
```

231

physically was last in the department, he exposed

himself to me, his genitals.

    Q.  What specifically occurred between the two

in that incident?

    A.  He had been in dispatch where he often would

come in and out.  He was standing behind me.  We were

not having a conversation.  I was in the middle of my

duty on the telephone, on the computer, whatever it

is I was doing.  And he called me and he said how

about a piece of this.  I am almost one hundred

positive those were his words am or I have something

for you.  As I turned and looked back at him, he was

standing with himself exposed to me.

    Q.  You said he called you and said -- what did

he say to you specifically?

    A.  I have something for you.  He often brought

me things from lunch.  But he didn't come in with a

bag.  He came into dispatch which he often does.  He

may want to retrieve something that I have that he

could you use so it was not uncommon for him to be in

dispatch.

    Q.  Was anybody present at this time with you?

    A.  No.  No one.

LEAVITT REPORTING, INC.

232

1    Q.  Is there anything else that you can recall

2  occurring between yourself and Inspector Simmons that

3  you believe constituted sexual harassment of you?

4    A.  Other than what I have described, no.

5    Q.  Now at the time that he made these requests

6  or the time that he first requested that you sit on

7  his lap, did you believe at that time that that

8  action constituted sexual harassment?

9    A.  And your question was when he first

10 initially asked me that?

11   Q.  You testified that the first time it

12 happened was sometime around 1999?

13   A.  Yes.

14   Q.  You previously testified that Inspector

15 Simmons had, I believe, certainly used the word sluts

16 to refer to women in your presence, correct?

17   A.  Yes, he did.

18   Q.  And I don't recall, did you say he also

19 referred to you as a slut?

20   A.  Yes, he did.

21   Q.  I am not sure exactly what time frame that

22 occurred when he referred to you as a slut, do you

23 recall approximately?

LEAVITT REPORTING, INC.

233

1        A.  With regard with referring to me as slut, I

2   have to say it probably goes hand in hand in 1999 the

3   sitting on the lap request.

4        Q.  So during the time that he's made this

5   request for you to sit on his lap in and around that

6   same time he had also on prior occasions or at least

7   one prior occasion called you a slut?

8        A.  Yes.

9        Q.  And at that point based on his conduct, did

10  you believe that his actions constituted sexual

11  harassment of you or harassment of you?

12       A.  Yes.

13       Q.  And that continued for and eventually his

14  conduct also included his attempts to put his hand

15  down your shirt, correct?

16       A.  Yes.

17       Q.  And finally it also included an incident

18  where he exposed himself to you, correct?

19       A.  Yes.

20       Q.  When you say he exposed himself to you, what

21  exactly did you see?

22       A.  When he called my attention to him?

23       Q.  Yes.

LEAVITT REPORTING, INC.

234

1       A.  And I turned and looked at him.  It was

2   exposed.  He wasn't in the process of exposing it.

3   It was exposed.  It was right there in front of me.

4   Behind me, in front of me.

5       Q.  And I realize this is probably an

6   uncomfortable topic but when you are saying, "It was

7   behind me.  It was right in front of me."  What are

8   you referring to?

9       A.  His penis.

10      Q.  And was he -- did he have his clothes on?

11      A.  Yes.

12      Q.  Did he have his pants on?

