UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

SUSAN SEARLE                    )
    Plaintiff                    )
                             )
v.                              )
                             )     Civil Action No. 04 CV 10791-RCL
                             )
TOWN OF SALISBURY,              )
SALISBURY POLICE                )
DEPARTMENT and,                 )
LAWRENCE STREETER               )
    Defendants.                  )
_____   )

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL
FACTS TO WHICH THERE IS NO GENUINE ISSUE PURSUANT TO LOCAL
RULE 56.1 AND PLAINTIFF'S
<u>STATEMENT OF FURTHER MATERIAL FACTS</u>**

       Plaintiff Susan Searle hereby responds to Defendants' Statement of Material Facts

to Which There is No Genuine Issue Pursuant to Local Rule 56.1 (hereinafter,

"Defendants' Statement of Material Facts") as follows, and further, sets forth Plaintiff's

Statement of Further Material Facts as follows[1]:

       **Alleged Fact No. 1**

The defendant, Lawrence Streeter (hereinafter, "Streeter"), served as the Town's Police

Chief from May 1989 until his retirement from the Town's employ on December 31,

2002.  Streeter Affidavit at ¶1.

---

[1] For the convenience of the Court, Plaintiff Searle has included herein Defendants'
alleged facts and Plaintiffs' responses thereto, which accounts for the length of the within
document.

**Response No. 1**

Admitted.

**Alleged Fact No. 2**

The plaintiff, Susan Searle (hereinafter, "Searle"), was hired by the Town of Salisbury (hereinafter, "Town") as a police dispatcher in its Police Department (hereinafter, "Department") in 1994, but later resigned sometime in 1996. She was later rehired as a dispatcher sometime in 1998, but was subsequently terminated from her employment effective January 31, 2002. Searle Deposition at 15, 76; Streeter Affidavit at ¶6.

**Response No. 2**

Admitted.

**Alleged Fact No. 3**

At all times relevant, the Department was overseen by the Chief of Police and employed both full-time police officers and reserve and seasonal police officers (hereinafter, "reserve officers"), as well as police dispatchers. Streeter Affidavit at ¶2

**Response No. 3**

Admitted.

**Alleged Fact No. 4**

The term "special police officer" was a generic term that was used to refer to a variety of positions in the Department including seasonal police officers, dispatchers, matrons and traffic/meter enforcers. This was somewhat of a misnomer, however, as among this group only the seasonal officers were trained and certified as true "police officers," as that term is commonly understood, and only the seasonal officers were police academy trained and possessed the legal authority to make arrests. Streeter Affidavit at ¶3.

**Response No. 4**

Plaintiff admits that the term "special police officer" was a term that was used to refer to a variety of positions in the Department, including seasonal police officers, dispatchers, matrons and traffic/meter enforcers.  Otherwise, the first sentence is denied. As to the second sentence, admitted.  Further answering, Susan Searle, and other dispatchers, served as sworn special officers. (Deposition of Susan Searle (hereinafter, "Dep. Searle"), **Exhibit A** to Affidavit of Paul J. Klehm, Esq. (hereinafter, "Aff. Klehm"), p. 160, ln. 17-19;  Deposition of Lawrence Streeter (hereinafter, "Dep. Streeter"), **Exhibit B** to Aff. Klehm, p. 41, ln. 4-6).  At his deposition, Chief Streeter admitted that all dispatchers are special officers.  (Dep. Streeter, p. 40, ln. 13-15; p. 64, ln. 13-14).   Susan Searle was a special police officer during her two tenures (1994 through 1996 and 1998 through 2002) with the Salisbury Police Department.  (Dep. Searle, p. 159, ln. 8-11; Town of Salisbury Admissions, **Exhibit C** to Aff. Klehm, Nos. 2, 4; Dep. Streeter, p. 153, ln. 17-22;  Affidavit of Susan Searle (hereinafter, "Aff. Searle"), **Exhibit D** to Aff. Klehm, ¶9).  The term "special police officer" is synonymous with "part time police officer." (Dep. Searle, p. 159, ln. 17-21).

From 1998 to 2001, Streeter hired at least ten males to serve as temporary summer special officers for the Salisbury Police Department. Most of the males worked beyond their temporary appointments.  Once their appointments ended, the officers either remained special officers, or they pursued becoming reserve officers or full-time officers. During that period, no women followed this route, except Jennifer Skelton and Kristin Kozacka.  Kozacka started as a meter maid, and eventually she went to the intermittent academy.  Kozacka never performed a detail, and she never worked as a police officer for

the Town of Salisbury.  Skelton attended the intermittent academy, and then, shortly thereafter she left to work for Amesbury Police Department.  Neither Skelton nor Kozacka ever performed any paid detail for the Town of Salisbury.  (Aff. Searle, ¶18).

**Alleged Fact No. 5**

The appointing authority for Department employees is the Town Manager who, at the time of Searle's termination, was Timothy P. McInerney.  Streeter Affidavit at ¶5.

**Response No. 5**

Admitted.

**Alleged Fact No. 6**

At all times relevant, Richard Simmons (hereinafter, "Simmons") held the position of Inspector in the Department.  Streeter Affidavit at ¶7.

**Response No. 6.**

Admitted.  Further answering, on December 1, 2002, Simmons became interim Chief of the Town of Salisbury after Chief Streeter stepped down.  (Deposition of Richard Simmons (hereinafter, "Dep. Simmons"), **Exhibit E** to Aff. Klehm, p. 12, ln. 22 to p. 13, ln. 5).

**Alleged Fact No. 7**

In his capacity as Inspector, Simmons served as one of the Department's Internal Affairs investigators and was responsible for investigating allegations of employee misconduct within the Department.  Streeter Affidavit at ¶8.

**Response No. 7**

Admitted.

**Alleged Fact No. 8**

As Inspector, Simmons did not possess any authority to hire, fire, promote, demote, transfer or discipline employees in the Department.  Streeter Affidavit at ¶9.

**Response No. 8**

Admitted.

**Alleged Fact No. 9**

Successful completion of the full-time Police Academy was only one of the requirements to become a full-time police officer with the Town.  Streeter Affidavit at ¶10.

**Response No. 9**

Admitted.

**Alleged Fact No. 10**

Successful completion of the part-time intermittent Police Academy was only one of the requirements to become a reserve police officer with the Town.  Streeter Affidavit at ¶11.

**Response No. 10.**

Admitted.

**Alleged Fact No. 11**

Reserve officers possessed the same powers of arrest as full-time police officers.  Streeter Affidavit at ¶14.

**Response No. 11**

Admitted.  Special officers in a patrol position also possessed the same powers of arrest as full-time officers.  (Aff. Searle, ¶3).

**Alleged Fact No. 12**

5

In addition to their regular police patrol shifts, full-time police officers regularly worked paid details which primarily consisted of construction and traffic details.  Streeter Affidavit at ¶12.

**Response No. 12**

Admitted.  Further answering, Searle sought to handle paid details during her tenure with the Salisbury Police Department.  (Aff. Searle, ¶4)

**Alleged Fact No. 13**

Reserve officers were utilized by the Department on an as needed basis to backfill full-time officer patrol shift vacancies and to fill details that could not be filled by the Department using full-time officers.  Streeter Affidavit at ¶13.

**Response No. 13**

Admitted.  Further answering, see Response No. 12, *supra*.

**Alleged Fact No. 14**

When filling full-time officer patrol shift vacancies, reserve officers were responsible for the same duties that the full-time officers were responsible for including, but not limited to, patrolling the community, responding to emergency calls for assistance, making arrests when necessary and, in general, maintaining the public safety and enforcing the laws of the Commonwealth. Streeter Affidavit at ¶14.

**Response No. 14**

Admitted.

**Alleged Fact No. 15**

When working details, reserve officers were responsible, like full-time officers, for monitoring traffic control, maintaining the public safety, enforcing the law and, if

necessary, making arrests and responding to emergencies that may arise at the site of the detail or throughout the community, if needed. Streeter Affidavit at ¶15.

