UNITED STATES DISTRICT COURT

ESSEX, SS          DISTRICT OF MASSACHUSETTS
                   CA No.  2004CV1079IRCL


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
SUSAN SEARLE,                    )
        Plaintiff,               )
                                 )
     vs.                         )
TOWN OF SALISBURY, SALISBURY     )
POLICE DEPARTMENT, and           )
LAWRENCE STREETER                )
                                 )
        Defendants.              )
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

          The deposition of SUSAN SEARLE,
a witness called on behalf of the Defendants,
provisions of Rule 30 of the Massachusetts Rules of
Civil Procedure, before Carmen Branson, Court
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Law offices of
Kopelman and Paige, P.C., 31 St. James Avenue,
Boston, Massachusetts 02116, on Thursday, June 16,
2005, commencing at  10:25 a.m.

APPEARANCES:

PAUL J. KLEHM, ESQ.
Law Offices of James B. Krasnoo
23 Main Street
Terrace Level
Andover, MA  01810
(For the Plaintiff)

JOSEPH S. FAIR, ESQ.
Kopelman and Paige, P.C.
31 St. James Avenue
Boston, MA  02116
(For the Defendants)

## Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

1     A.   I think I was going to add that Ann Jones --

2     Q.   I believe you said when you researched in

3  '98 she came on as a part-time person?

4     A.   Yes.

5     Q.   But other than Harrison, Richard, Powierza,

6  Jones and Searle, there weren't any other

7  dispatchers?

8     A.   No.

9     Q.   Are you familiar with 209As?

10     A.   Yes.

11     Q.   Can you describe the process with respect to

12  a dispatcher, what process a dispatcher follows for

13  209A request?

14     A.   Well a dispatcher would -- first of all

15  obviously file an incident first.

16     Q.   Okay.

17     A.   And nine out of ten times an officer has

18  gone to respond to this incident.  And sometimes they

19  bring all the parties back.  And the victim who is in

20  need of a 209A which is a protective order, the

21  dispatcher will provide her with a little packet and

22  she has to fill out a statement, an affidavit, and

23  once that is all complete, the dispatcher will call

1    an on-call advocate and they are part of the rapid

2    response team and that rapid response team is the

3    Salisbury Police Department team affiliated with the

4    Women's Crisis Center.

5           They are advocates for domestic issues.

6    You page one.  Someone is usually oncall and they

7    come into the station, hopefully soon, and help them

8    fill it out.  Explain, you know, how it is done.

9    They give that to the dispatcher, sometimes the

10   officer is still in the building and sometimes he's

11   not.  But they will give that back to the dispatcher,

12   she will call the on-call judge.  If it is after the

13   hours of 4 p.m. Monday through Friday.  Then there is

14   an on-call judge and he will respond back to her

15   call.  She provides him with the information.

16       Q.  We are still talking about when you say she,

17   the dispatcher?

18       A.  The dispatcher provides the judge with the

19   information.  Sometimes he'll ask if the officer is

20   still around in the building, and the dispatcher

21   provides Board of Probation information to the judge.

22   He wants to see if there is a pattern.  So that's

23   always done.  And then the judge determines whether

1    he will or will not issue an order.

2        Q.   Now, the packet that you referred to, who

3    makes the determination as to whether or not the

4    victim receives a packet to fill out to apply for the

5    209A?

6        A.   The officer that brought the instance in.

7        Q.   What if it is a walk-in situation if there

8    is no officer, then what happens?

9        A.   Then the dispatcher will get the packet and

10   provide it to the person.

11       Q.   So you provide it to the person, the person

12   then completes the information including the victim's

13   statement?

14       A.   Yes.  Yes.

15       Q.   And then he resubmits that victim's

16   statement to the dispatcher, correct?

17       A.   Yes.

18       Q.   And then at that point the dispatcher then

19   calls the on-call judge?

20       A.   Correct.

21       Q.   And does the walk-in situation, is it the

22   dispatcher that makes the determination then at that

23   point to call the on-call judge?

1       A.   A walk-in situation, someone reports that

2    there has been an instance of domestic violence or

3    there has always been one and now there will be a

4    restraining order or talk to an officer.  You call an

5    officer in.

6       Q.   Can a dispatcher contact the on-call judge

7    without first giving prior approval from an officer

8    to do so for a 209A?

9       A.   No.  For a walk-in case to the department?

10      Q.   Correct?

11      A.   Why would she want to.  If someone walked in

12   and said I want a restraining order, a dispatcher

13   wouldn't just call the judge, no.

14      Q.   Somebody would have to look first --

15      A.   Correct.

16      Q.   -- and the information that is provided by

17   the victim, correct?

18      A.   Yes.

19      Q.   And authorize the dispatcher to call the

20   on-call judge, is that right?

21      A.   Yes.

22      Q.   And that person that reviews the information

23   and gives the authorization is a police officer,

1    correct?

2        A.   It could be the dispatcher's supervisor.

3    Yes, it could be a police officer.

4        Q.   The dispatcher supervisor is a police

5    officer?

6        A.   Always.

7        Q.   And then at that point, the information is

8    then given to the dispatcher and the dispatcher makes

9    the necessary call, correct?

10       A.   Yes.

11       Q.   To the judge, that is?

12       A.   Right.

13       Q.   At what point does the board of probation

14   check get made?

