Page 1

VOLUME: I

PAGES: 1-232

ORIGINAL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04CV10791-RCL

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

SUSAN SEARLE,                         )

      Plaintiff                    )

                                    )

    vs.                              )

                                      )

TOWN OF SALISBURY POLICE              )

DEPARTMENT and LAWRENCE               )

STREETER,                             )

      Defendants           )

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

      DEPOSITION OF LAWRENCE E. STREETER, a
witness called on behalf of the Plaintiff,
pursuant to the Federal Rules of Civil
Procedure, before Kelly G. Patterson, a
Notary Public in and for the Commonwealth of
Massachusetts, at the Law Offices of
James B. Krasnoo, Andover, Massachusetts, on
Wednesday, March 30, 2005, commencing at
10:01 a.m.

1    Q.   What is the basis on which you say that one

2         must be a sworn trained police officer in

3         order to perform details during that period

4         of time?

5    A.   They would have to be a sworn officer having

6         taken an oath of office to perform general

7         law enforcement duties.  They would have to

8         have been academized.  If they were employed

9         by the Salisbury Police, they would have had

10        to have field training and gone through a

11        specific field training program, which is

12        supervised by a field training officer

13        supervisor as well as a field training

14        officer.  They would have had to

15        participated in a thorough background

16        investigation.  They would have had to pass

17        a department sanctioned, which was also

18        civil service sanctioned, psychological

19        evaluation, physical examination.  They

20        would have had to participate in a

21        structured oral board, which consisted of

22        trained officers and supervisors who were

23        trained in supervisory skills and had

24        extensive work knowledge and experience with

1      the department.

2  Q.  What is the basis on which you give this

3      list of qualifications to serve as a detail?

4             MR. FAIR:  Objection.

5  A.  I don't understand.

6  Q.  Is there a written policy and procedure that

7      was in effect from 1994 to 2001 that set

8      forth the qualifications one needed to meet

9      in order to serve on a detail?

10  A.  Yes.

11  Q.  Where was that writing kept?

12  A.  In the department's policy and procedure

13      manual.

14  Q.  During the time that you served as the Chief

15      of Police for the Town of Salisbury, did any

16      individuals serve on a detail who did not

17      work for the Salisbury Police Department?

18  A.  You need to clarify the question, please.

19  Q.  Were there any people during the 1994 to

20      2001 time period who served on a detail

21      within the Town of Salisbury but were not a

22      full-time police officer for the Town of

23      Salisbury?

24  A.  Yes.

Page 36

```
 1         officer and a reserve officer?

 2    A.   Civil service sanction.

 3    Q.   Which one has the civil service sanction?

 4    A.   Reserve officer.

 5    Q.   What is a civil service sanction?

 6    A.   Civil service reserve officer is a part-time

 7         tenured civil service employee.

 8    Q.   Is it fair to say that both special officers

 9         and reserve officers from 1994 to 2001

10         handled details for the Town of Salisbury?

11    A.   Yes.

12    Q.   Just so that it's clear for me, there were

13         no female special officers or reserve

14         officers that served on details within the

15         Town of Salisbury from '94 to '01, is that

16         correct?

17    A.   Yes.

18    Q.   When a need for a detail arose, how, from

19         '94 to 2001, did the Town of Salisbury go

20         about selecting an officer to handle that

21         detail?

22    A.   It was -- there were guidelines within the

23         policies and procedures for the general

24         application of detail officers, however the
```

```
 1              MR. FAIR:  Objection.

 2   A.  I don't understand the question.

 3   Q.  Why didn't you recommend any females for the

 4       intermittent academy from 1994 to 2001?

 5   A.  I had no females that went through the

 6       hiring process.  I beg your pardon, I'm

 7       sorry.  There was one, yes, I did.  There

 8       was one that I recommended for the academy.

 9       I apologize.

10   Q.  Was that Kristin Kazaca?

11   A.  No.

12   Q.  Who was it?

13   A.  Jennifer Scelton.

14   Q.  When did you recommend her for the

15       intermittent academy?

16   A.  I don't recall.  It would have been

17       somewhere around 1997, '98.

18   Q.  Was she a full-time police officer for the

19       Town of Salisbury?

20   A.  No, she was not.

21   Q.  Was she a special officer, reserve officer?

22   A.  She was a special police officer.

23   Q.  Was she a dispatcher?

24   A.  No, she was not.
```

Page 39

1   Q.  How long did she work for the Town of
2       Salisbury?

3   A.  I don't recall.  A year, a year and a half.

4   Q.  Did she go to the intermittent academy?

5   A.  Yes.

6   Q.  What did she do in her capacity as a special
7       officer during the time she worked for the
8       Town of Salisbury?

