UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SUSAN SEARLE )<br>     Plaintiff )<br> )<br>v. )<br> )<br> )<br>TOWN OF SALISBURY, SALISBURY )<br>POLICE DEPARTMENT and, )<br>LAWRENCE STREETER )<br>     Defendants. )<br> ) | Civil Action No. 04-CV-10791-RCL |

### AFFIDAVIT OF SUSAN M. SEARLE

I, Susan M. Searle, under oath, depose and state as follows:

1.      In or around September, 1994, I began working as a full-time public safety dispatcher for the Police Department of the Town of Salisbury, Massachusetts. During most of my tenure at the Salisbury Police Department, I also served as a liaison between the Salisbury Police Department, the Women's Crisis Center in Newburyport, MA, and the Newburyport District Court as a legal advocate, assisting members of the public who sought to obtain restraining orders pursuant to M.G.L. c. 209A. I also served as a matron, assisting with the processing of female arrestees.

2.      In 1994, when I began working for the Salisbury Police Department, Ron Stanwood, a male, was a dispatcher. He retired approximately two years later, and then began working as a maintenance worker for the police department.

3.      In or around August, 1994, and throughout my tenure as a dispatcher, I was designated as a sworn "special officer" for the Salisbury Police Department. Special officers who were in a patrol position possessed the same powers of arrest as full-time officers.

4. I was responsible for filling detail shifts during both of my tenures. I do not recall ever being permitted to call the Town of Rowley, which had a female officer, in order to fill a detail opening. I sought to handle paid details myself during my tenure with the Salisbury Police Department. In or around 1994, I first approached Chief Streeter regarding my wish to perform lucrative traffic/construction paid details (hereinafter, "paid details") in Salisbury, thereby affording me an opportunity to earn additional income and to have greater responsibility. I would have received more pay for working paid details than I would have received for working a comparable number of overtime hours as a dispatcher. From 1998 through 2001, I received a base pay of approximately $12.36 per hour. I also received overtime at a rate of approximately $18.54 per hour. As of 2001, upon information and belief, individuals received approximately $28.00 per hour for handling details for the Town of Salisbury. The details have a four hour minimum. I sought to do details because of the comparably high rate of pay and in order to supplement my low base pay. With the exception of the intermittent academy training and the "specific field training," I met the requirements listed by Streeter to perform details, and I was fully qualified. To the best of my recollection, some male special officers were placed on details before completing intermittent academy.

5. I served as a member on an oral board for another police department, and I assisted Salisbury in conducting an oral board. The oral board administered to dispatcher candidates was the same as the oral board administered to persons seeking to become a police officer.

6. In or around September, 1996, I left the Salisbury Police Department voluntarily.

7. In or around March, 1998, at the request of the Salisbury Police Department, I returned to the Salisbury Police Department as a full-time dispatcher.

8. The Town of Salisbury had one part-time dispatcher, Ann Jones.

9. I often worked overtime shifts throughout my tenure at the Salisbury Police Department, and I performed my job duties professionally. I was a special police officer during my two tenures (1994 through 1996 and 1998 through 2002) with the Salisbury Police Department. At all times relevant, I performed my job at a high level of competence. I regularly received praise for the quality of my work, and I received periodic increases in pay.

10. The regular police uniform included a blue shirt, while the dispatcher's uniform included a white shirt. Not until November, 2001, upon information and belief, after I filed the MCAD action pertaining to my allegations, did Chief Streeter require the male dispatchers to adhere to the same dress code as the female dispatchers.

11. Throughout my tenure, I observed that the Salisbury Police Department required female dispatchers to meet a higher standard of work performance than fill-in male dispatchers and male police officers. The Salisbury Police Department, through its officers, agents, servants or employees, including, without limitation, Streeter routinely degraded, belittled and insulted the female dispatchers, including, without limitation, me. Streeter often referred to women as "sluts," despite the protests of other female dispatchers and myself. The Salisbury Police Department, through its officers, agents, servants or employees, including, without limitation, Streeter, discriminated against other female employees of the Salisbury Police Department and me because of our gender.