13      A.  Yes.

14      Q.  How was he exposing himself to you?

15      A.  His zipper was unzipped and his penis was

16  outside of his pants.

17      Q.  Outside of his zipper?

18      A.  Outside of his zipper.

19      Q.  His pants were otherwise fastened and up?

20      A.  Yes, they were.

21      Q.  At any point in time did you complain to any

22  department officials concerning Inspector Simmons'

23  conduct toward you?

LEAVITT REPORTING, INC.

235

1        A.  Yes.

2        Q.  Who did you complain to?

3        A.  Chief Streeter.

4        Q.  And what did you tell him?

5        A.  I would do it immediately after that

6    specific type of incident.  And I would I never

7    specified what occurred.  But I called upstairs to

8    his office and asked him to keep his perverted

9    chauffer out of dispatch.

10        Q.  And what else did you stay on those

11    occasions when you complained to Chief Streeter?

12        A.  Basically the same thing every time.

13        Q.  That same statement?

14        A.  The same statement.

15        Q.  What, if anything, did he say in response to

16    you, to your statement?

17        A.  He never responded to it.  He would chuckle

18    at times.

19        Q.  Did you ever have any -- did you ever say

20    anything else further to him about what had happened

21    between yourself and Inspector Simmons?

22        A.  No, I did not.

23        Q.  Taking each category separately with respect

LEAVITT REPORTING, INC.

236

1    to Inspector Simmons attempting to put his hand down

2    your shirt, did you make that telephone call to Chief

3    Streeter on each of those occasions?

4         A.  Yes, I did.

5         Q.  And what about his requests, his being

6    Inspector Simmons' request to sit on your lap?

7         A.  I may have one time made that call upstairs

8    following his request for me to sit on his lap.  I

9    know that I made one call to him.

10        Q.  And what about on the occasion that he

11   exposed himself to you?

12        A.  I made that call also.

13        Q.  When he exposed himself to you, Inspector

14   Simmons did you, did you specifically tell Chief

15   Streeter what had transpired that he exposed himself

16   to you?

17        A.  I did not.

18        Q.  You just indicated your same statement to

19   please keep Inspector Simmons out of dispatch area?

20        A.  I specifically described him as a pervert.

21        Q.  And that was basically the statement that

22   you said to him when you spoke to him about that

23   incident?

LEAVITT REPORTING, INC.

237

1      A.  Yes.

2      Q.  Was anybody present when you made these

3  calls to Chief Streeter?

4      A.  Present in dispatch?

5      Q.  Correct.

6      A.  I don't recall anyone being present.

7      Q.  Was there anybody present somewhere else

8  that would have been able to hear your conversation

9  with Chief Streeter -- at least your side of the

10  conversation?

11          MR. KLEHM:  Object to the form.  You

12  can answer.

13      A.  If they could hear my side of the

14  conversation, they would have to have been standing

15  in dispatch so I would have to say no.

16      Q.  So to your recollection there was nobody in

17  your general area where you were when you made those

18  calls?

19      A.  No one other than Inspector Simmons.  He may

20  have still been in dispatch when I made the call.  I

21  am positive of one occasion he would have still been

22  in dispatch.

23      Q.  And what was that occasion?

LEAVITT REPORTING, INC.

.

238