### Response No. 15

Searle admits that Paragraph 15 of the Streeter Affidavit makes that averment, but Searle denies that the assertions contained therein are true, as Searle has located no documentation produced by Defendants in the within action which describe the duties and obligations of an individual conducting a paid detail, nor has Defendant produced any documentation which demonstrates that a uniformed police officer is necessary for construction details.

### Alleged No. 16

In order to work paid details for the Department during Streeter's tenure as Chief, the individual had to have successfully graduated from the police academy and be a full-time or reserve police officer with full police powers.  Streeter Affidavit at ¶16.

### Response No. 16

Searle admits that Streeter's Affidavit makes the assertion set forth in Paragraph 15, but Searle denies the assertions contained therein are true.  At his deposition, Streeter enumerated the requirements for performing details:

> They would have to be a sworn officer having taken an oath of office to perform general law enforcement duties.  They would have to have been academized.  If they were employed by the Salisbury Police, they would have had to have field training and gone through a specific field training program, which is supervised by a field training officer supervisor as well as a field training officer.  They would have had to participated [*sic*] in a thorough background investigation.  They would have had to pass a department sanction, which was also civil service sanctioned, psychological evaluation, physical examination.  They would have had to participate in a structured oral board, which consisted of trained officers and supervisors who were trained in supervisory skills and had extensive work knowledge and experience with the department.

(Dep. Streeter, pp. 31 ln. 1 to 32 ln. 1). According to Streeter, during the period from 1994 to 2001, those requirements were listed in the department's policy and procedure manual. (Dep. Streeter, p. 32, ln. 6-13). Searle has not located these requirements in the portion of the policy and procedure manual produced by Defendants in this litigation. Moreover, according to Edward Foote, a former Sergeant in the Salisbury Police who was on the force for thirty-one years until his retirement in 2002, one did not need to attend the intermittent academy in order to perform details. (Deposition of Edward Foote (hereinafter, "Dep. Foote"), **Exhibit F** to Aff. Klehm, p. 8, ln. 20-24, p. 14, ln. 24 to p. 15, ln. 3). Further answering, with the exception of the intermittent academy training and the "specific field training," Searle met the requirements listed by Streeter to perform details, and she was fully qualified. (Aff. Searle, ¶4). Searle served as a member of an oral board for another police department; she assisted Salisbury in conducting one of its oral boards, and the oral board administered to dispatcher candidates was the same as the oral board administered to persons seeking to become a police officer. (Aff. Searle, ¶5). Sgt. Foote thought Searle was a good dispatcher. (Dep. Foote, p. 41, ln. 2-4).

Persons performing details received a higher hourly pay rate than Searle's regular hourly rate, and there was a "four hour minimum" per detail. (Dep. Foote, p. 28, ln. 14 to p. 29, ln. 1). In 2000 and 2001, individuals performing details earned approximately $28.00 per hour. (See excerpt from "Officer Detail History," **Exhibit G** to Aff. Klehm).

**Alleged Fact No. 17**

The only individuals Streeter permitted to work details were full-time, reserve and patrol

officers who had successfully completed their police academy training and who

possessed full police powers.  Streeter Affidavit at ¶18.

**Response No. 17**

Admitted.  Further answering, some women performed details before Streeter

became Chief, and for a short period of time after he became Chief.  (Deposition of

Denise Richard (hereinafter, "Dep. Richard"), **Exhibit H** to Aff. Klehm, p. 37, ln. 7-12).

Streeter ended the practice of permitting women to handle details when he became Chief

of the Salisbury Police Department.  (Dep. Foote, p. 15, ln. 22 to p. 16, ln. 4).  When

Foote asked Streeter why women were no longer permitted to work details, Streeter

responded, "I'm the chief and that'll be it."  (Dep. Foote, p. 16, ln. 12-16).  Streeter also

told Foote, "Do not call women for road jobs anymore."  (Dep. Foote, p. 67, ln. 13-16).

According to Searle, Streeter stated, she believes during her second tenure (1998-2001),

that "[n]o woman would ever work a detail."  (Dep. Searle, p. 153, ln. 1-6, 18-23, p. 143,

ln. 1).  Even when Searle told him that Searle had to seek people from out of town to fill

the details (while Salisbury dispatchers were available to handle the details), Streeter

would shake his head and say that it was not going to happen.  (Dep. Searle, p. 154, ln.

14-21).  Sgt. Foote believed that Streeter's conduct was unfair to women.  (Dep. Foote, p.

16, ln. 16-18).  From1994 to 2001, no female special officers or reserve officers served

details within the Town of Salisbury.  (Dep. Streeter, p. 36, ln. 12-17).  Streeter recalled

that one female Rowley police officer did perform a detail once.  (Dep. Streeter, p. 202,

ln. 7-15)[2].  In order for an individual to attend an intermittent academy, the individual

needed to be recommended by Chief Streeter.  (Dep. Streeter, p. 55, ln 6-12). From 1994

to 2001, according to Streeter, Streeter only recommended one female, Jennifer Skelton,

a special police officer, for the intermittent academy[3].  (Dep. Streeter, p. 38, ln. 3-22).

Skelton never performed any details.  (Dep. Streeter, p. 39, ln. 11-12).

Ten to fifteen male special officers worked details for the Town of Salisbury during

Streeter's tenure as Chief.  (Dep. Streeter, p. 46, ln. 2-8,17-18).   Some of these males

served as police officers in other towns (Dep. Streeter, p. 46, ln. 21 to 47, ln. 1).  One

male special officer, James Leavitt, served as a dispatcher for the Town of Salisbury.

(Dep. Streeter, p. 48, ln. 3-7).  Streeter sent Leavitt to the intermittent academy.  (Dep.

Streeter, p. 48, ln. 20-24).  As of Streeter's retirement in 2001, there were fifteen or

sixteen full-time patrol officers in the Town of Salisbury, all of whom were male.  (Dep.

Streeter, p. 60, ln. 16-20).  There were less than ten, but more than five, reserve officers

as of the end of Streeter's tenure, all of whom were male.  (Dep. Streeter, p. 62, ln. 8-20).

Streeter testified that, from 1994 to 2001, he never developed a concern about the

disparity in the number of male and female officers on his force.  (Dep. Streeter, p. 71, ln.

16-20).  There were no male dispatchers hired during Searle's entire tenure with the

Salisbury Police Department.  (Dep. Searle, p. 190, ln. 2-6)[4]. Further answering, on

---

[2]  Searle was responsible for filling detail shifts during both of her tenures. She does not
recall ever being permitted to call the Town of Rowley, which had a female officer, in
order to fill a detail opening.  (Aff. Searle, ¶4).
[3]  He also recommended Kristen Kozacka for the intermittent academy.  See Response
No. 4, *supra*. At his deposition, Streeter denied that he recommended Kozacka for the
intermittent academy.  (Dep. Streeter, p. 38, ln. 3-11).
[4]  In 1994, when Searle began working for the Salisbury Police Department, Ron
Stanwood, a male, was a dispatcher.  He retired approximately two years later, and then
began working as a maintenance worker for the police department.  (Aff. Searle, ¶2).

January 19, 2001, Searle forwarded a letter to Streeter in which she complained, among other things, that "there is a general consensus within this department that women are second rate…" (Letter from Searle to Streeter dated 1/19/01, **Exhibit I** to Aff. Klehm).

### Alleged Fact No. 18

In addition to working patrols and details, reserve officers were also utilized on an as needed basis to fill in for dispatchers. Streeter Affidavit at ¶18.

### Response No. 18

Admitted. Further answering, in using reserve officers to handle the dispatch shifts, Streeter took the possibility of overtime away from the full-time female dispatchers, which became the subject of a grievance. Further answering, summer special police officers also filled in for dispatchers. While working as dispatchers, these summer special police officers, all of whom were male, received, at Streeter's direction, the same rate of pay as did the experienced dispatchers, all of whom were female, even though that rate of pay was higher than the rate of pay that the summer special police officers received for working on patrol. Additionally, the summer special police officers did not receive the lower rate of pay received by new dispatchers. As a result, at Streeter's direction, the experienced dispatchers, who were women, unfairly received the same rate of pay as male special police officers who filled in for dispatch shifts. (Aff. Searle, ¶17).