15            MR. KLEHM:   Objection.

16       A.   Prior to calling the judge.

17       Q.   And again, sticking with the walk-in

18   scenario, would the Board of Probation check be done

19   before or after authorization to call the on-call

20   judge has been given by the police officer?

21       A.   The board of probation would be done after

22   the packet was filled out.

23       Q.   Yes.

1       A.   And the next step would be to do a BOP,

2    board of probation.

3       Q.   Who tells the dispatcher to do a BOP?

4            MR. KLEHM:   Objection.  Go ahead.

5       A.   The dispatcher knows they have to do a BOP,

6    a restraining order.

7       Q.   You only do the BOP once you have been told

8    by an officer to initiate the 209A procedure?

9       A.   I guess.  Each shift is different.  Each

10   officer does it differently.  Some don't even get

11   involved.

12      Q.   They don't get involved in what?

13      A.   In the process of the 209A.  They are aware

14   of it.

15      Q.   Somebody instructs you to initiate the 209A

16   procedure, is that correct?

17           MR. KLEHM:   Objection to form, go

18   ahead.

19      A.   Somebody.  I am aware of the situation.  I

20   call an officer in.  If there isn't one in.  I say

21   this is what's going on.  She looks for the 209A.

22   Call an advocate and get a packet.  Sit and talk with

23   them for a few minutes to get some information.

1    Sometimes they don't even do a report.  They just

2    want to make sure that is what she needs or she wants

3    and they are off.  Sometimes they stay and sometimes

4    they don't.

5        Q.  So but the initial decision to start the 209

6    process is made by a police officer, is that correct?

7        A.  I would have to say, yes.

8        Q.  If the information gets provided by the

9    victim, the police officer looks at the information

10   to see if a 209A is even justified?

11       A.  Sure.  Yes.

12       Q.  Because there may be circumstances under

13   which while they want a 209A it is not an appropriate

14   situation, is that fair to say?

15       A.  Correct.  Some people don't qualify for a

16   209A.

17       Q.  And that determination is made by a police

18   officer.

19            MR. KLEHM:  Objection to the form.

20       A.  Yes.

21       Q.  And not by a dispatcher, correct?

22       A.  Yes.

23            MR. KLEHM:  Objection to the form.

1    Q.   So if someone were to walk in to you as a

2  dispatcher and say they want a 209A, you wouldn't

3  just automatically run a Board of Probation check

4  without first checking with the officer?

5    A.   Correct.

6    Q.   And it wouldn't be until after the officer

7  indicated that a 209A was warranted that you would

8  now begin the 209A process, correct?

9    A.   Correct.

10    Q.   And that would include a Board of Probation

11  check, correct?

12    A.   Yes.

13    Q.   And calling the on-call advocate, correct?

14    A.   Yes.

15    Q.   And calling the on-call judge, correct?

16    A.   Correct.

17    Q.   And a private citizen cannot obtain a 209A

18  without a police officer assisting them or going down

19  to court, is that correct?

20    A.   A private citizen coming in off the street?

21    Q.   Yes.

22    A.   No.  They would have to come in and notify

23  the police department and go directly to the court.

1      Q.    And an emergency situation would be after

2    the courts are closed, the only way would be through

3    coming into a police department and first speaking to

4    a police officer, correct?

5      A.    That's correct.

6      Q.    Now on your second go-around with the

7    department, at that point were the dispatchers

8    represented by a union?

9      A.    We were just commencing.  They are just

10   beginning a union.

11     Q.    And that union was the American Federation

12   of State County and Municipal Employees, Counsel 93

13   Local 939?

14     A.    Yes.

15     Q.    And was there eventually a Collective

16   Bargaining Agreement that came into being between the

17   town and the union?

18     A.    Yes.

19           (Bargaining Agreement marked Exhibit

20   No. 4 for identification.)

21     Q.    I am showing you a document that has been

22   marked as Exhibit 4 which on its face is an agreement

23   between the Town of Salisbury and Local 939,

1          Q.   Both full and part time?

2          A.   Yes.

3          Q.   And there was some clerical individuals,

4    clerks, I guess if you will, that worked for the

5    police department?

6          A.   Clerks?

7          Q.   Some sort of clerical support?

8          A.   That would be part of the dispatch.

9          Q.   Were there people who served strictly as

10   clerical employees but didn't perform dispatch

11   functions?

12         A.   The Chief's secretary.

13         Q.   Was she part of the dispatcher's union?

14         A.   No.

15         Q.   Was she part of any union?

16         A.   I don't believe so.

17         Q.   Other than that, were there any other

18   employees that worked for the police department?

19         A.   No.

20         Q.   You talked I think a little bit earlier

21   about the Women's Crisis Center, what is that agency?

22         A.   The Women's Crisis Center is an agency that

23   provides all types of assistance to not just women,

1    children with the family, and not just domestic

2    violence issues.  Any type of issue.  Any type of

3    social, you know, within the social service realm of

4    things.  All types of.

5        Q.  Where was it located?

6        A.  Newbury Port.

7        Q.  Did you have any affiliation with that

8    agency?