9   A.  Routine patrol duty.  Same duties as defined
10      by other special reserve officers.

11   Q.  Did she ever serve on details?

12   A.  No.

13   Q.  Did she ever ask you if she could serve on
14      details?

15   A.  I'm sorry?

16   Q.  Did she ever ask you if she could serve on
17      details?

18   A.  I don't recall.

19   Q.  Do you know where she works currently?

20   A.  Yes.

21   Q.  Where does she work currently?

22   A.  Amesbury Police Department.

23   Q.  Is she a full police officer there?

24   A.  No, she is a liaison for the Newburyport

Page 40

1          District Court, and she's also a sexual
2          assault/domestic violence advocate.
3     Q.   What were the circumstances under which
4          Jennifer Scelton was sent to the
5          intermittent academy?
6     A.   She applied through an advertised hiring and
7          went through the hiring process.
8     Q.   For a job as a special officer?
9     A.   Yes.
10    Q.   From 1994 to 2001, were there any other
11         female special officers that worked for the
12         Town of Salisbury Police Department?
13    A.   I don't understand the question.  Special
14         officer -- dispatchers were special police
15         officers, so that function community
16         specialist and greeting people in the foyer
17         as a receptionist.  The leader enforcement
18         person is a special police officer.
19    Q.   So the answer to my question would be yes,
20         then, there were other female special
21         officers from 1994 to 2001?
22    A.   Yes.
23    Q.   How many female special officers were there
24         from 1994 to 2001?

Page 41

1    A.   Several.

2    Q.   Can you give me a range, five, ten?

3    A.   Between five and ten.

4    Q.   Was Susan Searle one of those special

5         officers?

6    A.   Yes.

7    Q.   Can you name any of the other special

8         officers from 1994 to 2001 who were females?

9    A.   Ann Jones, Donna Polersa, Kristine Harrison,

10        Denise Richard, Barbara Webber, Kristin

11        Kazaca, Ann Champaigne, Jennifer Scelton,

12        and then there were a few other dispatchers

13        that I can't recall their names.  There were

14        a few other dispatchers.

15   Q.   Of those female special officers, how many

16        of them, from 1994 to 2001, served on

17        routine patrols?

18   A.   One.

19   Q.   That was just Jennifer Scelton?

20   A.   Yes.

21   Q.   Susan Searle was a dispatcher?

22   A.   Yes.

23   Q.   Was Ann Jones a secretary?

24   A.   Ann Jones was a part-time dispatcher.

1   A.   Yes.

2   Q.   Were there ever circumstances under which

3       male special officers would handle details

4       for the Town of Salisbury?

5   A.   Would handle details?

6   Q.   Yes.

7   A.   Would work details?

8   Q.   Sure, would work details.

9   A.   Yes.

10  Q.   How often did that happen?

11  A.   As their names were reached on a default

12      list.

13  Q.   Can you name these male special officers?

14  A.   Their names would have been available to

15      counsel through the department's personnel

16      roster.  Michael Magnifico, James Leavitt,

17      John Delorey, John Bianchi, John Engle.  We

18      probably had ten or 15 special officers, and

19      I don't mean to be -- I just don't recall a

20      lot of their names.

21  Q.   Of these ten or 15 special officers who

22      worked details for the Town of Salisbury,

23      who were males, were some of them police

24      officers for other towns?

Page 47

1    A.   Yes.

2    Q.   With regard to Mr. Magnifico, Mr. Leavitt,

3         Mr. Delorey, Mr. Bianchi and Mr. Engle, were

4         any of those police officers for other

5         towns?

6    A.   Yes.

7    Q.   Were all of them?

8    A.   No.

9    Q.   Which ones were other towns and which towns

10        were they from?

11   A.   John Bianchi, Beverly PD.

12   Q.   As to the other four, were they police

13        officers in another town?

14   A.   No, not that I'm aware of.

15   Q.   As to those -- Mr. Bianchi, was he a

16        full-time police officer in Beverly?

17   A.   No.

18   Q.   Mr. Magnifico, did he work for the Town of

19        Salisbury other than for details?

20   A.   No.

21   Q.   Where did he work, do you know?

22   A.   He worked for the State of Massachusetts.

23   Q.   Was he a state police officer?

24   A.   No.

Page 48

1   Q.   James Leavitt, where did he work --

2             MR. KLEHM:   Strike that.

3   Q.   James Leavitt, did he work for the Town of

4        Salisbury other than for details?

5   A.   Yes.

6   Q.   What did he do?

7   A.   Dispatch.

8   Q.   John Delorey?

9   A.   Yes.

10  Q.   Did he work for the Town of Salisbury, other

11       than through details?