12. During the course of my tenure, Chief Streeter made an effort to obtain various benefits for the male officers, such as computer equipment and extra overtime, without making any similar effort on behalf of the female dispatchers. I protested this unfair practice by voicing my objections to Streeter, but Streeter did not discontinue the practice.

13. During my tenure, I did not observe Chief Streeter insult or humiliate male officers or male dispatchers in the presence of their peers.

14. During the course of my tenure, the Salisbury Police Department, through its officer, agents, servant or employee, Chief Streeter, treated males and females within the department differently in terms of wages and salaries. The Salisbury Police Department required females, including, without limitation, me, to adhere to waiting periods for pay raises, while males did not have to endure such waiting periods. The Salisbury Police Department hired male special officers, who would serve temporarily as dispatchers, at the same rates of pay that the full time female dispatchers received, without having to begin at the lower rate at which the women dispatchers were hired. In so doing, Streeter prevented female dispatchers from obtaining opportunities for overtime. The Salisbury Police Department afforded male dispatchers preference for open shifts ahead of full-time female dispatchers.

15. On many occasions, I told Streeter that I objected to this practice of unequal pay and benefits, but Streeter did not discontinue the practice.

16. In or around 2000, a full-time dispatcher at the Salisbury Police Department suffered injuries in a car accident, and was unable to work. In violation of the terms of the union contract, without affording proper notice or otherwise taking into account the current dispatchers, Chief Streeter altered the dispatch schedule in order to add two part-time male special officers as dispatchers, thereby eliminating opportunities for the female dispatchers to work overtime. At the same time, the two male special officers accumulated numerous overtime hours through a combination of dispatch shifts, construction details and patrol shifts. When I confronted Chief Streeter about the unfair situation, he said, in words or substance, "be glad that you still have a full time schedule."

4

17. Additionally, in using reserve officers to handle the dispatch shifts, Streeter took the possibility of overtime away from the full-time female dispatchers, which became the subject of a grievance. Several summer special police officers also filled in for dispatchers. Summer special officers were not covered by the CBA. While working as dispatchers, these summer special police officers, all of whom were male, received, at Streeter's direction, the same rate of pay as did the experienced dispatchers, all of whom were female, even though that rate of pay was higher than the rate of pay that the summer special police officers received for working on patrol. Additionally, the summer special police officers did not receive the lower rate of pay received by new dispatchers. As a result, at Streeter's direction, the experienced dispatchers, who were women, unfairly received the same rate of pay as male special police officers who filled in for dispatch shifts.

18. From 1998 to 2001, Streeter hired at least ten males to serve as temporary summer special officers for the Salisbury Police Department. Most of the males worked beyond their temporary appointments. Once their appointments ended, the officers either remained special officers, or they pursued becoming reserve officers or full-time officers. During that period, no women attempted to follow this route, except Jennifer Skelton and Kristin Kozacka. Kozacka started as a meter maid, and eventually she went to the intermittent academy. Kozacka never performed a detail, and she never worked as a police officer for the Town of Salisbury. Skelton attended the intermittent academy, and then, shortly thereafter she left to work for Amesbury Police Department. Neither Skelton nor Kozacka ever performed any paid detail for the Town of Salisbury.

19. From approximately 2000 through July, 2001, including on or after April, 2001, Salisbury Police Department Inspector Richard Simmons, a close friend of Chief Streeter later

the interim Chief of the Salisbury Police Department, engaged in a pattern of sexual harassment of me – a pattern which included, among other things, physical humiliation, offensive utterances, and other wrongful conduct which unreasonably interfered with my work performance. The instances of distasteful and inappropriate conduct increased in 2001.