```
1       A.  I don't recall the date.

2       Q.  What incident was it?

3       A.  It would have been the hand down the shirt.

4       Q.  Did you ever complain to any town officials

5   about these incidents with Inspector Simmons?

6       A.  No, I did not.

7       Q.  Did you ever complain to any other police

8   officers, to any police officers other than Chief

9   Streeter about these incidents?

10      A.  I may have.

11      Q.  Who would that person -- who may have that

12  person been?

13      A.  Officer Michael Alder.

14      Q.  You say may have.  What do you mean he may

15  have?

16      A.  I trusted Officer Alder enough to give him

17  that type of information.

18      Q.  Do you recall -- do you have a recollection

19  of specifically telling Officer Alder about any of

20  these incidents?

21      A.  Yes.

22      Q.  Which incident?

23      A.  Sitting on the lap.
```

LEAVITT REPORTING, INC.

240

1   the department about these incidents with Inspector

2   Simmons?

3       A.  No, I do not.

4       Q.  Did you ever speak to the union about these

5   issues with Inspector Simmons?

6       A.  No, I did not.

7       Q.  Other than Inspector Simmons, did any other

8   department employee ever engage in similar type of

9   conduct toward you?

10      A.  No.

11      Q.  Did you ever observe Inspector Simmons

12  behave this way toward any other department employee?

13      A.  Behave this way?

14      Q.  Did you ever observe Inspector Simmons

15  attempt to put his hand down the shirt of another

16  employee in the department?

17      A.  No, I did not.

18      Q.  Did you ever observe Inspector Simmons

19  request another employee to sit on his lap?

20      A.  No, I did not.

21      Q.  And did you ever observe Inspector Simmons

22  expose himself to another employee?

23      A.  No, I did not.

280

1       A.  Yes, I did.

2       Q.  When did you do that?

3       A.  I believe the following day on my way to

4  work I stopped in Merrimac PD and I picked up a blank

5  complaint form, explained to them why I needed, and I

6  would fill it out and return it.

7       Q.  And did you, in fact, fill it out and return

8  it?

9       A.  Yes, I did.

10      Q.  And when did you do that?

11      A.  I believe it was that same evening.  I am

12  almost positive it was that same evening after the

13  end of my shift.

14      Q.  And now so this would have been the day

15  after the incident, correct?

16      A.  Correct.

17      Q.  And now on July 21, 2001, you worked a 3 to

18  11 shift, correct?

19      A.  Yes.  I believe, yes.

20      Q.  And during that shift you ran a criminal

21  background check on the former boyfriend?

22      A.  Yes.  Because I was in the process of

23  requesting a 209A.

LEAVITT REPORTING, INC.

281

1     Q.  Who was the duty officer that night?

2     A.  Sergeant Robert Roy.

3     Q.  And prior to running the criminal background

4  check on the former boyfriend, did you notify

5  Sergeant Robert Roy that you were going to be running

6  that check?

7     A.  I notified him that I was getting a

8  retraining order for my daughter.

9     Q.  What else did you say to Sergeant Roy in

10  that regard?

11     A.  He was sitting in dispatch with me.  We were

12  having a conversation.  I had explained to him what

13  had transpired.  I mentioned the male party's name,

14  and it rang a bell for him and he immediately went in

15  the inhouse computer and pulled up the name and said,

16  oh I know him.  I have arrested him.

17     Q.  What is the inhouse computer?

18     A.  It is the computer that holds all the

19  records and files, the police log, all you have to do

20  is key in someone's name.  If they have a record in

21  the department, I believe they go back twelve or

22  fifteen years.  Their complete record will come up.

23     Q.  And who was that person -- I am sorry I

LEAVITT REPORTING, INC.

282

1    didn't mean to step on that answer if you are done.

2        A.  He went into the computer and he brought

3    that person's name and any information that Salisbury

4    police had on him with regard to arrest incidents.

5        Q.  And who was the incident he pulled that up

6    for?

7        A.  His name was James Nickerson.

8        Q.  Is what you just described what Sergeant Roy

9    did, is that different from the criminal background

10   check?

11       A.  Yes.

12       Q.  Criminal back grouped check is that using a

13   criminal offender database?

14       A.  Yes.

15       Q.  Does that have a specific name?

16       A.  NCIC.

17       Q.  What else did you tell Sergeant Roy?  You

18   said you were going to be seeking a 209A for your

19   daughter, correct?

20       A.  Correct.

21       Q.  What else did you tell him?

22       A.  I told him that I was going to get a

23   restraining order for Megan.

LEAVITT REPORTING, INC.

283

1      Q.  Did you say anything else?

2      A.  I don't recall.  We did converse but I don't

3  recall what it was.  I do know that he reiterated.  I

4  know that person.  He's a scumbag.  That was his

5  words.

6      Q.  Anything else that you can recall about your

7  discussion with Sergeant Roy that night?

8      A.  No.

9      Q.  Other than what you just told me just now,

10  did you advise Sergeant Roy that you were going to be

11  running an NCIC check on the boyfriend?

12      A.  No, I did not.  And it is part of the