### Alleged Fact No. 19

The duties of a dispatcher included accepting initial communications into the Department whether they were received in person, in writing or over the telephone. After receiving

the initial communication, dispatchers were responsible for identifying and extracting the critical information and generating a report in the Department's computer system summarizing the matter. That report was then forwarded to the appropriate police personnel for action. If the matter being reported was of a non-emergency nature, but nonetheless required immediate attention in the dispatcher's judgment, the dispatcher was responsible for radioing a police officer to come to the station to pick up the report and handle it. If the matter being reported was an emergency, the dispatcher was to radio an officer and dispatch that officer to the location of the emergency. After dispatching an officer, the dispatcher was required to keep that officer apprised of all facts relevant to the officer's safety and the officer's response to the call. In addition, dispatchers were responsible for performing computer searches in various police related databases. They were also required to maintain a log of the calls that they received which included all information that was pertinent to the call and the action that was taken with respect to same. In essence, dispatchers served as the critical communication link between the public and police officers and between police officers and the Department. Streeter Affidavit at ¶19.

**Response No. 19**

Admitted.

**Alleged Fact No. 20**

At all times relevant, the Department maintained a policy which required employees in the police officer and dispatcher positions to wear a specified uniform. Streeter Affidavit at ¶20.

**Response No. 20**

Admitted.

**Alleged Fact No. 21**

The dispatcher uniform included a white shirt, badge, police patch, seasonal neck tie and

black or navy pants.  Streeter Affidavit at ¶21.

**Response No. 21**

Admitted that the Affidavit makes that averment, but, otherwise, Searle denies

Paragraph 21.  During Searle's tenure at the Salisbury Police Department, when males

worked as dispatchers, they wore their regular police uniform, and not a dispatcher's

uniform.  (Dep. Searle, p. 186, ln. 7-9).  The regular police uniform included a blue shirt,

while the dispatcher's uniform included a white shirt.  (Aff. Searle, ¶10).  Moreover,

Streeter would berate women in the presence of others for such minor dress code

violations as failing to wear a tie.  (Dep. Searle, p. 186, ln. 18-20; p. 187, ln. 8-11).

Searle cannot recall Streeter raising his voice to a male officer for being out of uniform.

(Dep. Searle, p. 187, ln. 14-21).  Females were required to be crisp and neat in their

appearance, while males could arrive without a tie and with a wrinkled shirt or dirty

shoes without reprimand.  (Dep. Richard, p. 86, ln. 8-16).  Searle could not recall an

instance where the Chief subjected males to the same treatment as he did the females for

failing to follow the dress code.  (Dep. Searle, p. 187, ln. 14 to p. 188 ln. 1).


**Alleged Fact No. 22**

The reserve officer uniform was substantially similar to the dispatcher uniform except

they wore a blue shirt instead of a white shirt.  Streeter Affidavit at ¶22.

**Response No. 22**

Admitted.  Further answering, see Response No. 21, *supra*.

**Alleged Fact No. 23**

On two (2) occasions, Searle asked Streeter if she could work paid details.  In response, Streeter advised her that if she wanted to perform details, she needed to fill out an application to become a reserve police officer with the Department and go through the hiring process.  Streeter Affidavit at ¶23; Searle Deposition at 151-52

**Response No. 23**

To the extent that the first sentence of Paragraph 23 states Searle asked Streeter if she could work paid details "on two (2) occasions," denied.  The first sentence is otherwise admitted.  At his deposition, Streeter testified that Searle asked if she could work paid details "[t]wice, that I'm aware of, that I can recall."  (Dep. Streeter, p. 56 ln. 6-11).  Susan Searle testified that she asked Streeter "a dozen times" if she could work paid details.  (Dep. Searle, p. 146, ln. 23 to p. 147, ln. 5).  Streeter admits that Searle first approached him about her wish to perform paid details in or around 1994.  (Town of Salisbury Admissions, No. 5).  According to Sgt. Foote, Searle was "almost being a hound about wanting to work road details, being persistent about it."  (Dep. Foote, p. 73, ln. 10-13).  Only a couple of the requests occurred during her first tenure with the Town of Salisbury (1994-1996), with the remainder of the requests occurring during her second tenure (from 1998 to 2001).  (Dep. Searle, p. 147, ln. 16-22).  Denise Richard, a fellow dispatcher, was present "approximately a couple of times in dispatch" when Searle brought up doing details with Streeter.  (Dep. Richard, p. 32, ln. 13-17).  Richard believes that these instances took place after 1998.  (Dep. Richard, p. 32, ln. 20-22).  According to

Richard, in response to Searle's request, Streeter laughed and said no.  (Dep. Richard, p. 33, ln. 5-9).  According to Searle, in response to Searle's requests to perform details, Streeter "would say that that's not going to happen."  (Dep. Searle, p. 149, ln. 2-6).  On other occasions, Streeter would laugh or tell her she should "shut up or be quiet and get back to my job at my desk."  (Dep. Searle, p. 149, ln. 7-11).  At times, Streeter would not respond to Searle's requests.  (Dep. Searle, p. 149, ln. 7-11).

At one point, Streeter told Searle that she needed to attend the intermittent academy in order to handle details.  (Dep. Searle, p. 151, ln. 20-22).  During her second tenure (1998-2001), Searle requested to be sent to the intermittent academy " a couple of times." (Dep. Searle, p. 151, ln. 20-22;  p. 157, ln. 7-23, p. 158, ln. 1, 15-16). In response to Searle's requests to be sent to the intermittent academy, Streeter would say that "[i] t is not going to happen."  (Dep. Searle, p. 158, ln. 5).  Eventually, Searle gave up asking, because Streeter was "wearing [her] down."  (Dep. Searle, p. 158, ln. 6-8).  At one point during her second tenure, Searle filled out an application and left it in Streeter's box at the police station.  (Dep. Searle, p. 155, ln. 16-20).  She never received a response to the application.  (Dep. Searle, p. 155, ln. 18-20). Streeter's lack of respect for Searle is also demonstrated by an email in which he wrote, "Thanks, Susan, but your opinion really isn't valued around here.  Thanks for trying however."  (Excerpt of email from Streeter to Searle dated August 4, 1999, **Exhibit J** to Aff. Klehm; Dep. Streeter, p. 126, ln. 1-24 to p. 127 ln. 8).

Further answering, see Response No. 16, *supra.*

**Alleged Fact No. 24**

Searle did not possess any police academy training and did not have any police powers. Streeter Affidavit at 24; Searle Deposition at 118; 160.

**Response No. 24**

As to the allegation that Searle did not have police academy training, admitted. As to the remainder of Paragraph 24, denied. Further answering, see Response No. 23, *supra*. Searle served as a matron at the Salisbury Police station. (Aff. Searle, ¶1). From approximately 1996 to July, 2001, Searle served as a part of the rapid response team at the Salisbury Police Department that worked with the Women's Crisis Center in Newburyport to respond on short notice for domestic violence issues. (Dep. Searle, p. 120, ln. 20 to 124, ln. 19). She also performed the duties and responsibilities of a dispatcher. (Public Safety Dispatcher/Clerk Duties and Responsibilities Policy, **Exhibit K** to Aff. Klehm).

**Alleged Fact No. 25**

At no time during her tenure did Searle ever submit an application to become a reserve police officer. Streeter Affidavit at 25; Searle Deposition at 160-62.

**Response No. 25**

Admitted. Further answering, see Response No. 23, *supra*.

**Alleged Fact No. 26**

The reason she did not do so was because she had no interest in becoming a police officer and working the police patrols that would have accompanied same. Searle Deposition at 160-62.