9        A.  Yes, I did.

10       Q.  What was that affiliation?

11       A.  At one time I was on the Board of Directors.

12   I was a legal advocate from 1995 to 2001.  I worked

13   the hot line.  And I was part of the rapid response

14   team which was Salisbury Police Department with the

15   Women's Crisis Center together a team that responded

16   at the spur of the moment for domestic violence

17   issues.

18       Q.  The legal advocate position, was that paid

19   or unpaid position?

20       A.  Unpaid.

21       Q.  What about the hot line?

22       A.  Unpaid also.  It was all volunteer.

23       Q.  Rapid response team?

1        A.   All volunteer.

2        Q.   When you say rapid response team, what

3   component of the team does someone from the Women's

4   Crisis Center fulfill?

5        A.   I am thinking I was the only one from the

6   Salisbury Police Department as an employee that was

7   affiliated with that program.  The rest were

8   volunteers from the outside that volunteered for the

9   Women's Crisis Center where they would fill that need

10  for the police department.

11       Q.   That's what I am asking you.  What need do

12  they fill?

13       A.   The need they are fulfilling was to provide

14  assistance to a victim with regard to a restraining

15  order.

16       Q.   They were a victim witness advocate

17  essentially, is that correct?

18       A.   Yes.

19       Q.   And you were -- so in your capacity as part

20  of the rapid response team, then you were serving as

21  a victim witness advocate for the Women's Crisis

22  Center?

23       A.   And the Salisbury Police Department.

1     Q.  Simultaneously?

2     A.  Yes.  Because the rapid response team

3  belongs to the Salisbury Police Department.  That was

4  their team.  It wasn't the Women's crisis team.  It

5  was the Salisbury Police Department's rapid response

6  team.

7     Q.  So if you were assigned -- if you were

8  working as a dispatcher though and a 209A comes in,

9  who would cover your dispatch duties while you served

10  as a victim witness advocate for someone that needed

11  services on a 209A.

12     A.  I wouldn't.  I would call the on-call

13  advocate.  There is a calendar that is made up of all

14  the on-call advocates.  So daily if you needed one,

15  you would look at the calendar to see who was on

16  call.  It was always the same pager number.  They

17  shared it.  You would call the pager and they would

18  call the police department and they would respond.

19     Q.  Did you share this pager with them?

20     A.  Yes, I did.

21     Q.  So when you were the on-call advocate, then

22  you obviously you weren't working as a dispatcher at

23  the time you were on call?

1      A.   Correct.

2      Q.   And then if you were working as a

3  dispatcher, somebody else was carrying the beeper and

4  being on call for the Women's Crisis Center?

5      A.   Yes.   Correct.

6      Q.   How long were you part of the rapid response

7  team?

8      A.   Since its inception.

9      Q.   And when was its inception?

10     A.   I think it was in '96.

11     Q.   And what period of time did you continue on

12  the rapid response team?

13     A.   Until 2001.

14     Q.   Do you recall when?

15     A.   Until I left the department.

16     Q.   Well you left the department officially in

17  2002?

18     A.   Correct.   I physically left in July of '01

19  so it would be up until that time.

20     Q.   After you left, after you were at your last

21  physical day at the Salisbury Police Department as a

22  dispatcher, you no longer continued to be an on-call

23  advocate?

1    drawing your attention to Exhibit 13; do you

2    recognize this document?

3        A.   I do.

4        Q.   Is that your signature there midway through?

5        A.   Yes, it is.

6        Q.   Did you file this grievance with the town?

7        A.   Yes, I did.

8        Q.   And it looks at the top Susan Searle slash

9    Denise Richard.   Now was this a -- do you recall why

10   this grievance was filed?

11       A.   In the midsection of the grievance it

12   explains that we were denied opportunity for

13   available dispatch overtime on four separate

14   occasions.   So after these missed opportunities for

15   this overtime passed is when we filed the grievance.

16       Q.   And these missed opportunities for overtime

17   was this as a result of the change in the schedule?

18       A.   Partially.

19       Q.   Just reading the grievance itself, "Denied

20   opportunity for available dispatch overtime on four

21   separate occasions," and list the dates.   It says,

22   "Full time regular dispatchers were replaced without

23   knowledge or consent by part time special officer."

1    other grievances in response to the schedule changes

2    other than this one?

3        A.   No.  Just this one.

4        Q.   Now you allege in your Complaint that you

5    were denied an opportunity to work paid details.

6    What details are you referring to?

7        A.   Construction details.

8        Q.   When you say construction details, what are

9    we talking about there?

10       A.   I mean if there is a utility company or a

11   construction company doing work in the public

12   roadway, there needs to be someone there to maintain

13   safety at all times to make sure that area is safe

14   for the contractor and the public.  Usually you see a

15   police officer there.

16       Q.   So details that would be performed out in

17   the public roadways --

18       A.   Public ways.

19       Q.   -- monitoring traffic where construction is

20   being formed.  Is that what you mean by construction

21   details?

22       A.   Yes.

23       Q.   Did you request to work those details?

1       A.   Yes, I did.

2       Q.   How did you make these request?

3       A.   I made them verbally.

4       Q.   On how many occasions?

5       A.   A dozen.

6       Q.   Do you recall to whom you made those

7    requests?

8       A.   To Chief Streeter.

9       Q.   Did you make them to anybody else?

10      A.   No, just to Chief Streeter.

11      Q.   Do you recall when you first requested to

12   work paid details?