12  A.   Yes.

13  Q.   What did he do?

14  A.   Dispatch.

15  Q.   Did John Delorey go to the intermittent

16       academy?

17  A.   Yes.

18  Q.   When did he go to the intermittent academy?

19  A.   I don't recall.

20  Q.   When did James Leavitt go to the

21       intermittent academy?

22  A.   I don't recall.

23  Q.   But he did go?

24  A.   Yes.

1    Q.    Is it fair to say then that once one becomes

2          a special police officer, one has to get

3          additional training in order to serve work

4          on a detail?

5    A.    Yes.

6    Q.    Is it fair to say that it is -- in order for

7          an individual to receive that additional

8          training, they have to be recommended for

9          that training by you as the chief?

10   A.    That's part of the process.

11   Q.    So is the answer to my question yes?

12   A.    Yes.

13   Q.    Were there instances in which a special

14         police officer approached you and asked to

15         receive the additional training to allow

16         them to work details and you said no?

17   A.    I don't recall.

18   Q.    Can you recall any instance in which you've

19         said you denied a special officer the

20         opportunity to obtain the additional

21         training in order to work a detail?

22   A.    No.

23   Q.    Did Susan Searle ever ask you if she could

24         obtain additional training in order to work

Page 56

1        a detail?

2   A.   No.

3   Q.   Did Susan Searle ever ask you if she could

4        attend the intermittent academy?

5   A.   No.

6   Q.   Did Susan Searle ever ask you if she could

7        perform work details?

8   A.   Yes.

9   Q.   On how many occasions did she ask you if she

10       could perform work details?

11  A.   Twice, that I'm aware of, that I can recall.

12  Q.   When did each of these instances take place?

13  A.   I don't recall.

14  Q.   Did they take place during the time you were

15       serving as the Chief of Police for the Town

16       of Salisbury?

17  A.   Yes.

18  Q.   As to the first of the two instances, can

19       you tell me what year it took place in?

20  A.   No.

21  Q.   Can you tell me who was present when she

22       asked?

23  A.   No.

24  Q.   Can you tell me whether she asked in writing

1    A.    No.

2    Q.    In 2001 or 2002, when you left the Town of

3          Salisbury Police Department, how many

4          full-time police officers were there?

5    A.    Fifteen or 16, as I recall.

6    Q.    Were they all male?

7    A.    No.

8    Q.    How many female full-time police officers

9          were there?

10   A.    When you're talking -- you have to specify

11         what you mean by "police officers".  I don't

12         understand the question.

13   Q.    You have full-time patrol officers that work

14         for the Salisbury Police Department?

15   A.    Yes.

16   Q.    As of the end of 2001 or 2002 when you left,

17         how many such officers were there?

18   A.    Fifteen or 16.

19   Q.    Of those, how many were male?

20   A.    Fifteen or 16.

21   Q.    How many were female?

22   A.    None.

23   Q.    If we go back to 1989, how many special

24         officers were there for the Town of

1       in 1989?

2   A.  Yes.

3   Q.  How many were there?

4   A.  I don't recall.

5   Q.  More than ten?

6   A.  I would think that ten would be a fair

7       number.

8   Q.  When you left the Salisbury Police

9       Department, how many reserve officers were

10      there?

11  A.  I don't recall.

12  Q.  More than ten?

13  A.  No.

14  Q.  Less than ten?

15  A.  Yes.

16  Q.  Less than five?

17  A.  No.

18  Q.  When you left, how many of the reserve

19      officers were male and how many were female?

20  A.  They were all male.

21  Q.  When you left the Salisbury Police

22      Department, how many special officers were

23      there?

24  A.  I don't recall.

1       female to handle details?

2              MR. FAIR:   Objection.

3  Q.  You can answer.

4  A.  I recommended a female to become a uniformed

5       sworn officer so she could in fact work

6       details.

7  Q.  Who was that?

8  A.  Jennifer Scelton.

9  Q.  Other than Ms. Scelton, was there any other

10      female that you recommended to handle

11      details?

12  A.  Not that I recall.

13  Q.  Are all dispatchers special officers?

14  A.  Yes.

15  Q.  What are the duties of the dispatcher?

16  A.  To accept initial communication as it came

17      into the police department, either in

18      person, in writing, over the telephone.  To

19      act as a receptionist.  They are

20      facilitators of communication, if you will,

21      and they are the link, essentially the

22      communication link between the public and

23      the police officers.  They also served as

24      matrons on certain occasions.