20. On numerous occasions, including on or after April, 2001, Simmons attempted to place his hand down the front of my uniform while I was sitting at my work station. I always verbally protested this conduct to both Simmons and Chief Streeter, and I moved Simmons' hand away.

21. On several occasions, including, without limitation, on or after April, 2001, Simmons would relieve me of my duties at the dispatcher console while I took a break and, upon my return from my break, he would remain seated and would plead with me to sit on his lap. I always verbally protested this conduct to both Simmons and Chief Streeter.

22. I felt humiliated, embarrassed and ashamed by Simmons' wrongful conduct. Upon information and belief, at no time did the Salisbury Police Department take any steps to reprimand Simmons.

23. In or around April, 2001, I heard Sergeant Kevin Sullivan of the Salisbury Police Department stating that no male officer would be laid off by the Town. He stated that the women would be laid off first because the men have careers.

24. On or about July 21, 2001, I last performed work on behalf of the Salisbury Police Department.

25. On or about July 26, 2001, I forwarded a letter via certified mail to Chief Streeter responding to the unfounded and spurious allegations made against me.

26. On July 27, 2001, in an act of retaliation and without any basis therefor, Chief Streeter ordered me not to appear at the workplace for the next four days.

27. On or about August 1, 2001, Chief Streeter and I held a meeting arising out of Scione and Sullivan's allegations and my response thereto, in which I made further allegations of wrongful conduct within the department.

28. At the meeting, Chief Streeter displayed a large three ring binder containing hundreds of pages of what he claimed to be incidents of wrongdoing on my part which were contained in my personnel file. Upon information and belief, Chief Streeter fabricated the contents of the binder in an effort to discriminate against, and retaliate against, me. At no time before August 1, 2001 did Streeter present the binder to me, and, at no time before August 1, 2001, did I know of the existence of the binder.

29. The documents included in the binder contained handwritten notes, but such notes, in my opinion, did not constitute a majority of the documents. I did not consider the notes to constitute discipline, and I did not consider them to be grounds for termination. The documents included in the binder contained various reports and other documents completed by the Salisbury Police Department.

30. Until that meeting, I was unaware of almost all of the incidents referenced in that three ring binder. The binder included incidents dating back to 1994, which was before I was rehired in 1998, and, which could not have served, therefore, as a basis upon which I was terminated. At that time, I requested a copy of my personnel file.

31. I was not discourteous to Patrolman Scione on July 4, 2001. On that occasion, I sent Scione on a call, and Scione was rude and unprofessional to me over the radio. On July 25, 2001, I forwarded a letter to Streeter outlining my version of the events.

32. On or about July 5, 2001, I did not fail to assign an officer to a call for service, nor was I evasive or less than forthright when questioned about the incident.

33. At no time did I fail to assign an officer, under the circumstances alleged by Sullivan.

34. On or about July 11, 2001, I did not negligently delay relaying an emergency call to the fire dispatcher, and I was later exonerated by Salisbury Police Department for that alleged misconduct.

35. In obtaining a restraining order for my daughter, I did not violate any oral or written policy of the Salisbury Police Department, as I am not aware of any oral or written policy, nor any rule or regulation, which required me to obtain the authority or authorization of an officer before initiating 209A restraining order proceedings. At all times relevant, Sgt. Roy was aware that I was seeking the emergency restraining order. During my telephone call with the judge, I explained to the judge, among other things, that I was a Salisbury dispatcher seeking an emergency restraining order for my daughter in the Town of Merrimack, and the judge issued the order. I even explained to the judge that I may have to put him on hold in the event that I received other calls, and he accepted that situation.

36. I do not believe that I used the word "traumatized" when speaking with Anne Jones. I do recall using that language in a letter to Streeter; I believed that the Salisbury Police Department was treating me unfairly. I believe that the Salisbury Police Department would not have treated a male in the same manner in which it treated me.

37. On or about August 1, 2001, Chief Streeter invited me to a meeting with him in his office. Without any basis or reason therefor, he placed me on administrative leave.