13  process of getting a restraining order.

14      Q.  Did you tell Sergeant Roy that you were

15  going to be processing the 209A restraining order

16  yourself?

17      A.  Yes, by way of saying I was getting her a

18  retraining order, I didn't elaborate on the process I

19  was taking to do it.  No.

20      Q.  You could have gotten a 209A restraining

21  order from another department, correct?

22      A.  Yes.

23      Q.  From the Merrimac Police Department,

284

1  correct?

2      A.  Correct.

3      Q.  That's where the incident occurred?

4      A.  Correct.

5      Q.  So did you tell Sergeant Roy that you were

6  going to be processing the 209A restraining yourself

7  from the Salisbury Police Department?

8      A.  I didn't elaborate.

9      Q.  You just said you were getting a 209A for

10 your daughter?

11     A.  Correct.

12     Q.  And so you ran the NCIC check which is part

13 of getting the 209A order?

14     A.  Correct.

15     Q.  Why do you that.  Why do you run the check?

16     A.  It is part the of process requested you

17 normally provide to the judge, the background if

18 there is one.  It shows a pattern.  It doesn't always

19 mean that someone has a criminal background.  They

20 just like for you to have it in front of you.

21     Q.  Was Sergeant Roy present when you ran the

22 NCIC check?

23     A.  I believe he was still in dispatch when I

LEAVITT REPORTING, INC.

285

1    ran the BOP, yes.

2         Q.  When you say BOP, board of probation?

3         A.  Correct.

4         Q.  It is a report that is synonymous with the

5    NCIC check?

6         A.  Correct.

7         Q.  Did you eventually call the on-call judge?

8         A.  Yes, I did.

9         Q.  And was Sergeant Roy present when you called

10   the on-call judge?

11        A.  The sergeant was still in the next door in

12   the next room in his office.  He was preparing to go

13   back on patrol.  As a matter of fact, as he was

14   leaving with officer to go out which is their normal

15   suppertime, I knew that's where they were going.  I

16   wanted to catch him so he could sit on the desk so I

17   could receive the responding call from the judge so

18   as to not be interrupted.  He went out the front

19   door.  I didn't get him to sit on the desk.

20             Within minutes the judge returned the

21   call to me.

22        Q.  At the time you placed the initial call to

23   have the on-call judge contact you, was Sergeant Roy

LEAVITT REPORTING, INC.

286

1    present?

2         A.  Yes, he was in the room right next door to

3    me.

4         Q.  He wasn't sitting in dispatch?

5         A.  He had gone back to the sergeant suite.

6         Q.  It is the office that is off the dispatch

7    area?

8         A.  Yes.

9         Q.  And when the on-call judge called you back,

10   Sergeant Roy had left the building, correct?

11        A.  He had just left the building.

12        Q.  And was your -- so was there anyone present

13   when you spoke to the judge?

14        A.  No.  There was no one there but me.

15        Q.  Had your daughter filled out any witness

16   statements.

17        A.  No, she hadn't.

18        Q.  What did you tell the judge?

19        A.  When the judge returned my call, I told him

20   who I was.  Which I normally did when I got a

21   retraining order for a victim.  Told him who I was,

22   where I was employed, and my reason for the call.

23   And it was due to something that occurred.  It was

LEAVITT REPORTING, INC.

314

1        A.  Correct.

2        Q.  You subsequently appealed to arbitration?

3        A.  That's correct.

4        Q.  Could you mark this, please.

5            (Letter dated 3-21-02 marked Exhibit

6    No. 27 for identification.)

7        Q.  And I am showing a two-page document cover

8    letter Wayne Soini, AFSCME counsel 93, to  Jamie

9    Kelley, Board of Conciliation & Arbitration.

10   Attached to it is a document that says petition to

11   initiate grievance arbitration.  Do you recognize

12   this document?

13       A.  I do.

14       Q.  This was the arbitration demand that was

15   filed by the union requesting arbitration of your

16   termination, correct?

17       A.  That's correct.

18       Q.  And do you know what the status is of that

19   arbitration?

20       A.  Yes, I do.

21       Q.  What's that status of that arbitration?

22       A.  In 2003, there was an agreement to settle

23   hammered out.  And the town is still at this time not

LEAVITT REPORTING, INC.

315

1  completed -- not completed their part of the

2  agreement to fulfill the actual agreement to settle.

3      Q.  Has there been a finalized settlement

4  agreement yet to your knowledge?

5      A.  Several times.

6      Q.  Several times what?

7      A.  We have modified an actual agreement to

8  settle several times.

9      Q.  To this point, anyway, there hasn't been a

10 finalized settlement agreement that has been signed

11 by all parties, correct?

12     A.  Correct.

13     Q.  So at this point in time, that arbitration

14 case is still open?

15     A.  Correct.

16     Q.  Could you mark this, please.

17          (MCAD Document marked Exhibit No. 28

18 for identification.).

19     Q.  Ms. Searle, showing you what has been marked

20 as Exhibit 28.  Do you recognize this document?

21     A.  Yes, I do.

22     Q.  This is a copy of the complaint that you

23 filed with the MCAD, correct?

LEAVITT REPORTING, INC.