**Response No. 26**

Admitted.  Further answering, Searle was seeking to attend the intermittent academy so that she could work details.  (Dep. Searle, p. 162, ln. 11-14).  For clarification, Searle did submit an application to be able to perform details.  (See Response No. 23, *supra*).

**Alleged Fact No. 27**

Sometime during Searle's second tenure with the Department (1998-2001), Jennifer Skelton, a female, applied to the Department to become a reserve police officer, was hired by the Town in such capacity and was sent to the Police Academy by Streeter. Streeter Affidavit at 26.

**Response No. 27**

Admitted.  Further answering, see Responses Nos. 4 and 17, *supra*.

**Alleged Fact No. 28**

Sometime during Searle's second tenure with the Department (1998-2001), Kristin Kozacka, a female meter enforcer employed by the Department, asked Streeter to sponsor her to attend the police academy.  It was Streeter's understanding that she did so to enhance her resume and her ability to eventually obtain a police officer position with the Town or some other community.  This request was granted by Streeter.  Streeter Affidavit at ¶27.

**Response No. 28**

Admitted that the Affidavit makes the averment contained in Paragraph 28; otherwise, Searle denies Paragraph 28.  At his deposition, Streeter denied that he recommended Kozacka for the intermittent academy.  (Dep. Streeter, p. 38, ln. 3-11).

**Alleged Fact No. 29**

All individuals that were employed by the Town as full-time police dispatchers were members of a collective bargaining unit for which the American Federation of State, County and Municipal Employees, Council 93, Local 939 ("AFSCME" or "Union") served as the exclusive bargaining agent with respect to their wages, hours and other terms and conditions of employment.  Streeter Affidavit at ¶28; Exhibit A at 4.

**Response No. 29**

Admitted.

**Alleged Fact No. 30**

The rates of pay and other terms and conditions for individuals employed by the Town as full-time police dispatchers, including Searle, were set by the terms of the CBA.  Exhibit A at 15.

**Response No. 30**

Admitted.

**Alleged Fact No. 31**

To the extent there was any variation between the rates of pay full-time dispatchers received, the variations were based on the individuals' years of service with the Department as specified in Article 26 of the CBA.  Exhibit A at 15.

**Response No. 31**

Denied.  Further answering, see Response No. 18, *supra*.

**Alleged Fact No. 32**

In addition to their wages, full-time dispatchers also were entitled under the CBA to receive additional benefits such as paid sick, vacation, bereavement and personal leave,

longevity pay, health insurance benefits, holiday pay, and a sick leave buyback benefit. Exhibit A at 11-15.

**Response No. 32**

Admitted.

**Alleged Fact No. 33**

Reserve officers, on the other hand, were not covered by the CBA and were essentially per diem employees who were paid an hourly rate for actual time worked who were not entitled to receive fringe benefits such as paid sick, vacation, bereavement or personal leave, longevity pay, health insurance benefits, holiday pay, or sick leave buyback. Streeter Affidavit at ¶29; Exhibit A at 4.

**Response No. 33**

Admitted.  Further answering, summer special officers were also not covered by the CBA.  (Aff. Searle, ¶17).

**Alleged Fact No. 34**

In addition to full-time dispatchers, the Town also employed a limited number of part-time dispatchers.  The part-time dispatchers were not members of the AFSCME bargaining unit, but instead were essentially per diem employees who were paid an hourly rate for actual time worked who were not entitled to receive fringe benefits such as paid sick, vacation, bereavement or personal leave, longevity pay, health insurance benefits, holiday pay, or sick leave buyback.  Streeter Affidavit at ¶30; Exhibit A at 4.

**Response No. 34**

As to the first sentence, denied.  The Town of Salisbury had one part-time dispatcher, Ann Jones.  (Aff. Searle, ¶8).  As to the second sentence, admitted.

**Alleged Fact No. 35**

The Town did not employ any full-time or part-time male police dispatchers while Searle was actively working there, i.e. prior to her being placed on administrative leave in July 2001.  Streeter Affidavit at ¶31; Searle Deposition at 160-61; 190.

**Response No. 35**

Admitted.

**Alleged Fact No. 36**

To the extent that males performed any dispatcher functions during the time that Searle was actively working there, the individuals who did so were reserve police officers. Streeter Affidavit at ¶32**;** Searle Deposition at 160-61.

**Response No. 36**

Denied.  Several summer special officers served as dispatchers during Searle's tenure.  (Aff. Searle, ¶17).

**Alleged Fact No. 37**

Beginning in December 1996, Streeter instituted a formal sexual harassment policy which he subsequently reviewed, revised and reposted in March 1998, December 1999 and in and around January 2001.  Streeter Affidavit at ¶33; see Exhibit B at 6.

**Response No. 37**

Admitted.

**Alleged Fact No. 38**

A copy of the policy and any subsequently revised versions were issued by the Department to all personnel, including Searle, and were posted in the main lobby of the Department.  Streeter Affidavit at 34; Searle Deposition at 38; 116-17.

**Response No. 38**

Admitted.

**Alleged Fact No.39**

A mandatory Department-wide professional behavior training that focused on various

forms of potential harassment and sensitivity issues was given in approximately February

2001.  Streeter Affidavit at 35; see Searle Deposition at 114.

**Response No. 39**

Admitted.

**Alleged Fact No. 40**

On or about July 4, 2001, Patrolman Eugene Scione filed a report with Streeter alleging

that Searle had been discourteous toward him.  Streeter Affidavit at 36.

**Response No. 40**

Admitted that Patrolman Scione filed such a report.  Searle denies that she was

discourteous to Patrolman Scione.  (Aff. Searle, ¶31).  On that occasion, Searle sent

Scione on a call, and Scione was rude and unprofessional to her over the radio.  (Aff.

Searle, ¶31).  On July 25, 2001, Searle forwarded a letter to Streeter outlining her version

of the events.  (Letter from Searle to Streeter dated July 25, 2001, **Exhibit L** to Aff.

Klehm; Aff. Searle, ¶31).

**Alleged Fact No. 41**

On or about July 5, 2001, Sergeant Kevin Sullivan filed a report with Streeter alleging

that on or about that same date Searle had failed to assign an officer to a call for service

and further alleged that Searle was evasive and less than forthright when he questioned

her about the incident.  Streeter Affidavit at 37.

**Response No. 41**

Admitted that Sgt. Sullivan filed such a report.  Searle denies that, on or about

July 5, 2001, she failed to assign an officer to a call for service, and she denies that she

was evasive or less than forthright when questioned about the incident.  (Aff. Searle,

¶32).

**Alleged Fact No. 42**

On or about July 11, 2001, Streeter received a report from the Town's Fire Chief

regarding an allegation that Searle had negligently delayed relaying an emergency call to

the fire dispatcher which Streeter assigned to Internal Affairs to investigate.  Streeter

Affidavit at 38.

**Response No. 42**

Admitted that Streeter's affidavit makes that assertion;  otherwise, Searle denies

the Paragraph.  Searle denies that she negligently delayed relaying an emergency call to

the fire dispatcher.  (Aff. Searle, ¶34).  Searle further asserts that she was later exonerated

by Salisbury Police Department for that alleged misconduct. (Aff. Searle, ¶34).

**Alleged Fact No. 43**

On July 24, 2001, Searle was interviewed by Simmons and Sergeant William Packer in

connection with the complaints that were made against her by Scione and Sullivan.

Streeter Affidavit at ¶39.

**Response No. 43**

Admitted.

**Alleged Fact No. 44**

Searle's two (2) scheduled days off followed (July 25 and July 26) and then on July 27, 2001, she called in sick.  Streeter Affidavit at ¶40**.**

**Response No. 44**

Admitted.

**Alleged Fact No. 45**

As her reason for doing so, Searle stated that she was traumatized by the complaints that Sullivan and Scione had made against her.  Streeter Affidavit at ¶41.

**Response No. 45**

Admitted.  Further answering, Searle does not believe that she used the word "traumatized" when speaking with Anne Jones.  She does recall using that language in a letter to Streeter.  Further answering, Searle believed that the Salisbury Police Department was treating her unfairly.  She believes that the Salisbury Police Department would not have treated a male in the same manner in which it treated her.  (Aff. Searle, ¶36).