13      A.   1995.

14      Q.   During your first tenure with the town?

15      A.   Yes.

16      Q.   And do you recall how many of your requests

17   to work paid details came during that first time

18   period that you worked for the town?

19      A.   A couple.

20      Q.   And then the rest of them would have been

21   during your second tenure?

22      A.   Yes.

23      Q.   Were all of the requests that you made to

149

1    details with the Chief, strike that.

2          Let me rephrase that. When you requested

3    of the Chief permission to work details, what did he

4    say?

5    A.   He would say that that's not going to

6    happen.

7    Q.   Did he say anything else?

8    A.   There were occasions when he said I should

9    shut up or be quiet and get back to my job at my desk

10   or he would just laugh.  Or he wouldn't answer me at

11   all.

12   Q.   These are different occasions that you are

13   describing?

14   A.   Yes.

15   Q.   Do you recall of those occasions that you

16   described which occurred during your first tenure

17   with the police department?

18   A.   Just that's not going to happen.  That is

19   never going to happen.  I recall that early.

20   Q.   During your '94 to '96 period?

21   A.   Yes.

22   Q.   Do you recall him making any of the other

23   types of comments that you mentioned during that

1      A.  None of them.

2      Q.  So the conversations between '94 and '96 to

3  your recollection would have occurred with just you

4  and the Chief present?

5      A.  Yes.

6      Q.  Now jumping from '98 to 2002, did you ask

7  the Chief why that wasn't going to happen with

8  respect to you working details, of course.

9      A.  I think that I did ask him why but I knew he

10  wasn't going to respond to me, but I didn't give up.

11      Q.  Were you ever given a reason as to why you

12  weren't going to work details?

13      A.  No.  He did say at one time that you will

14  need to go to the intermittent academy.  You need to

15  go to the academy.  I said fine.  Send me to the

16  intermittent academy.

17      Q.  And the academy or the intermittent academy

18  that you are referring to, is that the police

19  academy?

20      A.  It is intermittent police academy.  It is

21  not for full time police officers.  It is

22  intermittent academy.

23      Q.  So the full time police officers have their

1      A.   NO.   He was very set in his·decision that

2   women weren't going to do details.   I know he said

3   that to me at one time.   I don't think it was in my

4   '94 to '96 -- I think it was in my second stint.

5      Q.   That he stated what to you?

6      A.   No woman would ever work a detail.

7      Q.   Do you recall who would have been present

8   during that conversation?

9      A.   I don't.

10     Q.   Out of the people you have mentioned, you

11  don't recall who would have been present for that?

12     A.   Maybe Inspector Simmons.                    .

13     Q.   Do you have a recollection of him being

14  present for that?

15     A.   He was always around.   He was always there.

16  It would make me think that he was present.   But he

17  may not have been.

18     Q.   So as you sit here today, do you have a

19  specific recollection as to who was present when the

20  Chief indicated to you that no woman would ever work

21  a detail.

22            MR. KLEHM:   Objection.              .

23     A.   I believe that was the conversation between

154

1    he and I.

2        Q.   You don't believe anybody was present when

3    you had that conversation?

4        A.   I don't.  I can recall it happening.  I can

5    still see him standing on the stairs right in front

6    of me standing on the stairs saying that to me.

7        Q.   Where was that?

8        A.   That was in the foyer.

9        Q.   Do you recall anything else that Chief

10   Streeter said to you in response to your request to

11   work details?

12       A.   It is not going to happen.  That's usually

13   what he said or he laughed.

14       Q.   Do you recall anything else that he may have

15   said to you.  Or that you did say to him I should

16   say?

17       A.   I used to say to him I can't fill these

18   details.  I have to go out of town.  I can't fill

19   them.  I could fill them with these girls, with the

20   dispatchers.  And he would shake his head and say it

21   is not going to happen.

22       Q.   And do you recall anything else that was

23   said between you and the Chief regarding your request

1    to work details?

2        A.   No.

3        Q.   Have you now told me everything you can

4    recall about your conversations with the Chief with

5    respect to your request to work details?

6        A.   I believe so, yes.

7        Q.   Now for the academy, do you know what the

8    process was for attending the academy?

9        A.   All your department just had to speak for

10   you to go.  The Chief would recommend you to the

11   academy.

12       Q.   Was there some sort fill out paperwork or an

13   application?

14       A.   Sure.  There was a little bit of paperwork

15   to fill out, yes.

16       Q.   Did you ever fill out that paperwork?

17       A.   Actually I at one time filled out an

18   application and I put it in the Chief's box.  I never

19   got a response or heard about it.  It was what I

20   expected.

21       Q.   Do you recall when you submitted that

22   application to the Chief?

23       A.   No, I don't.

1    that you were referring to earlier?

2        A.    They were the exact same conversations.

3        Q.    But during those conversations you didn't

4    ask the Chief what was the status of your application

5    on the academy?

6        A.    No, I did not.

7        Q.    Did you ever ask the Chief outside of your

8    submission of the application, did you ever ask the

9    Chief to sponsor you to the police academy?

10        A.    That would have been, yes.

11        Q.    I am sorry I am not sure?

12        A.    What we just discussed.  He said you have

13    got to go to the academy.  I said well then sponsor

14    me to go, sponsor us.  Everyone would go.

15        Q.    Who was present when you had that

16    conversation with the Chief, do you remember?