1       personnel records would be myself and Andrea

2       Snyder who was my administrative assistant.

3   Q.  Does Andrea Snyder still work for the

4       Salisbury Police Department?

5   A.  Yes, she does.

6   Q.  Is she still the administrative assistant to

7       the Chief?

8   A.  Yes, she is.

9   Q.  I guess specifically looking?

10  A.  For candidate recruit information.  It would

11      be other than personnel.

12  Q.  Who would it be?

13  A.  That would be Sergeant Kevin Sullivan and

14      Dispatcher Ann Jones who does the overall

15      records file records management.

16  Q.  From 1994 to 2001, did you ever develop a

17      concern about the disparity in the number of

18      male officers versus the number of female

19      officers?

20  A.  No.

21  Q.  Did you ever take any steps during your

22      tenure of the Chief of Police to rectify the

23      disparity between male and female officers

24      in the Salisbury Police Department?

1    A.    Yes.

2    Q.    What is a "piss note"?

3    A.    It's a term that was used typically for

4          notes that I would send to people

5          identifying shortfalls or issues that need

6          to be corrected.

7    Q.    Was there a better term than that that you

8          used?

9    A.    I didn't use that term.

10   Q.    Right.  Was there a term that you used to

11         identify those notes?

12   A.    Just e-mail notices, informal counselling.

13   Q.    You said they were notes to people

14         identifying what, I'm sorry?  I missed the

15         last part you said.

16   A.    That I identified as shortcomings or issues

17         that required follow-up or correction.

18   Q.    Were they discipline?

19   A.    Not discipline, per se.  They are informal

20         counsellings, if you will.  It's not

21         negative discipline.  It could be construed

22         as positive discipline.

23   Q.    Were these notes that you would handout on a

24         daily basis?

Page 126

1   Q.  Did you ever tell Ms. Searle that her

2       opinions were not valued?

3   A.  Yes.

4   Q.  When you said that, did you mean it?

5   A.  I said it sarcastically as part of an e-mail

6       that was taken out of context.

7   Q.  How many times did you tell her that her

8       opinions were not valued?

9   A.  One that I recall.

10  Q.  What were the circumstances under which you

11      said that to her?

12  A.  I don't recall.

13  Q.  Did you ever apologize to Ms. Searle for

14      having written those words?

15  A.  Those words were only one part of a longer

16      e-mail that was said sarcastically, and I

17      think I tried to take the sarcasm out of it

18      by further explanation in the e-mail.  I

19      don't recall specifically apologizing.  I

20      may have, I may not have.

21  Q.  Did you ever feel that you needed to

22      apologize to her?

23  A.  No.

24  Q.  Did she ever confront you with that e-mail?

1   A.   No.

2              (E-mail dated 8/4/99 marked Exhibit

3        No. 2 for Identification.)

4   Q.   Chief, I'm now showing you what has been

5        marked as Deposition Exhibit 2.  Is this the

6        e-mail that you were talking about about

7        Ms. Searle's opinion not being valued?

8   A.   Yes.

9   Q.   It's your testimony now that this e-mail

10       contains sarcasm?

11  A.   Yes.

12  Q.   What portions of this e-mail contain

13       sarcasm?

14  A.   When I told her that I didn't value her

15       opinion.

16  Q.   Is that the only portion that's sarcasm?

17  A.   I think by "adios" is a little flavor of

18       sarcasm, but I try to explain.  I always try

19       to be an open and empathetic person, to the

20       extent that I went overboard to understand

21       people's feelings, and I was frustrated.  I

22       was quite candidly frustrated by the initial

23       insinuation, and that's how I responded.

24  Q.   What initial insinuation?

Page 147

1          MR. KLEHM:  I have to go off for

2     one second.  I'll be right back.

3          (Recess begins at 2:22 p.m. and

4     concludes at 2:23 p.m.)

5  Q.  Rather than take this apart, I'm going to

6     show you a letter dated October 9, 2001 from

7     your counsel to the investigator at the

8     MCAD, and attached to it is an Exhibit A,

9     which consists of four pages.  I'm going to

10     ask you, sir, if you recognize the Exhibit A

11     to that document.

12  A.  Yes, it would be a chronological spreadsheet

13     listing of issues that were maintained in

14     that particular notebook.

15  Q.  Is this a document you prepared?

16  A.  Yes -- I don't recall.

17  Q.  If you didn't prepare it, who would have?

18  A.  Myself or Andrea Snyder.

19  Q.  Did Andrea Snyder, as a part of her duties,

20     prepare discipline history for each of the

21     people we listed earlier for whom you kept

22     folders?

23  A.  She might have maintained and help prepare,

24     yes.