38. Upon information and belief, the 209A incident, which was not raised during the course of this meeting on August 1, 2001 and which I did not learn was an issue until I received a letter from Chief Streeter on or about August 8, 2001, was simply a pretext for Chief Streeter to attempt to dismiss or otherwise discipline me in a discriminatory and retaliatory manner.

39. On September 20, 2001, not having received a copy of my personnel file as requested, I forwarded a letter to Chief Streeter via certified mail, return receipt requested, seeking a copy of my personnel file.

40. On or about November 27, 2001, in an act of retaliation and before I received my personnel file, the Town served a letter upon me giving me notice of a Pre-Disciplinary Hearing because of certain alleged "ongoing performance problems" and my alleged failure to comply with purported Salisbury Police Department policies regarding restraining orders.

41. I deny that there were any "ongoing serious performance problems during [my] employment with the Department." I deny "failing to assign officers to calls, giving improper, inaccurate, or incomplete information to officers responding to calls, failing to completely and accurately fill out police logs, and insubordination." I deny being evasive with my answers when questioned regarding a complaint filed by Sergeant Sullivan alleging that I had failed to assign an officer to a call for service, and I deny failing to assign an officer in that instance. I deny failing to comply with policy in the recording and issuance of emergency restraining orders involving a family member. I deny that I had any performance problems. I deny that, at any time, I was unable to carry out my duties in a competent, adequate manner.

42. On December 7, 2001, more than two months after the written request was made and shortly before the then scheduled pre-disciplinary hearing, Chief Streeter finally provided me, through his counsel, with a copy of my personnel file. Moreover, upon information and

9

belief, Chief Streeter turned over the requested personnel file only on the eve of the disciplinary hearing so as to prevent me from having the opportunity to defend myself consistently with concepts of due process.

43. The file includes hundreds of documents covering alleged incidents dating back to approximately 1994, none of which had ever been made part of my personnel file during the course of my work at the Salisbury Police Department.

44. At no time did the Salisbury Police Department or Streeter take any remedial, corrective or disciplinary action of any kind with regard to the ongoing acts of gender discrimination and sexual harassment in the workplace at the Salisbury Police Department, despite my ongoing protests.

45. I was on administrative leave for approximately six months. During that time, I was unable to earn overtime pay, upon which I depended to supplement my income.

46. I considered the January 3, 2002 disciplinary hearing, and my subsequent termination, to constitute acts of retaliation against me for, among other things, seeking equality for men and women in the department.

47. On or about January 31, 2002, the Salisbury Police Department wrongfully, and without any basis therefor, discharged me. Shortly thereafter, I filed a grievance through my union.

48. I have been attempting to have the arbitration scheduled in the matter of my Union termination grievance. Through no fault of my own, the arbitration remains unscheduled.

49. At some point between the time that I was placed on administrative leave and the time of my termination, I was present at the home of Denise Richard and speaking with Denise Richard and Sgt. Foote. Streeter and Simmons parked a vehicle across the street and watched

Richard's home for approximately fifteen or twenty minutes. I felt that Streeter was trying to intimidate me.

50. As a result of the wrongful conduct of the Town of Salisbury and Lawrence Streeter, I have suffered lost wages, various lost benefits, lost accrued pension, lost longevity pay, lost overtime, and lost detail pay in an amount in excess of $100,000.00. I also suffered significant emotional distress, mental anguish and pain and suffering. My doctor placed me on medication.

Signed under the pains and penalties of perjury this 29th day of September, 2006,

/s/ Susan M. Searle
Susan M. Searle

**CERTIFICATE OF SERVICE**

I, Paul J. Klehm, Esq., hereby certify that I have served a copy of the within document upon all counsel of record not served via ECF and upon all parties not represented by counsel by first class mail, postage pre-paid, on September 29, 2006.

/s/ Paul J. Klehm
Paul J. Klehm