**Alleged Fact No. 46**

As a result of Searle's statements about being traumatized, Streeter placed Searle on paid administrative leave that same day and referred her for a psychological fitness for duty evaluation.  Streeter Affidavit at ¶42.

**Response No. 46**

Admitted.

**Alleged Fact No. 47**

On August 1, 2001, Streeter met with Searle to discuss with her issues regarding her work performance.  Streeter Affidavit at ¶43.  At no time did Streeter tell Searle before the meeting that he wanted to meet with her in order to discuss performance issues; instead, Searle believed that the purpose of the meeting was to discuss a cross-complaint that Searle made against Scione.

**Response No. 47**

Admitted.

**Alleged Fact No. 48**

At said meeting, Streeter presented Searle with a three-ring binder that contained copies of various documents he had compiled regarding her performance over the years. Streeter Affidavit at ¶44.

**Response No. 48**

Admitted.  Further answering, the binder included an estimated more than one hundred pages of documents, including, without limitation, multiple single page log sheets with short handwritten notes (such as, "Who authorized the tow?") which are the notes referred to in Response No. 49, *infra*, various police reports and other reports[5].  The binder included not only documents, but also a document entitled "Discipline History." (See "Discipline History" of Susan Searle, **Exhibit M** to Aff. Klehm).  The "Discipline History" included a "chronological spreadsheet listing of issues that were maintained in that particular notebook."  (Dep. Streeter, p. 147, ln. 5-14).  Streeter believes that the third or fourth page of the "Discipline History" was not attached on August 1, 2001.

---

[5]  Because the binder is fairly voluminous, Searle has not produce same here, other than the "Discipline History."  Upon request of the Court, Searle will immediately cause a copy of same to be filed with the Court.

(Dep. Streeter, p. 150, ln. 8-11).  According to Streeter, the entries in the Discipline

History represent "positive or negative discipline."  (Dep. Streeter, p. 148, ln. 23-24).

He agrees that there are several entries on the third page which do not appear to constitute

discipline of any kind; these entries were added later.  (Dep. Streeter, p. 149, ln. 4-16).

At no time before August 1, 2001 did Streeter present the binder to Searle, and, at no time

before August 1, 2001, did Searle know of the existence of the binder.  (Aff. Searle, ¶28).

**Alleged Fact No. 49**

The majority of the documents contained handwritten notes from Streeter to Searle

pointing out or questioning why certain information was not present in the dispatcher log

or why certain action was not taken by Searle, including not assigning officers to calls,

not entering vehicle tow information in the log or not including other information in the

log that should have been included.  Streeter Affidavit at ¶45.

**Response No. 49**

 Admitted that the documents included in the binder contained such handwritten

notes, but, as to whether such notes constituted a majority of the documents, denied.

Further answering, the documents included in the binder contained various reports and

other documents completed by the Salisbury Police Department.  (Aff. Searle, ¶29).  As a

practice, Streeter would issue notes to officers and dispatchers based upon what he

reviewed in the log.   (Dep. Searle, p. 241, ln. 6-13).  The employees referred to the notes

by a derogatory term.  (Dep. Searle, p. 243, ln. 1, to p. 245, ln. 5;  Dep. Streeter, p. 92, ln.

2-6).  Searle did not consider the notes to constitute discipline, and she did not consider

them to be grounds for termination.  (Aff. Searle, ¶29).  According to Streeter, the notes

were "not discipline, *per se*."  (Dep. Streeter, p. 92, ln. 18-19).  Streeter relied upon the

notes in terminating Searle.  (See Alleged Fact No. 59).  Simmons, a male and a good

friend of Streeter, received hundreds of such notes, and he did not consider them to be

discipline.  (Dep. Simmons, p. 91, ln. 2-6;  Aff. Searle, ¶19).  Simmons, of course, went

on to serve as interim Chief of the Salisbury Police Department.  (See Response No. 6,

*supra*).

**Alleged Fact No. 50**

On August 2, 2001, Streeter issued Searle a memorandum summarizing the performance

issues he discussed with her.  In the "conclusion" portion of the memorandum, Streeter

wrote as follows:  "By virtue of this correspondence, please be advised that continued

performance issues, of the same, like or similar nature, as has been articulated herein, will

lead to probable suspension and potential/possible employment termination."  Streeter

Affidavit at ¶46; Exhibit C.

**Response No. 50**

Admitted.

**Alleged Fact No. 51**

On or about August 8, 2001, while Searle was still on paid administrative leave and the

results of the psychological exam were still pending, Streeter sent Searle a memorandum

in which he advised her that it had come to his attention that, on or about July 22, 2001,

she was alleged to have initiated a 209A restraining order process for her daughter while

she was on duty as a dispatcher for the Department without authorization.  Streeter

advised Searle that he had assigned Packer and Simmons to investigate the allegation and

that she would remain on administrative leave pending the outcome of same.  He also

indicated that, if substantiated, the allegation could affect her continued employment with the Town.  Streeter Affidavit at ¶47; Exhibit D.

**Response No. 51**

Admitted.

**Alleged Fact No. 52**

Under the Department's rules and regulations, dispatchers are not permitted to unilaterally initiate the 209A process, but instead must receive authorization from an officer to do so.  Streeter Affidavit at ¶48; Searle Deposition at 92-100.

**Response No. 52**

Admitted that the Affidavit makes the averments set forth in Paragraph 52; otherwise, Searle denies Paragraph 52.  The Paragraph makes no reference to the particular rules and regulations.  Searle is not aware of any rule or regulation that requires such authorization under the circumstances.  (Aff. Searle, ¶35).  Moreover, the Paragraph cites to a portion of the deposition of Susan Searle which discusses, it appears, only the situation where an individual walks into the station seeking a restraining order.  (See Dep. Searle, pp. 92-100).

**Alleged Fact No. 53**

On or about August 13, 2001, Internal Affairs exonerated Searle in connection with the Fire Chief's complaint that she had failed to relay a call for emergency services to the fire dispatcher in a timely fashion.  Streeter Affidavit at ¶49.

**Response No. 53**

Admitted.

**Alleged Fact No. 54**

On or about August 17, 2001, Internal Affairs substantiated the allegation of failure to assign an officer that had been filed against Searle by Sullivan.  Streeter Affidavit at ¶50.

**Response No. 54**

Searle admits that the Internal Affairs made the finding alleged in Paragraph 54; otherwise, Searle denies Paragraph 54.  At no time did Searle fail to assign the officer in the incident in question.  (Aff. Searle, ¶33).

**Alleged Fact No. 55**

On or about August 29, 2001, Searle filed a charge against the Town at the Massachusetts Commission Against Discrimination in which she alleged that she had been discriminated against on the basis of her gender.  Specifically, Searle alleged that she had been denied the ability to work details because she was a woman, that Streeter had made statements to the effect that women would never work details in the Department, that Streeter discounted her opinion because she is a woman, that she had been told by other members of the Department that women would be laid off before men because "men have careers" and that false complaints had been filed against her within the Department.  Streeter Affidavit at ¶51; Exhibit E.

**Response No. 55**

As to the first sentence, Searle admits that she alleged gender discrimination.  The language of the MCAD complaint also includes sexual harassment.  (See MCAD Complaint filed by Susan Searle (hereinafter, "MCAD Complaint"), **Exhibit N** to Aff. Klehm)  For instance, "I have been subjected to harrasement [*sic*] based on sex by the male officers in the department."  (MCAD Complaint).  The document also reads:

"Cause of discrimination based on: Sex. (Female)." (MCAD Complaint). The document further cites to M.G.L. c. 151B §4 par. 1. (MCAD Complaint).