17        A.    I believe that Denise Richard was.

18        Q.    Anybody else?

19        A.    I can't say for sure, no.

20        Q.    And do you recall how many times you asked

21    the Chief to sponsor you, that is?

22        A.    A couple.  A couple of times.  Probably the

23    last few times I asked, that I had the discussion

1    with him.

2        Q.   And what was his response?

3        A.   It was always the same.

4        Q.   And that was?

5        A.   It is not going to happen.

6        Q.   And again did you ever ask him why it wasn't

7    going to happen?

8        A.   He was wearing me down.

9        Q.   So then no, you didn't ask him then?

10       A.   No, I didn't.

11       Q.   And did any of these requests to sponsor you

12   occur during the prior tenure.  If I asked this I

13   apologize if I did.

14            MR. KLEHM:  Objection.

15       A.   Did I ask in my prior tenure if he would

16   sponsor me?  No, that word never came up much.

17       Q.   Now during either period of time that you

18   worked as a dispatcher for the Salisbury Police

19   Department, did full time police officer positions

20   become available with the department?

21       A.   During my tenure, either tenure, yes.

22       Q.   And did you ever make any efforts to apply

23   for a police officer position with the department?

1    A.   As a full time police officer?

2    Q.   Correct.

3    A.   No.

4    Q.   During either tenure did any special police

5  officers' positions become available with the

6  department?

7    A.   Yes.

8    Q.   Did you make any efforts to apply to be a

9  special police officer with the department?

10    A.   I was a special police officer.

11    Q.   Well all the dispatchers were designated as

12  special police officers?

13    A.   Yes.

14    Q.   But earlier we were talking about part time

15  patrol officers or police officers?

16    A.   Yes.

17    Q.   And what you indicated what you remember

18  referring to as special police officer was synonymous

19  with what I have was calling a part time police

20  officer?

21    A.   Yes.

22    Q.   And I am just trying to make sure the record

23  was clear.  But dispatchers are also referred to as

1  special police officers?

2      A.  Yes.

3      Q.  Earlier when we were talking about special

4  police officers, were you including dispatchers as

5  part of that conversation or were you referring to

6  what I was referring to as part time police officer?

7              MR. KLEHM:  Objection to the form of

8  the question.

9      A.  I agreed with your interpretation of the

10  special officer as being a part time special police

11  officer.

12      Q.  So to the extent that we had those

13  conversations earlier, you weren't including

14  dispatchers in the mix unless we were referring to

15  them as dispatchers, correct?

16      A.  Correct.

17      Q.  Now dispatchers are also technically

18  considered a special police officer?

19      A.  Yes, they are sworn officers.

20      Q.  But they don't have any police powers, is

21  that correct?

22      A.  They don't go on patrol.  They aren't

23  patrolmen.

1    A.   No.   No.   I was looking to go to the

2    intermittent academy.

3    Q.   So you weren't seeking to become a part time

4    police officer in sort of the traditional sense, is

5    that correct?

6    A.   Correct.

7    Q.   You weren't interested in becoming a part

8    time police officer to go out on the patrols and

9    things of that type?

10    A.   Correct.

11    Q.   You were just trying to fulfill the

12    requirement that the Chief had given you that you

13    have to go to the academy so you could work details?

14    A.   Correct.

15    Q.   So getting back to my question, you weren't

16    applying then by virtue of that application to become

17    a part-time police officer?

18    A.   Correct.

19    Q.   And you never submitted any other

20    applications to become a part time police officer,

21    did you?

22    A.   No, I did not.

23    Q.   Now are you familiar with an individual by

**185**

1       A. Short leave to long sleeve.

2       Q. There was a difference in the shirt?

3       A. As the season changed, right.

4       Q. Who was required?

5       A. Anybody sitting at the dispatch desk.

6       Q. Now the dispatch uniform the same as the

7   police officer uniform?

8       A. No, it was not.

9       Q. So they were different?

10      A. Yes.

11      Q. How were they different?

12      A. The shirt was white and not navy.

13      Q. The police officers shirts are navy?

14      A. Yes.

15      Q. And the dispatchers are white?

16      A. Yes. With the navy trim.

17      Q. And now you contend that -- is there some

18  sort that the males that work in dispatch weren't

19  required to wear the same uniform is that what you

20  are alleging here?

21      A. Correct.

22          MR. KLEHM: Objection.

23      Q. The males that you are referring to, are

**186**

1   these the male part time officers that were covering

2   dispatch?

3       A. Yes.

4       Q. What did they wear when they worked

5   dispatch?

6       A. They wear their regular police uniform.

7       Q. When they worked in dispatch, they wore

8   their police officer uniforms?

9       A. Yes.

10      Q. Now you have alleged in your complaint that

11  the police subjected you and other females to

12  humiliation and degradation for violating the dress

13  code. How did this occur?

14      A. He would berate you. If your tie wasn't on,

15  for anything like that. He would kind of mock you.

16  Make an issue of it. Continually play it up.

17      Q. Can you give me an example?

18      A. Because that would be the only out of

19  uniform that someone would be. Their tie wouldn't be

20  on. Just kind of hollaring and yelling at you in

21  front of everyone.

22      Q. What would be said?

23      A. You are out of uniform. You are out of

**187**

1   uniform. Do you want to get dressed. Do you want to

2   start over again and get dressed again this morning.