Page 148

1    Q.    So is your answer to my question yes?

2    A.    Yes.

3    Q.    So it wasn't only Susan Searle for whom you

4          maintained a discipline history, much like

5          as appears here in Exhibit A to this letter?

6    A.    Yes.

7                   (Letter dated October 9, 2001

8          marked Exhibit No. 3 for Identification.)

9    Q.    With regard to Exhibit A to Exhibit 3, who

10         was it that prepared the remarks portion of

11         the discipline history?

12   A.    I don't recall.

13   Q.    Was August 1, 2001 the first date on which

14         Susan Searle was presented with this

15         Exhibit A?

16   A.    Yes.

17   Q.    What is the purpose of this Exhibit A?

18   A.    The purpose is to track -- paper trail and

19         track discipline issues with particular

20         employees for administrative purposes.

21   Q.    Are each of these entries, do they represent

22         discipline of some sort?

23   A.    No, they represent positive or negative

24         discipline.  Again, counselling of either

Page 149

```
 1        verbal or written corrections you could
 2        consider positive discipline.  Discipline is
 3        not necessarily a negative thing.
 4    Q.  So if I refer you to the third page of
 5        Exhibit A, will you agree with me that there
 6        are several entries here that don't appear
 7        to constitute discipline of any kind?
 8    A.  Third page?
 9    Q.  Yes.
10    A.  Yes.
11    Q.  Again, then, I ask, what is the purpose of
12        this discipline history?
13    A.  I think I've explained that to you.  The
14        third page is something that I compiled
15        later organizing all the issues that had
16        occurred on specific dates.
17    Q.  So what's the significance then to the
18        discipline history of the entry of July 25,
19        2001 which says "Day off"?
20    A.  It was a chronological tracking of the
21        events that occurred during this significant
22        timespan, if you will.  I think there was
23        some times when the Internal Affairs
24        investigators couldn't reach Ms. Searle, and
```

1          it's just an administrative tracking.

2     Q.   What's been marked as Exhibit A, is this

3          what was attached to the binder that you

4          presented to her?

5     A.   Some of it, yes.

6     Q.   What do you mean by "some of it"?

7     A.   Some of it.

8     Q.   What portions were not attached on August 1,

9          2001?

10    A.   Probably not the third page or the fourth

11         page.

12    Q.   When you say "probably", was the third or

13         fourth page attached to --

14    A.   I don't recall.  I don't believe it was, no.

15    Q.   Do you have an intact copy of what it was

16         that you presented to her on August 1, 2001?

17    A.   No.

18    Q.   Where is the intact copy of what you

19         presented to her on August 1, 2001?

20    A.   It would be with her personnel file.

21    Q.   Does that continue to be in the possession

22         of the Salisbury Police Department?

23    A.   Yes, it does.

24    Q.   As of the time you left, did the Exhibit A

Page 153

```
 1        I would have preferred to have done more.  I
 2        would have liked to have done more, it just
 3        wasn't --
 4   Q.   What would Susan Searle have had to have
 5        done in order to perform details?
 6   A.   She would have to file an application to be
 7        a special police officer, a sworn special
 8        police officer.  She would participate in a
 9        structured oral interview.  She would, if
10        recommended, she would have to take a
11        psychological exam, a physical exam,
12        purchase her own uniforms within the defined
13        standards of the department, participate in
14        a field training officer program.
15   Q.   Attend the intermittent academy?
16   A.   Thank you.
17   Q.   Was she a sworn special police officer?
18   A.   Yes, she was a special police officer for
19        the purposes of being sometimes a person in
20        charge of the police building, the
21        receptionist for people coming into the
22        building, and performing as a matron.
23   Q.   Are you saying she would have to file a
24        separate application to be a sworn special
```

Page 202

```
 1   Q.   Are you aware of whether any of the officers

 2        listed in this document are female?

 3   A.   No, I've never seen the document.

 4   Q.   Can you name a single female who performed

 5        detail work who did not work for the Town of

 6        Salisbury?

 7   A.   There was a female officer from the Town of

 8        Rowley, as I recall.

 9   Q.   What was that officer's name?

10   A.   I don't recall.

11   Q.   When did that officer perform a detail?

12   A.   I don't recall.

13   Q.   On how many occasions did that officer

14        perform a detail?

15   A.   I believe it was once.

16   Q.   Other than that one incident, can you name

17        another female who performed a detail who

18        did not work for the Town of Salisbury?

19   A.   No.

20   Q.   Did it ever cross your mind that there were

21        not enough women handling details?

22             MR. FAIR:  Objection.

23   A.   No.

24   Q.   Did you ever believe that women, by virtue
```