### Alleged Fact No. 56

Prior to filing her initial complaint at the MCAD, Searle had not filed any complaints with the Town about Streeter's use of the word "sluts" nor had she advised Streeter or any Town officials that Simmons had been referring to her as a "slut", had attempted to place his hand down her shirt, had invited her to sit on his lap or that he had exposed himself to her. Searle Deposition at 205; 227-38; Streeter Affidavit at ¶53.

### Response No. 56

To the extent that Paragraph 56 alleges certain facts that are purportedly contained in Paragraph 53 of Streeter's Affidavit, denied. To the extent that Paragraph 56 alleges that, prior to filing her initial complaint at the MCAD, Searle had not filed any complaints with the Town about Streeter's use of the word "sluts, admitted. Otherwise, Searle denies Paragraph 56. Further answering, Searle would complain to Streeter when Simmons exposed his penis to her in the workplace[6]. (Dep. Searle, p. 234, ln. 21 to p. 235, ln. 14; p. 236, ln. 10-12). Streeter would not respond to Searle; at times, he would chuckle. (Dep. Searle, p. 235, ln. 15-18). Searle called Streeter each time Simmons attempted to put his hand down her shirt. (Dep. Searle, p. 235, ln. 23 to p. 236, ln. 4). Searle called Streeter once when Simmons requested to sit on her lap. (Dep. Searle, p. 236, ln. 5-9). She also told Officer Michael Adler about that incident. (Dep. Searle, p. 238, ln. 11-23). Simmons never took any steps to stop any of the sexual jokes or the foul language that he heard in the workplace. (Dep. Simmons, p. 64, ln. 4-9, p. 66, ln. 11-15).

**Alleged Fact No. 57**

On October 30, 2001, Searle was interviewed by Packer and Simmons in connection with the 209A issue. Ultimately, Packer and Simmons concluded that Searle did in fact initiate the 209A process for her daughter while on duty as a dispatcher without prior authorization. Streeter Affidavit at ¶53.

**Response No. 57**

As to the first sentence of Paragraph 57, admitted. As to the second sentence, Searle admits that Packer and Simmons reached that conclusion, but she denies that the conclusion was correct.

**Alleged Fact No. 58**

Searle does not dispute that she obtained a 209A restraining order on behalf of her daughter without receiving the express permission of a police officer. Searle Deposition at 280-86.

**Response No. 58**

Admitted. Further answering, Searle did inform Sergeant Roy that she was obtaining a restraining order for her daughter. (Dep. Searle, p. 284, ln. 9-11). She believes he was present in dispatch when she ran a criminal records check in connection with obtaining the order. (Dep. Searle, p. 284, ln. 21 to p. 285, ln. 6). Sgt. Roy was in the next room when Searle initially called the judge. (Dep. Searle, p. 285, ln. 9 to p. 286 ln. 8). She did not log the call to the judge in the Salisbury Police Department log because it was not a Salisbury police matter. (Dep. Searle, p. 290, ln 14-19). She did log the criminal records check in the police log as required. (Dep. Searle, p. 291, ln. 12-17).

---

[6] Searle did not tell Streeter specifically that Simmons had exposed himself to her; she

Further answering, in obtaining a restraining order for her daughter, Searle did not violate any oral or written policy of the Salisbury Police Department, as she is not aware of any oral or written policy which required her to obtain the authority of an officer before initiating restraining order proceedings.  At all times relevant, Sgt. Roy was aware that Searle was seeking the emergency restraining order.  During her telephone call with the judge, Searle explained to the judge, among other things, that she was a Salisbury dispatcher seeking an emergency restraining order for her daughter in the Town of Merrimack, and the judge issued the order.  Searle even explained to the judge that she may have to put him on hold in the event that she received other calls, and he accepted that situation.  (Aff. Searle, ¶35).

**Alleged Fact No. 59**

By letter dated November 27, 2001, the Town notified Searle that a hearing had been scheduled to determine if there was just cause to discipline her, up to and including termination of her employment, as a result of the following stated allegations:

> You have had ongoing serious performance problems during your employment with the Department.  Your infractions include, among other violations, failing to assign officers to calls, giving improper, inaccurate, or incomplete information to officers responding to calls, failing to completely and accurately fill out police logs, and insubordination.  The Police Department recently sustained a complaint filed by Sergeant Sullivan that you failed to assign an officer to a call for service and that your answers were evasive when you were questioned about this.  I am enclosing a chart that summarizes your disciplinary history with the Department.
>
> You have failed to comply with Police Department policy in the recording and issuance of an emergency G.L. c. 209A restraining order involving a family member.

---

told Streeter that Simmons was "a pervert."  (Dep. Searle, p. 236, ln. 18-20).

Despite numerous counseling sessions and several letters of formal counseling/reprimands, your performance problems have continued unabated.  You are unable to carry out your duties in a competent, adequate manner.

Exhibit F at 1.

**Response No. 59**

Searle admits that the letter includes the language cited in the Paragraph.  She denies that there were any "ongoing serious performance problems during [her] employment with the Department."  She denies "failing to assign officers to calls, giving improper, inaccurate, or incomplete information to officers responding to calls, failing to completely and accurately fill out police logs, and insubordination." She denies being evasive with her answers when questioned regarding a complaint filed by Sergeant Sullivan alleging that she had failed to assign an officer to a call for service, and she denies failing to assign an officer in that instance.  She denies failing to comply with policy in the recording and issuance of emergency restraining orders involving a family member.  She denies that she had any performance problems.   She denies that, at any time, she was unable to carry out her duties in a competent, adequate manner.  (See Aff. Searle, ¶41).

**Alleged Fact No. 60**

On or about December 21, 2001, Searle filed a motion to amend her charge with the MCAD.  Specifically, Searle sought to add Streeter as a respondent to her discrimination charge and to raise additional allegations including claims that Streeter was discriminating against her on the basis of her gender in that female dispatchers received unequal pay in comparison to male dispatchers, that male dispatchers were not required to adhere to the dress code, that male dispatchers were being allowed to work details, but

females were not and that the Town and Streeter were retaliating against her by bringing disciplinary charges against her.  Exhibit G.

**Response No. 60**

As to the first sentence of Paragraph 60, admitted.  As to the second sentence, Searle admits that the allegations listed were included in the motion to amend, but, she notes that there were additional allegations in the motion to amend as well, including, without limitation, allegations that the Salisbury Police Department and Streeter retaliated against Searle for seeking equal treatment for men and women in the department, that Streeter had often referred to women as "sluts," despite the protests of Searle and others, Streeter made various derogatory comments about Searle (including a comment regarding the size of her buttocks), and the disparity between the salaries earned by males and females in the department.  (See Exhibit G to Defendants' Exhibits).

**Alleged Fact No. 61**

On January 3, 2002, the disciplinary hearing on the charges identified in the Town Manager's November 27, 2001 letter was held.  While Streeter testified at the hearing, Searle elected not to and did not call any witnesses on her behalf.  Streeter Affidavit at ¶56-57.

**Response No. 61**

Admitted.  Further answering, Searle considered the hearing, and her subsequent termination, to constitute acts of retaliation against Searle for, among other things, seeking equality for men and women in the department.  (Aff. Searle, ¶46).

**Alleged Fact No. 62**

By letter from the Town Manager dated January 30, 2002, Searle's employment was

terminated for the following stated reasons:

> It is clear that upon hiring her in 1998, the Police Chief had clear
> expectations of her duties and responsibilities.  After being
> employed a short time, a number of sessions of informal
> counseling were documented.  This included:  arriving late for
> shifts, smoking in unauthorized areas, filing incomplete/improper
> reports, misusing her position to make a 209A for a family
> member, and failing to assign officers to calls.
>
> All of the above-mentioned well documented incidents support a
> decision to terminate Ms. Searle.  However, the most disturbing
> charge against Ms. Searle is her repeated failure to assign officers
> to calls.  Dispatchers do not hold authority to make decisions about
> assigning calls.  Ms. Searle has a duty to assign calls to officers
> and other public safety personnel.
>
> By not assigning calls, Ms. Searle put the community at risk and
> posed a threat to public safety.  Despite receiving repeated
> counseling on the importance of assigning officers to calls, Ms.
> Searle continues to fail to assign officers to calls.  This, combined
> with her performance history and most recent violation of
> Departmental procedure in obtaining 209A orders, convinces me
> that Ms. Searle does not appreciate the great responsibility
> associated with her position.  There is no basis to conclude that
> Ms. Searle's performance will improve, as she has been given
> numerous attempts to rectify her performance issues and failed to
> do so.  Ms. Searle's performance problems have resulted in an
> unjustifiable risk to public safety.
>
> After reviewing the information presented at the hearing on
> January 3, 2002, I find that there is just cause to terminate Ms.
> Searle and agree with the recommendation of Police Chief Streeter.
> The effective date of termination is January 31, 2002.
>
> Exhibit H at 2.