3   Something sarcastic like that.

4       Q. At the time that the Chief said that, was

5   it, in fact, true that the person didn't have the

6   proper uniform on?

7       A. Their tie wasn't on. Sure.

8       Q. Do you recall who would have been present at

9   the time that any of these occasions occurred?

10      A. Other police officers. Patrol officers.

11  The Chief secretary. Other dispatchers.

12      Q. Do you recall any males who were out of

13  uniform that the Chief -- strike that.

14          Did you ever observe the Chief subject

15  any males to that same treatment for being out of

16  uniform?

17      A. I can't recall any. I can't recall him

18  raising his voice to any.

19      Q. You say you can't recall him raising his

20  voice to any of them?

21      A. No.

22      Q. Do you recall him ever addressing the fact

23  that they were out of uniform in front of others?

**188**

1       A. No, I don't recall. I can't recall.

2       Q. Have you ever been present when a male

3   officer was out of uniform in the presence of the

4   Chief?

5       A. Yes.

6       Q. Who was that officer?

7       A. It would have been Officer Sforza.

8       Q. Do you recall when that was?

9       A. No.

10      Q. Do you recall what was taking place at that

11  time?

12      A. No, I don't.

13      Q. Do you recall what the deficiency in his

14  uniform was?

15      A. I believe he had a summer shirt on when we

16  weren't authorized to change to summer uniform.

17      Q. Do you recall when that was?

18      A. Just before the summer.

19      Q. Do you know the year?

20      A. I don't.

21      Q. Did you ever complain, bring this issue to

22  the Chief's attention?

23      A. No.

1    uniform.  Do you want to get dressed.  Do you want to

2    start over again and get dressed again this morning.

3    Something sarcastic like that.

4        Q.  At the time that the Chief said that, was

5    it, in fact, true that the person didn't have the

6    proper uniform on?

7        A.  Their tie wasn't on.  Sure.

8        Q.  Do you recall who would have been present at

9    the time that any of these occasions occurred?

10        A.  Other police officers.  Patrol officers.

11    The Chief secretary.  Other dispatchers.

12        Q.  Do you recall any males who were out of

13    uniform that the Chief -- strike that.

14            Did you ever observe the Chief subject

15    any males to that same treatment for being out of

16    uniform?

17        A.  I can't recall any.  I can't recall him

18    raising his voice to any.

19        Q.  You say you can't recall him raising his

20    voice to any of them?

21        A.  No.

22        Q.  Do you recall him ever addressing the fact

23    that they were out of uniform in front of others?

1     A.   No, I don't recall.  I can't recall.

2     Q.   Have you ever been present when a male

3 officer was out of uniform in the presence of the

4 Chief?

5     A.   Yes.

6     Q.   Who was that officer?

7     A.   It would have been Officer Sforza.

8     Q.   Do you recall when that was?

9     A.   No.

10    Q.   Do you recall what was taking place at that

11 time?

12    A.   No, I don't.

13    Q.   Do you recall what the deficiency in his

14 uniform was?

15    A.   I believe he had a summer shirt on when we

16 weren't authorized to change to summer uniform.

17    Q.   Do you recall when that was?

18    A.   Just before the summer.

19    Q.   Do you know the year?

20    A.   I don't.

21    Q.   Did you ever complain, bring this issue to

22 the Chief's attention?

23    A.   No.

1      A.   No.

2      Q.   At some point did the department hire male

3   dispatchers?

4      A.   Hire them as dispatchers?

5      Q.   As dispatchers, correct.

6      A.   No. Not while I was there.

7      Q.   Now you allege that sometime in November of

8   2001 the Chief began requiring male dispatchers to

9   adhere to the same dress code?

10     A.   Could you repeat what month that was.

11     Q.   November of 2001?

12     A.   Yes.

13     Q.   Now to the extent that you are referring in

14   your complaint to male dispatchers, there weren't any

15   males that were hired as dispatchers at that time as

16   I understand your testimony, is that correct?

17     A.   Yes.

18     Q.   So the to the extent that you are saying

19   male dispatchers, you are referring to the male

20   police officers who are filling in as dispatchers, is

21   that correct?

22     A.   Correct.

23     Q.   Now at that time you were on paid

1      A.   And I turned and looked at him.  It was

2   exposed.  He wasn't in the process of exposing it.

3   It was exposed.  It was right there in front of me.

4   Behind me, in front of me.

5      Q.   And I realize this is probably an

6   uncomfortable topic but when you are saying, "It was

7   behind me.  It was right in front of me."  What are

8   you referring to?

9      A.   His penis.

10      Q.   And was he -- did he have his clothes on?

11      A.   Yes.

12      Q.   Did he have his pants on?

13      A.   Yes.

14      Q.   How was he exposing himself to you?

15      A.   His zipper was unzipped and his penis was

16   outside of his pants.

17      Q.   Outside of his zipper?

18      A.   Outside of his zipper.

19      Q.   His pants were otherwise fastened and up?

20      A.   Yes, they were.

21      Q.   At any point in time did you complain to any

22   department officials concerning Inspector Simmons'

23   conduct toward you?