**Response No. 62**

Searle admits that the letter includes the language cited, but she denies the

allegations set forth therein.  Searle denies that there were "a number of sessions of

informal counseling." She denies "arriving late for shifts, smoking in unauthorized areas, filing incomplete/improper reports, misusing her position to make a 209A for a family member, and failing to assign officers to calls." She denies putting the community at risk or posing a threat to public safety. She denies the allegation that she does not appreciate the great responsibility associated with her position. She denies that there was just cause to terminate her. (See generally, Searle's Responses).

**Alleged Fact No. 63**

On or about February 8, 2002, Searle, with the assistance of the Union, filed a grievance with the Town asserting that she had been terminated from her dispatcher position without just cause in violation of Article 25 of the CBA. Streeter Affidavit at ¶59; Exhibit I.

**Response No. 63**

Admitted.

**Alleged Fact No. 64**

On or about March 21, 2002, the Union processed Searle's termination grievance to arbitration. Streeter Affidavit at ¶60; Exhibit J.

**Response No. 64**

Admitted.

**Alleged Fact No. 65**

At present, Searle's termination grievance is still pending. Streeter Affidavit at ¶61; Searle Deposition at 314-15.

**Response No. 65**

Admitted. Further answering, Searle has been attempting to have the arbitration scheduled in the matter. Through no fault of her own, the arbitration remains unscheduled. (Aff. Searle, ¶48).

**Alleged Fact No. 66**

On or about March 31, 2004, Searle withdrew her charge from the MCAD, pursuant to G.L. c. 151B, §9, and filed her Complaint in this matter against the Town and Streeter in Superior Court. See Complaint.

**Response No. 66**

Admitted.

**Alleged Fact No. 67**

On or about April 21, 2004, Defendants removed the case to Federal Court pursuant to 28 U.S.C. §1446(d).

**Response No. 67**

Admitted.

**Alleged Fact No. 68**

A review of the record in this matter does not reveal that Searle ever served the Town with a presentment letter pursuant to M.G.L. c. 258.

**Response No. 68**

Admitted.

**Alleged Fact No. 69**

A review of the record does not reveal that Searle ever received the requisite right-to-sue letter from the Equal Employment Opportunity Commission in connection with her Title

VII claims against Defendants or that if said agency failed to take action on her complaint, that she filed the instant action within the requisite time period.

**Response No. 69**

Denied.  On or about July 27, 2004, the U.S. Equal Employment Opportunity Commission issued a Dismissal and Notice of Rights because "[c]harging Party is pursuing a claim in another forum."  (See U.S. Equal Employment Opportunity Commission Dismissal and Notice of Rights, **Exhibit O** to Aff. Klehm).  According to the Dismissal and Notice of Rights, the Salisbury Police Department was mailed a copy of the document.

## Plaintiff Susan Searle's Statement of Additional Material Facts[7]

70.    In or around September, 1994, Searle began working as a full-time public safety dispatcher for the Police Department of the Town of Salisbury, Massachusetts. During most of her tenure at the Salisbury Police Department, Searle also served as a liaison between the Salisbury Police Department, the Women's Crisis Center in Newburyport, MA, and the Newburyport District Court as a legal advocate, assisting members of the public who sought to obtain restraining orders pursuant to M.G.L. c. 209A.  She also served as a matron, assisting with the processing of female arrestees. (Aff. Searle, ¶1).

71.    In or around August, 1994, and throughout her tenure as a dispatcher, Searle was designated as a sworn "special officer" for the Salisbury Police Department. (Aff. Searle, ¶3).

---

[7] Searle incorporates by reference her responses to Alleged Facts Nos 1 to 69, *supra*, as if expressly set forth herein.

72.    In or around 1994, Searle first approached Chief Streeter regarding her wish to perform lucrative traffic/construction paid details (hereinafter, "paid details") in Salisbury, thereby affording her an opportunity to earn additional income and to have greater responsibility.  Searle would have received more pay for working paid details than she would have received for working a comparable number of overtime hours as a dispatcher.  From 1998 through 2001, she received a base pay of approximately $12.36 per hour.  She also received overtime at a rate of approximately  $18.54 per hour.  As of 2001, upon information and belief, individuals received approximately $28.00 per hour for handling details for the Town of Salisbury.  The details have a four hour minimum. Searle sought to do details because of the comparably high rate of pay and in order to supplement her low base pay.  To the best of Searle's recollection, some male special officers were placed on details before completing intermittent academy.  (Aff. Searle, ¶4).

73.    In or around September, 1996, Searle left the Salisbury Police Department voluntarily.  (Aff. Searle, ¶6).

74.    In or around March, 1998, at the request of the Salisbury Police Department, Searle returned to the Salisbury Police Department as a full-time dispatcher. (Aff. Searle, ¶7).

75.    Searle often worked overtime shifts throughout her tenure at the Salisbury Police Department, and she performed her job duties professionally.  At all times relevant, Plaintiff Searle performed her job at a high level of competence.  She regularly received praise for the quality of her work, and she received periodic increases in pay. (Aff. Searle, ¶9).

76.    Not until November, 2001, upon information and belief, after the MCAD action was filed pertaining to Searle's allegations, did Chief Streeter require the male dispatchers to adhere to the same dress code as the female dispatchers.  (Aff. Searle, ¶10).

77.    Throughout her tenure, Searle observed that the Salisbury Police Department required female dispatchers meet a higher standard of work performance than fill-in male dispatchers and male police officers.  The Salisbury Police Department, through its officers, agents, servants or employees, including, without limitation, Streeter routinely degraded , belittled and insulted the female dispatchers, including, without limitation, Searle.  Streeter often referred to women as "sluts," despite the protests of Searle and other female dispatchers.  The Salisbury Police Department, through its officers, agents, servants or employees, including, without limitation, Streeter, discriminated against Searle and other female employees of the Salisbury Police Department because of their gender.  (Aff. Searle, ¶11).

78.    During the course of Searle's tenure, Chief Streeter made an effort to obtain various benefits for the male officers, such as computer equipment and extra overtime, without making any similar effort on behalf of the female dispatchers.  Searle protested this unfair practice by voicing her objections to Streeter, but Streeter did not discontinue the practice.  (Aff. Searle, ¶12).

79.    During her tenure, Searle did not observe Chief Streeter insult or humiliate male officers or male dispatchers in the presence of their peers.  (Aff. Searle, ¶13).

80.    During the course of Searle's tenure, the Salisbury Police Department, through its officer, agents, servant or employee, Chief Streeter, treated males and females within the department differently in terms of wages and salaries.  The Salisbury Police

Department required females, including, without limitation, Searle, to adhere to waiting periods for pay raises, while males did not have to endure such waiting periods. The Salisbury Police Department hired male special officers who would serve temporarily as dispatchers at the same rates of pay that the full time female dispatchers received, without having to begin at the lower rate at which the women dispatchers were hired. In so doing Streeter prevented female dispatchers from obtaining opportunities for overtime. The Salisbury Police Department afforded male dispatchers preference for open shifts ahead of full-time female dispatchers. (Aff. Searle, ¶14).

81. On many occasions, Searle told Streeter that she objected to this practice of unequal pay and benefits, but Streeter did not discontinue the practice. (Aff. Searle, ¶15).