1    A.  Yes.

2    Q.  Who did you complain to?

3    A.  Chief Streeter.

4    Q.  And what did you tell him?

5    A.  I would do it immediately after that

6  specific type of incident.  And I would I never

7  specified what occurred.  But I called upstairs to

8  his office and asked him to keep his perverted

9  chauffer out of dispatch.

10    Q.  And what else did you stay on those

11  occasions when you complained to Chief Streeter?

12    A.  Basically the same thing every time.

13    Q.  That same statement?

14    A.  The same statement.

15    Q.  What, if anything, did he say in response to

16  you, to your statement?

17    A.  He never responded to it.  He would chuckle

18  at times.

19    Q.  Did you ever have any -- did you ever say

20  anything else further to him about what had happened

21  between yourself and Inspector Simmons?

22    A.  No, I did not.

23    Q.  Taking each category separately with respect

1    to Inspector Simmons attempting to put his hand down

2    your shirt, did you make that telephone call to Chief

3    Streeter on each of those occasions?

4        A.  Yes, I did.

5        Q.  And what about his requests, his being

6    Inspector Simmons' request to sit on your lap?

7        A.  I may have one time made that call upstairs

8    following his request for me to sit on his lap.  I

9    know that I made one call to him.

10       Q.  And what about on the occasion that he

11   exposed himself to you?

12       A.  I made that call also.

13       Q.  When he exposed himself to you, Inspector

14   Simmons did you, did you specifically tell Chief

15   Streeter what had transpired that he exposed himself

16   to you?

17       A.  I did not.

18       Q.  You just indicated your same statement to

19   please keep Inspector Simmons out of dispatch area?

20       A.  I specifically described him as a pervert.

21       Q.  And that was basically the statement that

22   you said to him when you spoke to him about that

23   incident?

1       A.   I don't recall the date.

2       Q.   What incident was it?

3       A.   It would have been the hand down the shirt.

4       Q.   Did you ever complain to any town officials

5   about these incidents with Inspector Simmons?

6       A.   No, I did not.

7       Q.   Did you ever complain to any other police

8   officers, to any police officers other than Chief

9   Streeter about these incidents?

10      A.   I may have.

11      Q.   Who would that person -- who may have that

12  person been?

13      A.   Officer Michael Alder.

14      Q.   You say may have.  What do you mean he may

15  have?

16      A.   I trusted Officer Alder enough to give him

17  that type of information.

18      Q.   Do you recall -- do you have a recollection

19  of specifically telling Officer Alder about any of

20  these incidents?

21      A.   Yes.

22      Q.   Which incident?

23      A.   Sitting on the lap.

1    Q.   Now you previously testified that Chief

2    Streeter had a -- I believe the way you phrased it.

3    He had a practice of going through the dispatcher log

4    with a fine tooth comb, is that correct?

5    A.   Yes.

6    Q.   Now the Chief had as part of that practice

7    he would go through the log on a daily basis,

8    correct?

9    A.   That's correct.

10    Q.   And as part of that practice, he would issue

11    short notes to officers and dispatchers based on what

12    he reviewed in the log, is that correct?

13    A.   Yes.   That's correct.

14    Q.   And the notes would typically involve

15    something that was not done or something -- strike

16    that.

17             The notes would deal with issues he had

18    with whatever the log entry was, correct?

19             MR. KLEHM:   Object to the form, go

20    ahead.

21    A.   Could you just repeat that last.

22    Q.   Let me rephrase it.   These notes that the

23    Chief would issue, those notes would sometimes be

1    A.  The way you phrase it, you could say yes.

2    Q.  You are saying -- what is it about the way I

3    phrased it that makes you pause?

4         MR. KLEHM:  Objection, but go ahead.

5    A.  By reading the log and not seeing an officer

6    having been dispatched, he would put a question mark

7    and he would write officer.  In other words why was

8    an officer not dispatched.  That would be the reason

9    for that little notation.  And it would have been

10   because he didn't look further into the incident that

11   was number that was created in the log.  Had he read

12   into the incident, he would have seen that an officer

13   took the call which in 99 percent of the cases would

14   be because the officer was in the building, did not

15   have to be dispatched.

16   Q.  And these notes that the Chief would

17   sometimes write, it was his practice to -- since you

18   make a copy of whatever the log entry was and hand

19   write a comment down below about the log entry?

20   A.  That's correct.

21   Q.  And those notes would either would be put in

22   the dispatcher's mailbox?

23   A.  Yes.

1     Q.  And just if you could, describe there is

2 sort of a cubby hole that you have.  That information

3 would go in for each dispatcher?

4     A.  Yes.  It was for the whole department.

5     Q.  But there was -- okay.  So each person in

6 the department had their own mail slot so to speak?

7     A.  Yes.

8     Q.  An that's where the Chief would communicate

9 with the department employees via letter and notes

10 and things like that?

11     A.  Yes.

12     Q.  And did other employees use that to

13 communicate back and forth with one another?

14     A.  Yes.

15     Q.  And sometimes did the Chief hand deliver

16 these notes about the log to dispatchers?

17     A.  Specifically to dispatchers?

18     Q.  With respect to when he had an issue with

19 something that was in the log and he would make a

20 copy of that log entry, did he ever hand deliver

21 those as opposed to putting them in the mailbox?

22     A.  Yes.

23     Q.  And these notes that the Chief would hand

1    out, they actually had a name in the department,

2    didn't they?