82. In or around 2000, a full-time dispatcher at the Salisbury Police Department suffered injuries in a car accident, and was unable to work. (See Plaintiff Susan Searle's Supplemental Answer To Interrogatory Nos. 1 and 12 (hereinafter, "Searle's Supp. Ans."), **Exhibit P** to Aff. Klehm). In violation of the terms of the union contract, without affording proper notice or otherwise taking into account the current dispatchers, Chief Streeter altered the dispatch schedule in order to add two part-time male special officers as dispatchers, thereby eliminating opportunities for the female dispatchers to work overtime. At the same time, the two male special officers accumulated numerous overtime hours through a combination of dispatch shifts, construction details and patrol shifts. When Searle confronted Chief Streeter about the unfair situation, he said, in words or substance, "be glad that you still have a full time schedule." (Aff. Searle, ¶16).

83.    From approximately 2000 through July, 2001, including on or after April, 2001, Salisbury Police Department Inspector Richard Simmons, a close friend of Chief Streeter later the interim Chief of the Salisbury Police Department, engaged in a pattern of sexual harassment of Susan Searle – a pattern which included, among other things, physical humiliation, offensive utterances, and other wrongful conduct which unreasonably interfered with Searle's work performance.  The instances of distasteful and inappropriate conduct increased in 2001.  (See Searle's Supp. Ans.;  Aff. Searle, ¶19).

84.    On numerous occasions, including on or after April, 2001, Simmons attempted to place his hand down the front of Searle's uniform while she was sitting at her work station.  Searle always verbally protested this conduct to both Simmons and Chief Streeter, and she moved Simmons' hand away.  (Searle's Supp. Ans.;  Aff. Searle, ¶20).

85.    On several occasions, including, without limitation, on or after April, 2001, Simmons would relieve Searle of her duties at the dispatcher console while she took a break and, upon her return from her break, he would remain seated and would plead with her to sit on his lap.  Searle always verbally protested this conduct to both Simmons and Chief Streeter.   (Searle's Supp. Ans.;  Aff. Searle, ¶21).

86.    Searle felt humiliated, embarrassed and ashamed by Simmons' wrongful conduct.  Upon information and belief, at no time did the Salisbury Police Department take any steps to reprimand Simmons.  (Searle's Supp. Ans.;  Aff. Searle, ¶22).

87.    In or around April, 2001, Searle heard Sergeant Kevin Sullivan of the Salisbury Police Department stating that no male officer would be laid off by the Town.

He stated that the women would be laid off first because the men have careers.  (Aff. Searle, ¶23).

88.    On or about July 21, 2001, Searle last performed work on behalf of the Salisbury Police Department.  (Aff. Searle, ¶24).

89.    On or about July 26, 2001, Searle forwarded a letter via certified mail to Chief Streeter responding to the unfounded and spurious allegations  made against her. (Aff. Searle, ¶25).

90.    On July 27, 2001, in an act of retaliation and without any basis therefor, Chief Streeter ordered Searle not to appear at the workplace for the next four days.  (Aff. Searle, ¶26).

91.    On or about August 1, 2001, Chief Streeter and Searle held a meeting arising out of Scione and Sullivan's allegations and her response thereto, in which she made further allegations of wrongful conduct within the department.  (Aff. Searle, ¶27).

92.    At the meeting, Chief Streeter displayed a large three ring binder containing hundreds of pages of what he claimed to be incidents of wrongdoing on the part of Searle which were contained in her personnel file.  Upon information and belief, Chief Streeter fabricated the contents of the binder in an effort to discriminate against, and retaliate against, Searle.  (Aff. Searle, ¶28).

93.    Until that meeting, Searle was unaware of almost all of the incidents referenced in that three ring binder.  The binder included incidents dating back to 1994, which was before she was rehired in 1998, and, which could not have served, therefore, as a basis upon which she was terminated.  At that time, Searle requested a copy of her personnel file.  (Aff. Searle, ¶30).

94.     On or about August 1, 2001, Chief Streeter invited Searle to a meeting with him in his office. Without any basis or reason therefor, he placed Searle on administrative leave.  (Aff. Searle, ¶37).

95.     Upon information and belief, the 209A incident, which was not raised during the course of this meeting on August 1, 2001 and which Searle did not learn was an issue until she received a letter from Chief Streeter on or about August 8, 2001, was simply a pretext for Chief Streeter to attempt to dismiss or otherwise discipline Searle in a discriminatory and retaliatory manner.  (Aff. Searle, ¶38).

96.     On September 20, 2001, not having received a copy of her personnel file as requested, Searle forwarded a letter to Chief Streeter via certified mail, return receipt requested, seeking a copy of her personnel file.  (Aff. Searle, ¶39).

97.     On or about November 27, 2001, in an act of retaliation and before Searle received her personnel file, the Town served a letter upon Searle giving her notice of a Pre-Disciplinary Hearing because of certain alleged "ongoing performance problems" and her alleged failure to comply with purported Salisbury Police Department policies regarding restraining orders.  (Aff. Searle, ¶40).

98.     On December 7, 2001, more than two months after the written request was made and shortly before the then scheduled pre-disciplinary hearing, Chief Streeter finally provided Searle, through his counsel, with a copy of her personnel file.  Moreover, upon information and belief, Chief Streeter turned over the requested personnel file only on the eve of the disciplinary hearing so as to prevent Searle from having the opportunity to defend herself consistently with concepts of due process.  (Aff. Searle, ¶42).

99.    The file includes hundreds of documents covering alleged incidents dating back to approximately 1994, none of which had ever been made part of Searle's personnel file during the course of her work at the Salisbury Police Department.  (Aff. Searle, ¶43).

100.    At no time did the Salisbury Police Department or Streeter take any remedial, corrective or disciplinary action of any kind with regard to the ongoing acts of gender discrimination and sexual harassment in the workplace at the Salisbury Police Department, despite Searle's ongoing protests.  (Aff. Searle, ¶44).

101.    Searle was on administrative leave for approximately six months.  During that time, she was unable to earn overtime pay, upon which she depended to supplement her income.  (Aff. Searle, ¶45).

102.    On or about January 31, 2002, the Salisbury Police Department wrongfully, and without any basis therefor, discharged Searle.  Shortly thereafter, Searle filed a grievance with her union.  (Aff. Searle, ¶47).

103.    At some point between the time that she was placed on administrative leave and the time of her termination, Searle was present at the home of Denise Richard and speaking with Denise Richard and Sgt. Foote.  (Aff. Searle, ¶49).  Streeter and Simmons parked a vehicle across the street and watched Richard's home for approximately fifteen or twenty minutes.  Searle felt that Streeter was trying to intimidate her.  (Aff. Searle, ¶49).  Simmons was "uncomfortable sitting there."  (Dep. Simmons, p. 84, ln. 14-15).

104.    As a result of the wrongful conduct of the Town of Salisbury and Lawrence Streeter, Searle has suffered lost wages, various lost benefits, lost accrued

pension, lost longevity pay, lost overtime, and lost detail pay in an amount in excess of

$100,000.00.  She also suffered significant emotional distress, mental anguish and pain

and suffering.  Her doctor placed her on medication.  (Aff. Searle, ¶50).

<div style="margin-left:3em">

The Plaintiff
Susan Searle
By Her Attorneys,


/s/ Paul J. Klehm
James B. Krasnoo, BBO #279300
jkrasnoo@krasnooklehm.com
Paul J. Klehm, BBO #561605
pklehm@krasnooklehm.com
Krasnoo|Klehm LLP
23 Main Street
Andover, MA  01810
(978) 475-9955

</div>

## CERTIFICATE OF SERVICE

I, Paul J. Klehm, Esq., hereby certify that I have served a copy of the within

document upon all counsel of record not served via ECF and upon all parties not

represented by counsel by first class mail, postage pre-paid, on September 29, 2006.

<div style="margin-left:3em">

/s/ Paul J. Klehm
Paul J. Klehm

</div>