3         A.   They did.

4         Q.   What was that name?

5         A.   Piss notes.

6         Q.   And during your tenure from talking about

7    the second tenure now from '98 on, did you receive

8    some of these so-called piss notes from the Chief?

9         A.   I did.

10        Q.   And they would be in your mailbox?

11        A.   Normally, yes.

12        Q.   Sometimes he would hand deliver them to you

13   sometimes if you were on duty and he would delivering

14   them.

15              (A brief recess was taken.)

16        Q.   Now these notes, did you sometimes receive

17   similar notes from the dispatcher supervisor?

18        A.   Never.

19        Q.   And did you sometimes -- did you ever

20   receive any kind of notes from the dispatch

21   supervisor concerning missing information in the log

22   entry?

23        A.   Never.

1  correct?

2       A.   Correct.

3       Q.   That's where the incident occurred?

4       A.   Correct.

5       Q.   So did you tell Sergeant Roy that you were

6  going to be processing the 209A restraining yourself

7  from the Salisbury Police Department?

8       A.   I didn't elaborate.

9       Q.   You just said you were getting a 209A for

10 your daughter?

11      A.   Correct.

12      Q.   And so you ran the NCIC check which is part

13 of getting the 209A order?

14      A.   Correct.

15      Q.   Why do you that.  Why do you run the check?

16      A.   It is part the of process requested you

17 normally provide to the judge, the background if

18 there is one.  It shows a pattern.  It doesn't always

19 mean that someone has a criminal background.  They

20 just like for you to have it in front of you.

21      Q.   Was Sergeant Roy present when you ran the

22 NCIC check?

23      A.   I believe he was still in dispatch when I

1    ran the BOP, yes.

2        Q.   When you say BOP, board of probation?

3        A.   Correct.

4        Q.   It is a report that is synonymous with the

5    NCIC check?

6        A.   Correct.

7        Q.   Did you eventually call the on-call judge?

8        A.   Yes, I did.

9        Q.   And was Sergeant Roy present when you called

10   the on-call judge?

11       A.   The sergeant was still in the next door in

12   the next room in his office.  He was preparing to go

13   back on patrol.  As a matter of fact, as he was

14   leaving with officer to go out which is their normal

15   suppertime, I knew that's where they were going.  I

16   wanted to catch him so he could sit on the desk so I

17   could receive the responding call from the judge so

18   as to not be interrupted.  He went out the front

19   door.  I didn't get him to sit on the desk.

20            Within minutes the judge returned the

21   call to me.

22       Q.   At the time you placed the initial call to

23   have the on-call judge contact you, was Sergeant Roy

1    present?

2        A.    Yes, he was in the room right next door to

3    me.

4        Q.    He wasn't sitting in dispatch?

5        A.    He had gone back to the sergeant suite.

6        Q.    It is the office that is off the dispatch

7    area?

8        A.    Yes.

9        Q.    And when the on-call judge called you back,

10    Sergeant Roy had left the building, correct?

11        A.    He had just left the building.

12        Q.    And was your -- so was there anyone present

13    when you spoke to the judge?

14        A.    No.    There was no one there but me.

15        Q.    Had your daughter filled out any witness

16    statements.

17        A.    No, she hadn't.

18        Q.    What did you tell the judge?

19        A.    When the judge returned my call, I told him

20    who I was.  which I normally did when I got a

21    retraining order for a victim.  Told him who I was,

22    where I was employed, and my reason for the call.

23    And it was due to something that occurred.  It was

1   Mr. Nickerson.

2       Q.  Did you ever seek the assistance of the

3   Merrimac police in obtaining the 209A?

4       A.  No, I did not.

5       Q.  Why not?

6       A.  Because when I was at work and she called

7   me, the moment that she called me, I knew that her

8   life was in danger, and I didn't want it to go any

9   further.  So rather than ask someone to fill my

10  position at work and leave the police department,

11  drive to the Town of Merrimac, and ask them to the

12  call the on-call judge.  I did it right from where I

13  was sitting.

14      Q.  Did you log your call to the on-call judge

15  in the Salisbury Police Department log?

16      A.  No, I did not.

17      Q.  Why not?

18      A.  Because it was not a Salisbury police

19  matter.

20      Q.  How long was the 209A in effect for?

21      A.  It was an emergency order.  It would be in

22  affect for one day.  And then I would be able to

23  renew it the following day during court hours.

1       Q.   And did you take any steps to extend it the

2  next day?

3       A.   Yes, I did.

4       Q.   And did your daughter go to court with you?

5       A.   Yes, she did.

6       Q.   And was that 209A extended?

7       A.   Yes, it was.

8       Q.   Now as of your receipt --

9       A.   May I add something?

10      Q.   Sure.

11      A.   I didn't log it in the police department log

12  because it was not a Salisbury police matter.  I did

13  log it in the BOP log required by the state when you

14  run a BOP on individual you must record the date and

15  time when you logged it.  And it was logged in the

16  police log because it is mandatory by the state that

17  when you run a BOP you log it and you sign in on it.

18      Q.   As of your receipt of the Exhibit 17, you

19  are aware that the Chief was investigating that

20  incident, the incident in terms of your issuance of

21  the 209A?

22      A.   Upon receipt of this, I was aware of it,

23  yes.