UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SUSAN SEARLE | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| TOWN OF SALISBURY, SALISBURY | ) |
| POLICE DEPARTMENT and, | ) |
| LAWRENCE STREETER | ) |
| Defendants. | ) |
| | ) |

Civil Action No. 04-CV-10791-RCL

## PLAINTIFF SUSAN SEARLE'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

At its very core, the within action involves allegations of sexual harassment, gender discrimination and retaliation asserted by Plaintiff Susan Searle, a dispatcher at the Salisbury Police Department from 1994 to 1996 and 1998 to 2001, against the Town of Salisbury and its former police chief, Lawrence Streeter arising out of (a) the unfair treatment of women in the workplace, including without limitation, the refusal to permit females to handle lucrative paid details and the unfair application of the dress code, (b) multiple acts of sexual harassment sufficient to constitute a hostile work environment, (c) unequal pay for women, and (d) various acts of retaliation against Searle for seeking equality for women in the workplace. Based upon the evidence adduced thus far by Searle, there are, at the very least, genuine issues of material fact that preclude the entry of summary judgment in favor of Defendants on Searle's claims for violations of Mass. Gen. Laws c. 151B, Title VII, the Federal Equal Pay Act, the federal civil rights act, and intentional infliction of emotional distress[1].

---

[1]  In her opposition, Searle wrote that she does not oppose Defendants' motion for summary judgment with regard to her claims pursuant to Mass. Gen. Laws c. 214, the Massachusetts Equal Rights Act, breach of contract, breach of

## FACTS

Searle relies upon, and incorporates herein by reference, Plaintiff's Response to Defendants' Statement of Material Facts to Which There is No Genuine Issue Pursuant to Local Rule 56.1 and Plaintiff's Statement of Further Material Facts.

## ARGUMENT

### I.     Standard of Review

The party moving for summary judgment must meet the initial burden of demonstrating the absence of a genuine issue of material fact, upon which a reasonable jury could find for the nonmovant.  Fed. R. Civ. P. 56(c).  All facts must be viewed in the light most favorable to the nonmovant, giving the nonmovant "the benefit of all reasonable inferences that can be drawn from these facts."  *Lockhart v. Cedar Rapids Comm. Sch. Dist.,* 963 F. Supp. 805, 814 (N.D. Iowa 1997) (citation omitted).  "A 'genuine' issue is one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir. 1989), would permit a rational fact finder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds,* 896 F.2d 5, 7 (1st Cir. 1990).

Motions for summary judgment should only rarely be allowed in discrimination cases. *Bauer v. Metz,* 59 F.Supp.2d 896, 901 (N.D. Iowa 1999).  "Because discrimination cases often turn on inferences rather than on direct evidence, we are particularly deferential to the nonmovant." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994).

---

covenant of good faith and fair dealing, negligent infliction of emotional distress and intentional infliction of emotional distress (against Defendant Town of Salisbury and Salisbury Police Department only).

II.     **Searle Has Presented Genuine Issues of Material Fact Supporting Her Claims Pursuant to Mass. Gen. Laws c. 151B and Title VII (Counts I and II).**

In Count I, Searle asserts three distinct discrimination claims pursuant to Mass. Gen. Laws Chapter 151B: (1) unlawful gender discrimination; (2) unlawful sexual harassment amounting to the creation of a hostile work environment; and (3) unlawful retaliation.  In Count II, Searle asserts parallel federal claims pursuant to Title VII (42 U.S.C. §2000e, *et seq.*).  The same basic analysis applies to both the Title VII and M.G.L. c. 151B claims.  *See Fite v. Digital Equip. Corp.*, 232 F.3d 3, 7 (1st Cir. 2000) ("In our view, federal and Massachusetts law are now generally aligned….") (citations omitted).  Where there is no direct evidence of discrimination, courts employ a three-pronged framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, Searle must first establish a *prima facie* case of discrimination.  *Id.* at 802.  The elements of the *prima facie* case vary depending upon the circumstances, but it always involves setting forth facts which, if unexplained, would permit one to infer discrimination. *Mass. Practice*, Vol. 45, §8.30 (1996).  At that point, the defendant bears the burden of production to show lawful grounds for the action taken," and "produce[] evidence of underlying facts in support thereof."  *Brunner v. Stone & Webster Eng'g Corp.*, 413 Mass. 698, 700, 603 N.E.2d 206, 208 (1992)(citation omitted).   Thereafter, the burden shifts back to plaintiff to show, by a preponderance of evidence, that the reason for the adverse employment action articulated by the employer is not the real reason for the termination, but is, instead, a pretext for discrimination.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).

**A.    Searle Has Presented Genuine Issues of Material Fact With Reference to Her Claims for Gender Discrimination Pursuant to Mass. Gen. L. c. 151B and Title VII.**

In this case, Searle alleges that, since she is a woman, Defendants treated her differently than they treated the men employed at the police department.  The differences manifested themselves in four main ways:  (a) the refusal of Defendants to permit females, including, without limitation, Searle, to perform paid details, (b) the Defendants' preference for males to handle certain dispatcher shifts, (c) the unequal pay received by men and women for serving as dispatchers, and (d) the unequal enforcement of the dress code.

In order to demonstrate a *prima facie* discrimination case, the plaintiff must demonstrate the following:  (1) she is within a protected class; (2) she was qualified; (3) she was rejected despite qualifications; and (4) the defendant filled the position, or continued its efforts to fill the position, with someone with plaintiff's qualifications.  *Wiener v. Polaroid Corp.*, 790 F. Supp. 363, 365 (D. Mass. 1992).  A *prima facie* case is a "small showing" that is "not onerous" but "easily made."  *Quinones v. Houser Buick*, 2005 WL 1668195, at *2 (D. Mass. July 14, 2005).

**1.    Defendants wrongfully refused to permit females, including, without limitation, Searle to perform paid details, the Defendants prevented Searle and other females from working certain dispatcher shifts, and Defendants followed an unequal pay practice for men and women working as dispatchers.**

Searle served as a sworn special officer for the Salisbury Police Department for both of her tenures with the department (1994 to 1996 and 1998 to 2002[2]).  (Resp., ¶71).  She was a highly competent dispatcher.  (Resp., ¶¶16, 75).  Searle also served as a matron and a court liaison regarding restraining order matters for the department.  (Resp., ¶70).

---

[2]   At times in these materials, Searle will refer to the second period as 1998 to 2001.  This is because Searle worked her last shift as a dispatcher in July, 2001.  She was later placed on administrative leave, and she was terminated in January, 2002.  (Resp., ¶¶94, 101 and 102).

Her requests to Streeter to permit her to perform details date back to 1994.  (Resp., ¶72).
She asked Streeter more than a dozen times whether she could perform details, most of those
requests occurring during her second tenure with the department (1998 to 2001).  (Resp., ¶23).
Sgt. Foote, a thirty-one year veteran of the Salisbury Police Department who retired in 2002,
testified that Searle was "almost being a hound about wanting to work road details, being
persistent about it."  (Resp., ¶¶16, 23).  In response to her requests, Streeter "would say that
that's not going to happen," or he would tell her to shut up and get back to her work, or he would
not respond at all.  (Resp., ¶23).

In fact, Chief Streeter ended the practice of permitting females to perform details when
he became Chief in 1989.  (Resp., ¶¶1,17).  From 1994 to 2001, no female special officers for the
Town of Salisbury served any details within the Town.  (Resp., ¶¶17).  A female police officer
from Rowley did handle one detail on a fill-in basis on one occasion.  (Resp., ¶17).  Streeter
stated that "[n]o woman would ever work a detail," and he told Sgt. Foote, "Do not call women
for road jobs anymore."  (Resp., ¶17).  When Sgt. Foote questioned Streeter on the issue, Streeter
replied, "I'm the chief and that'll be it."  (Resp., ¶17).

At one point, Streeter told Searle that she needed to attend the intermittent academy in
order to handle details.  (Resp., ¶23).  In order to attend the intermittent academy, one needed to
be recommended by Streeter.  (Resp., ¶17).  Searle requested that Streeter recommend her for the
intermittent academy on more than one occasion. (Resp., ¶23).  Streeter would refuse.  (Resp.,
¶23).  Searle even went so far as to complete an application to be able to handle details, and to
leave it in Streeter's mail slot at the station, but she received no response.  (Resp., ¶23).  Streeter
did send one or two women to attend the intermittent academy during his tenure as Chief, but
they never performed any details.  With the exception of the intermittent academy training and

the "specific field training," Searle met the requirements listed by Streeter to perform details, and she was fully qualified. (Resp., ¶16). The only reason why she did not meet all of the purported requirements to perform details was that Streeter unilaterally prevented her from doing so.

While Searle was a special officer who wished to perform details, Streeter permitted ten to fifteen male special officers to perform details during Streeter's tenure as chief. (Resp., ¶17). Streeter did not hire any male dispatchers during Searle's tenure. (Resp., ¶17). As of the date of his retirement in 2001, there were fifteen or sixteen full-time patrol officers in the Town of Salisbury, all of whom were male. (Resp., ¶17).

At his deposition, Streeter testified that, in order to perform details, one had to (a) take an oath of office to perform general law enforcement duties, (b) attend the academy, (c) attend field training, (d) participate in background investigation, (e) pass a psychological evaluation and a physical examination, and (f) participate in an oral board. (Resp., ¶16). While Streeter claims that these requirements were contained in the department's policies and procedures manual, to date, upon information and belief, Defendants have yet to produce same. Defendants also did not attach same to their summary judgment materials.

Searle wanted to perform details in order to supplement her income with the comparably high rate of pay given for details. (Resp., ¶16,72). From 1998 to 2001, she received a base pay of approximately $12.36 per hour. (Resp., ¶72). Individuals handling details received approximately $28.00 per hour, with a four hour minimum. (Resp., ¶72).

Instead of permitting Searle to handle details, Streeter used male reserve and summer special police officers to fill those roles. (Resp., ¶18). The summer special police officers received, at Streeter's direction, the same rate of pay as the experienced female dispatchers, even though that rate of pay was higher than the rate of pay that the summer special police officers

received for working on patrol.  (Resp., ¶18).  Additionally, the summer special police officers did not receive the lower rate of pay received by new dispatchers.  (Resp., ¶18).  As a result, at Streeter's direction, the experienced dispatchers, who were women, unfairly received the same rate of pay as male special officers who filled in for dispatch shifts.  (Resp., ¶18).

Male special officers received preference for open shifts ahead of full-time female dispatchers.  (Resp., ¶80).  For instance, in 2000, after a full-time dispatcher was out of work for some time as a result of a car accident, Streeter filled the dispatcher shifts with two part-time male special officers, thereby eliminating the possibility for female dispatchers to work overtime. (Resp., ¶82).  At the same time, the two male special officers accumulated numerous overtime hours through a combination of dispatch shifts, construction details and patrol shifts.  (Resp., ¶82).  When confronted by Searle, Streeter said, in words or substance, "be glad that you still have a full time schedule."  (Resp., ¶82).  Moreover, the Salisbury Police Department required females, including, without limitation, Searle, to adhere to waiting periods for pay raises, while males did not have to wait.  (Resp., ¶80)[3].

The above facts demonstrate, if nothing else, that Streeter ascribes to the old-fashioned, out-dated sexual stereotyping that police officers should be men and that women should be back at the station in their role as dispatchers.  Even though Searle met the qualifications (as much as she could, given Streeter's refusal to send her to intermittent academy), Streeter refused to permit her to handle details because she is a woman.  *See Dalrymple v. Town of Winthrop*, 50 Mass.App.Ct. 611, 740 N.E.2d 204 (2000)(female officer prevailed on c. 151B claims against Town and Chief of Police for retaliation and sex discrimination where, among other things, female officer was not allowed to go on drug raid with male officers); *Riffelmacher v. Board of*

---

[3]  Streeter also made an effort to obtain computer equipment and other benefits for the male officers, without making any similar effort on behalf of females.  Searle protested to Streeter, but to no avail.  (Resp., ¶78).

*Police Commrs. Of Springfield*, 27 Mass.App.Ct. 159, 160, 535 N.E.2d 1280 (1989)(judgment on gender discrimination in favor of female who was not appointed police officer based upon apparent sexual stereotyping affirmed). Instead, he used male officers to handle details.  His contention that Searle was not qualified for the position is a mere pretext;  a fair inference, taking the evidence in the light most favorable to Searle, is that he was discriminating against her on the basis of her gender.  Defendants have failed to advance a legitimate, non-discriminatory reason for failing to permit Searle to perform details. *See Townsend v. Gray Line Bus. Co.*, 767 F.2d 11 (1st Cir. 1985) (Lack of experience on part of applicant did not render him unqualified candidate in order to negate finding of *prima facie* case of discrimination).

The case of *Northeastern Metropolitan Regional Vocational School v. Massachusetts Commission Against Discrimination*, 31 Mass. App. Ct. 84, 87 (1991), is instructive here.  In that case, a school committee refused to hire a qualified female candidate to fill a superintendent's position because, according to a member of the committee, the position required "a big strong man with a big strong voice" to deal with the politics of the committee.  Assessing the gender discrimination claim under Mass. Gen L. c. 151B, the Court found:

> Here, the statements made by the two members of the committee were couched in terms of **"we do not want a woman in that position"** and "what we need is a big strong man who can come to the committee and fight." When this evidence is considered along with statements made by the chairperson of the committee and another committee member that the complainant was the victim of discrimination based on her sex in the selection process and evidence of her qualifications, including the testimony of another committee person that the complainant was the best qualified person for the job, we conclude that the commission's determination that the reasons advanced for the complainant's rejection were mere pretexts is based on evidence that a reasonable person might accept as adequate to support these conclusions.

*Id.* at 89-90 (emphasis added).

A discrimination claim brought under M.G.L. c. 151B and Title VII may also be based upon unequal pay. *See Mass. Practice*, Employment Law, Vol. 45, §8.9 (1996). The Defendants argument concerning unequal pay (see pp. 4-5 of Defendants' brief) misses the point of the claim. Here, the argument is not that women received less pay for the same work; it is, rather, that Streeter was permitting relatively inexperienced male summer special officers who worked as dispatchers to receive the same rate of pay as experienced female dispatchers, even though those same male officers would normally receive a lower rate of pay for working as special officers or as new dispatchers. In other words, Streeter arranged for the male officers to skip from the lower rate of the new dispatchers to the higher rate of the experienced, female dispatchers. Additionally, Streeter favored men over women to fill in the dispatch positions, thereby depriving the otherwise low-paid women of much-needed overtime. In so doing, Streeter discriminated against the female dispatchers, including, without limitation, Searle. Women in the Salisbury Police Department were "second rate." (Response, §17).

## 2. Defendants enforced the dress code differently for men and women.

Searle also contends that the Salisbury Police Department subjected female dispatchers to a more stringent dress code than that which the department applied to men. It is acceptable for an employer to institute a dress code which has a comparable neatness requirement for men and women employees. *See e.g. Knott v. Mo. Pacific R.R.*, 527 F.2d 1249 (8th Cir. 1975). If, however, an employer applies a dress code to women more strictly than to men, courts may find the dress code to be discriminatory against women. *See O'Donnell v. Burlington Coat Factory Warehouse, Inc.*, 656 F.Supp. 263(D.Ohio, 1987)(women sales clerks had to wear uniforms, while men could wear normal business attire; held, rule discriminated against women).

Defendants argue that Searle's dress code claim is meritless, since there were no male dispatchers. (Defendants' Memo., at p. 17). Defendants also claim that reserve officers working in dispatch were required to wear their police uniforms. (Defendants' Memo., at p. 18). Defendants' argument ignores the fact that males working as dispatchers wore blue shirts, rather than the dispatcher's white shirts. (Resp., ¶21). In other words, while working as dispatchers, male officers were permitted to circumvent the dress code requirements for dispatchers. Since there were, in essence, no male dispatchers, and since Streeter effectively refused to hire females as full-time police officers, the dress code served to separate the men from the women.

Moreover, Streeter would berate women in the presence of others for minor dress code violations, such as failing to wear a tie, but Searle does not recall Streeter raising his voice when a male officer was out of uniform. (Resp., ¶21). Streeter required females to be crisp and neat in their appearance, while males were not held to that standard. (Resp., ¶21). Once again, the reasons advanced by Defendants for the application of the dress code are mere pretexts. The bottom line, therefore, is that, as applied, the dress code discriminated against women.

**B.    Searle Has Presented Genuine Issues of Material Fact With Reference to Her Claims for Sexual Harassment Pursuant to Mass. Gen. L. c. 151B and Title VII.**

In this case, Searle also contends that she was sexually harassed by Streeter and Simmons at the Salisbury Police Department during her tenure. Under Title VII, a plaintiff may demonstrate unlawful discrimination by showing that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001), quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)(citations omitted).

To prevail on a hostile work environment claim under Chapter 151B, the plaintiff must present evidence of verbal or physical conduct (1) of a sexual nature; (2) that is unwelcome; (3) that has the purpose or effect of creating a hostile or humiliating or offensive work environment; and (4) that interferes with the plaintiff's ability to perform his or her job.  *See College-Town, Div. of Interco, Inc. v. Massachusetts Com'n Against Discrimination*, 400 Mass. 156, 162-163 (1987); Mass. Gen. Laws c. 151B, §1(18).   Under Title VII, Plaintiff must show:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*O'Rourke*, 235 F.3d at 728.

Whether the conduct has the purpose or the effect of creating a subjectively *and* objectively offensive work environment are "typically the most important" elements in a Title VII claim.  *Id.*  These findings are both to be determined based upon the totality of the circumstances, including:

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris,* 510 U.S. at 23.  The inquiry is fact-specific; there is no minimum number of incidents of harassment required to create a hostile work environment.  *Gnerre v. Massachusetts Comm'n Against Discrimination*, 402 Mass. 502, 508-509 (1988); *see also Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999) (imposing hostile work environment liability based upon single incident).   "Incidents of sexual harassment serious enough to create a work environment permeated by abuse typically accumulate over time, and many incidents in isolation may not be

serious enough for complaint." *Cuddyer v. Stop and Shop Supermarket Co., Inc.,* 434 Mass. 521, 532-33 (2001). When those incidents are considered together, however, they may show that Plaintiff was forced to "work under intolerable, sexually offensive, conditions," thus giving rise to a hostile work environment claim. *Cuddyer*, 434 Mass. at 533.

In the case at bar, Searle had to endure attempts by Simmons to put his hand down her shirt. (Resp., ¶56, 84). Searle protested the conduct to Simmons and Streeter, and she moved Simmons' hand away. (Resp., ¶84). On several occasions, including, without limitation, after April, 2001, Simmons would plead with Searle to sit on his lap. (Resp., ¶85). Searle always verbally protested this conduct to Simmons and Streeter. (Resp., ¶85). Simmons exposed his private parts to Searle in the workplace. (Resp., ¶56; *see Manno v. BJ's Wholesale Club*, 150 F.Supp.2d 325 (D. Mass. 2001)(Defendants' summary judgment motion denied where, among other things, Defendant exposed himself to co-worker.)). Searle was subjected to foul language which disparaged women, despite her protests. (Resp., ¶60). She had to endure a comment about the size of her buttocks. (Resp., ¶60). Searle would alert Streeter when Simmons, Streeter's close friend, was behaving inappropriately, but Streeter did not correct the situation. (See Resp., ¶56, 83). Additionally, Searle had to endure the constant mistreatment of women in the workplace, simply because of her gender, as described above. She worked in an abusive environment, where she was forced to endure inappropriate conduct from Simmons and Streeter. Searle felt embarrassed and ashamed by Simmons' wrongful conduct. (Resp., ¶86).

Defendants seek to downplay Searle's claims by arguing that since Searle also uttered profanities, there can be no abusive work environment and that the claims against Streeter for uttering "sluts" should be dismissed. (Defendants' Memo., at p. 24). Upon information and belief, there was no suggestion in the record, however, that Searle was ever reprimanded for any

profanities that she said.  Moreover, Mass. Gen. L. c. 151B provides for individual liability.  *See Beaupre v. Cliff Smith & Associates, Inc.*, 50 Mass.App.Ct. 480, 490-91, 738 N.E.2d 753, 764 (2000) (corporate president individually liable for acts of harassment); *Dalrymple v. Town of Winthrop*, 50 Mass.App.Ct. 611, 622, 740 N.E.2d 204, 212 (2000) (Chief individually liable for harassment of subordinate).  In this case, Streeter is liable to Searle, not only for his own acts of harassment against her, but also for aiding and abetting under M.G.L. c. 151B, §4(5) for failing to take corrective action at a time when he knew of the ongoing sexual harassment committed by Simmons and others in the workplace.  See Resp., ¶60;  *see Chapin v. University of Massachusetts at Lowell*, 977 F. Supp. 72 (D. Mass. 1997) (police chief's failure to act gave rise to aiding and abetting claim under M.G.L. c. 151B, §4(5)).

> Defendants argue, at page 25 of their memorandum, that
>
> in the absence of any evidence that Searle complained to any Town officials about Streeter's alleged conduct toward her or that the Town should have been aware of it, the Town cannot be held liable for any alleged harassment by Streeter under Title VII.

This argument fails because both Title VII and Chapter 151B make employers vicariously liable for hostile work environments created by supervisors.  *Noviello v. City of Boston*, 398 F.3d 76, 95 (1st Cir. 2005).  Here, it is undisputed that Streeter, the chief of police, was Searle's supervisor.  Searle complained about Simmons' wrongful conduct to Streeter.  Streeter failed to address the problem. (*See* Resp., ¶¶84, 85).  Therefore, Searle has presented genuine issues of material fact regarding whether Salisbury is liable to her under Title VII and Chapter 151B.

> The Defendants next aim their sights at Searle's work performance.  (Defendants' Memo., at p. 26).  Relying upon Searle's testimony that she was a very good dispatcher and that her performance remained at a high level throughout her tenure, the Defendants also argue that Searle's claims fail because her work performance did not suffer as a result of the alleged

harassment.  Searle does not need to demonstrate that her work performance suffered.  Under c. 151B, Searle must show "the offensive conduct is based on the employee's sex, is unwelcome and is sufficiently severe or pervasive to interfere with the employee's job performance **or** to create an abusive work environment."  *Morehouse v. Berkshire Gas Co*., 989 F.Supp. 54, 61 (1997).   Moreover, under Title VII, the question as to whether Searle suffered any adverse employment consequences as a result of the harassment is "irrelevant to a hostile work environment claim.  It is sufficient for Plaintiff to show a hostile atmosphere to prevail on such claim."  *Rose v. Baystate Medical Center, Inc*., 985 F.Supp. 211, 217 n. 3 (D.Mass. 1997).   Thus, Searle need not show any adverse employment consequences.  Such a result comports with public policy.  To refuse to permit a claimant to assert a hostile work environment claim because the claimant performed his or her duties successfully amid hostile work conditions would only reward defendants for the claimant's valor, thus creating a cycle of abuse in the workplace.

Assuming *arguendo*, though, that Searle must demonstrate that the conduct interfered with her job performance, the evidence adduced in this case demonstrates that the ongoing harassment of Searle certainly altered the conditions of her employment.  Most egregiously, Salisbury terminated her without cause.  Even before her termination, she missed some days of work because she was traumatized by the baseless complaints that Sullivan and Scione made against her and because she believed that the Salisbury Police Department was treating her unfairly.  (*See* Resp., ¶45).  As described above, she had to endure ongoing harassment from Simmons and Streeter.  She suffered emotional distress and mental anguish.  (Resp., ¶104).  Thus, Searle did, and a hypothetical reasonable person would, suffer adverse interference with

their work performance as a result of Defendants' wrongful conduct[4].  Under both a subjective

and an objective standard, then Searle's work performance was affected by the harassment[5].

### C.    Searle Has Presented Genuine Issues of Material Fact As To Whether She Was Retaliated Against For The Exercise of Protected Rights.

To succeed on a claim for retaliation under the workplace discrimination statutes, the

plaintiff must show:  (1) a reasonable, good faith belief that the employer was engaged in

unlawful discrimination; (2) that she engaged in legally protected conduct; (3) an adverse

employment action; and (4) causal connection between the plaintiff's engagement in legally

protected conduct and the adverse employment action.  *Ritchie v. Department Of State Police*, 60

Mass. App. Ct. 655, 664 (2004) (citation omitted).  Defendants argue that the facts preclude an

inference of retaliatory motive from being drawn from the timing of Searle's discharge because

Searle had not filed complaints with the Town about Streeter's use of the word "sluts" before the

"209A investigation" began.  (Defendants' Memo., p. 21).

The Defendants miscast Searle's retaliation claim.  The Defendants retaliated against

Searle for seeking equality for women in the workplace and for complaining about acts of sexual

harassment in the workplace.  In addition to treating her poorly in the workplace, the Chief

placed Searle on administrative leave without cause based upon a purported, falsified

Disciplinary History that did not include actual discipline.  Streeter informed Searle, in early

August, 2001, that any further misconduct would result in potential termination.  Then, without

Searle having worked another day (and, therefore, without having any opportunity to commit any

---

[4]  Some caselaw suggests that the relevant inquiry is not whether Plaintiff subjectively suffered interference with her work performance, but rather whether a reasonable person in plaintiff's position would suffer an adverse impact on his or her work performance. *See Muzzy v. Callihane Motors, Inc.,* 434 Mass. 409, 411-12, 749 N.E.2d 691, 694 (2001);  *but see Ramsdell v. Western Massachusetts Bus Lines, Inc.,* 415 Mass. 673 (1993).

[5]  Finally, Defendants cannot have it both ways:  they cannot, on the one hand claim that Searle was justifiably terminated because of her poor performance while simultaneously claiming that she was a very good dispatcher in an effort to escape liability for sexual harassment claims.  Those conflicting positions, on their own, demonstrate the presence of genuine issues of material fact which a factfinder must resolve.

further misconduct), Streeter sought to terminate Searle based, in part, upon an alleged act (the restraining order she obtained for her daughter) that had occurred before August, 2001. (Defendants' Exhibits C, F).  Streeter also delayed turning over Searle's personnel file to her until the eve of a hearing.  (Resp., ¶96,98).  These are all retaliatory acts.

In addition, Streeter engaged in another act that is particularly indicative of retaliatory intent.  After Searle was placed on administrative leave but before her termination, Searle was present at the home of Denise Richard and speaking with Richard and Sgt. Foote, when Streeter and Simmons parked a vehicle across the street and watched Richard's home for approximately fifteen or twenty minutes.  (Resp., ¶103).  Searle felt that Streeter was trying to intimidate her. (Resp., ¶103).  Even Simmons admitted that he was uncomfortable.  (Resp., ¶103).  Streeter's act of intimidation demonstrates that placing Searle on administrative leave and scheduling a disciplinary hearing leading to her termination was a mere pretext.  *Cf. Ligenza v. Genesis Health Ventures of Massachusetts, Inc.*, 995 F. Supp. 226, 232 (D. Mass. 1998).

In sum, Searle has demonstrated all four of the elements needed to show a retaliation claim.  Defendants have failed to present a viable reason for the misconduct, and the wrongful acts are clear evidence of retaliation.

### D.    Searle's Discrimination, Harassment and Retaliation Claims Under Title VII and Chapter 151B Are Not Time-Barred.

On pages 12 through 14 of their memorandum, Defendants contend that Searle's harassment claims are time barred.  At the time, a complainant needed to file a claim with the MCAD and the EEOC within 180 days of the last act giving rise to the discrimination claim.  See *Cuddyer*, 434 Mass. at 531 n. 11;  *Jorge v. Rumsfeld*, 404 F.3d 556, 564 (1st Cir. 2005).

Under the continuing violation doctrine, to establish a timely sex discrimination claim based, for instance, upon a hostile work environment, a plaintiff must show (1) that she was

compelled to work in a hostile work environment during her employment; and (2) that during the

six month period preceding her filing of a complaint with the Massachusetts Commission

Against Discrimination, she experienced at least one incident of discrimination which

> standing alone might not necessarily support her claim, but which substantially
> relates to earlier incidents of abuse, and substantially contributes to the
> continuation of a hostile work environment, such that the incident anchors all
> related incidents, thereby making the entirety of the claim for discriminatory
> conduct timely.

*Cuddyer*, 434 Mass. at 533 (2001).  The Supreme Judicial Court explained this policy:

> A hostile work environment may be manifested by a series of harassing acts that
> have been described as "pinpricks [that] only slowly add up to a wound." *Keeler*
> *v. Putnam Fiduciary Trust Co.*, 238 F.3d 5, 12 (1st Cir.2001).  One pinprick may
> not be actionable in itself, and its abusive nature may not be apparent except in
> retrospect, until the pain becomes intolerable. *See Cuddyer*[], *supra* at 533, 538-
> 539, 750 N.E.2d 928. One subjected to a hostile work environment may suffer
> weeks, months, or even years of persistent and humiliating harassment before
> reaching the point where the only reasonable course of remedial action is to file a
> claim with the MCAD. *See id.* at 539-540, 750 N.E.2d 928.

*Clifton v. Massachusetts Bay Transp. Authority*, 445 Mass. 611, 616 n.5 (2005).  The continuing

violation doctrine applies equally to claims of unlawful retaliation and gender discrimination.  *Id.*

at 616.  In the case at bar, Searle filed an MCAD/EEOC action on August 29, 2001 in which she

claimed that she was being discriminated against on the basis of sex.  (See Exhibit N).  The

language of the initial MCAD Complaint also includes sexual harassment. *Id.* "I have been

subjected to harrasement [*sic*] based on sex by the male officers in the department." *Id*.  The

document also read:  "Cause of discrimination based on:  Sex.  (Female)," and the document

cites to M.G.L. c. 151B §4 ¶1.  There is a fair inference, therefore, that the Complaint refers to

both gender discrimination and sexual harassment in the workplace.  In or around December,

2001, Searle sought to amend that claim to add additional claims, thus putting Defendants on

notice of same. (See Defendants' Exhibit G).  In the filings, Searle referred to various incidents

and ongoing claims:

a.    that, from late 1999 or early 2000 through May 2001, Streeter subjected Searle to demeaning and insulting comments, often in the presence of her co-workers.  (See Defendants' Exhibit G).

b.    that, in February, 2000, after a female dispatcher was injured in a car accident, Streeter prevented female dispatchers from obtaining overtime pay by hiring two male special officers to fill the dispatcher shifts.  (See Defendants' Exhibit G).

c.    that, in or around April 2001, she heard Sgt. Sullivan state that no male officer would be laid off because the men have careers.  (See Exhibit N).

d.    that, in April or May, 2001, Streeter told Searle that if her buttocks were any larger, he would need to purchase another dispatch chair.  (See Defendants' Exhibit G).

e.    that, in June 2001, Streeter referred to female dispatchers as "girls."  (See Defendants' Exhibit G).

f.     that, on July 24, 2001 Simmons and another officer informed Searle that Scione and Sullivan had filed false complaints against her in an effort to discriminate against her for being a woman.  (See Exhibit N).

g.    that, on July 27, 2001, Streeter told Searle not to return to work for four days.  (See Defendants' Exhibit G).

h.    that, on August 1, 2001, Streeter presented Searle with hundreds of pages of alleged acts of wrongdoing on the part of Searle (as discussed more fully herein).  (See Defendants' Exhibit G).

i.     that Streeter failed to provide Searle with a timely copy of her personnel file upon request, only turning it over on the eve of a hearing. (Defendants' Exhibit G); and

j.     that Streeter proceeded with a disciplinary hearing against Searle, ultimately leading to her termination.  (See Defendants' Exhibit G).

Courts make a distinction between serial violations (like the series of events listed above) and systemic violations, both of which exist here.  "A systemic violation is 'the maintenance of a general practice or policy aimed at members of a protected class of employees.'"  *Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 441 Mass. 632, 643, 808 N.E.2d 257, 267 n. 14 (2004) quoting *Cuddyer*,

434 Mass. at 531-32 n. 12. "A systematic policy of discrimination is actionable as a continuing violation 'even if some or all of the events evidencing its inception occurred prior to the limitations period.'" *Jenkins v. Wal-Mart Stores, Inc*., 910 F.Supp. 1399, 1415 (N.D. Iowa, 1995)(citation omitted).    In the filings, Searle also made general systemic violation allegations regarding ongoing discriminatory practices or polices in effect at the Salisbury Police Department:

> a.    that, throughout her employment, Searle had` "been subjected to harassment based on sex by the male officers in the department."  (Exh. N).
>
> b.    that female dispatchers were held to a higher standard of work performance throughout her tenure.  (Defendants' Exhibit G).
>
> c.    that Streeter degrades and insults the female dispatchers, but not male dispatchers. (Defendants' Exhibit G).
>
> f.    that Streeter treated males and females differently in terms of salary. (Defendants' Exhibit G).

These general practices or policies of discriminating against women, without more, demonstrate that Searle had to endure hostile working conditions during her tenure with the Salisbury Police Department.  Many of the individual incidents which occurred within the 180 day period before August 21, 2001 constitute the "pinpricks" described in the quote from *Clifton* above.  (*See e.g.*, ¶¶ a, c, d, e, f, g and h on p. 18, *supra*).  These individual incidents are supplemented, and aggravated, though, by the general practice or policy which was intended to discriminate against women.  The fact that these wrongful policies existed before the 180 day period is not fatal to Searle's claims.  *See Jenkins*, 910 F.Supp. at 1415.

Defendants argue that, since Searle cannot recall specifically when from 1998 to 2001 she had conversations with Streeter in which he refused to permit her to handle details, such claims fall outside of the scope of the 180 day limit.  (Defendants' Memo., at p. 13). Searle

testified that she asked to work road details a dozen times, most of those times occurring during the 1998 to 2001 timeframe. (Resp., ¶23). Eventually, Streeter wore Searle down, and she gave up asking to be sent to the intermittent academy so that she could handle details. (Resp., ¶23). What Defendants fail to recognize is that Streeters' refusal to permit Searle, or any other female dispatcher, to work details, was an ongoing wrong. At some point, she did not need to ask in order to learn the answer. That ongoing condition, coupled with all of the other evidence of discriminatory conduct, demonstrate that Searle's claims are not barred by the 180 day limit.

Defendants also argue that the allegations of sexual harassment by Simmons must be barred because Searle failed to file her claims against him back in 1999. (Defendants' Memo., at p. 13-14). In her Complaint, Searle asserted several claims against Simmons, which included, without limitation, Simmons asking to sit on her lap and seeking to put his hand down her shirt, in the dispatcher area. (*See* Resp., ¶56). These incidents occurred on several occasions, including after April, 2001. (Resp., ¶¶84, 85).

In *Cuddyer*, the Supreme Judicial Court refused to adopt a rule that would bar a c. 151B claim if plaintiff failed to file an MCAD complaint within six months of learning that she was subjected to an incident of sexual harassment which could form the basis of a continuing violation. *Cuddyer*, 434 Mass. at 537, 720 N.E.2d at 941. The *Cuddyer* Court noted that the *O'Rourke* decision, which required the filing of an MCAD action within six months of the date that plaintiff has notice of a viable discrimination claim, fails to "recognize fully that an employee who suffers from recurring acts of abusive … conduct that, over time, rise to the level of a hostile work environment, may not be able to appreciate the breadth of the discriminatory environment until later." *Id*. at 538, 720 N.E.2d at 941. A hostile work environment requires a pattern of sexual harassment which may be clear only in hindsight. *Id.* Even the *O'Rourke*

decision recognized that a potential claimant may not realize that he or she has a claim until there is an overall pattern. *O'Rourke*, 235 F.3d 732. Searle filed her claims shortly after she was placed on administrative leave. It is a fair inference that, at that point, Searle determined that there was a pattern of discrimination which would not improve. While Simmons began calling Searle a "slut" and asked her to sit on his lap back in 1999, that conduct was simply one of many events which, when considered with all of the other wrongful acts and the wrongful, discriminatory policies against women at the Salisbury Police Department, caused Searle to determine that she had a viable MCAD claim against the Defendants.

    **E.**    **Searle Exhausted Her Administrative Remedies With Respect To Her Discrimination, Harassment and Retaliation Claims Under Title VII and Chapter 151B.**

Defendants argue in their Memorandum, at pp. 11-12, that Searle failed to set forth a claim for sexual harassment with the MCAD, and that, therefore, her claim for sexual harassment must be dismissed. This argument fails because plaintiffs may allege a claim in a complaint "where the factual statement in [the] written charge should have alerted the agency to an alternative basis of discrimination, and should have been investigated regardless of whether it was actually investigated." *Davis v. Lucent Technologies, Inc.*, 251 F.3d 227, 233 (1st Cir. 2001), *quoting Conroy v. Boston Edison Co.*, 758 F. Supp. 54, 58 (D. Mass. 1991). Stated differently, the civil complaint is limited in scope to the EEOC charge and "the investigation which can reasonably be expected to grow out of that charge." *Luciano v. Coca-Cola Enterprises, Inc.,* 307 F.Supp.2d 308, 323 (D.Mass. 2004)(citation omitted).

Here, Searle's initial MCAD complaint gave fair notice of her claims for gender discrimination and sexual harassment to the MCAD, the EEOC and the Defendants. See *Luciano,* 307 F.Supp.2d at 323. Searle went on to file a motion to amend her claim, in which she presented details about her sexual harassment, gender discrimination and retaliation claims. (See

21

Defendants' Exhibit G).  The previous section of the within memorandum lists the various

allegations set forth in Searle's initial MCAD complaint and in the motion to amend, all of which

give fair notice of the claims advanced here.

Moreover, Searle obtained right to sue letters from both the MCAD and EEOC. (See

Exhibit O;  Resp., ¶66).  Thus, she properly exhausted her administrative remedies with regard to

her sexual harassment, gender discrimination and retaliation claims.

### III.    Searle Has Presented Genuine Issues of Material Fact Supporting Her Claims Pursuant to 42 U.S.C. §1983.

To prevail on a claim pursuant to 42 U.S.C. §1983, the plaintiff must show:  (1) that she

was deprived of a federally protected right; and (2) that the deprivation occurred under color of

state law.  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).  In the case at bar, Searle has presented

evidence sufficient to create genuine issues of material fact as to whether Streeter has deprived

her of federally protected rights under Title VII.  Streeter's actions have deprived Searle of her

right to be free from sexual harassment under Title VII, her right of equal protection, which

includes her right to be free from discrimination, under Title VII, and her right to be free from

retaliation under Title VII.  *See* Argument §II, *supra*; *see also Rivera v. Puerto Rico Aqueduct

and Sewers Authority*, 331 F.3d 183, 192 (1st Cir. 2003) ("When a plaintiff attempts to use

§1983 as a parallel remedy to a Title VII claim, the *prima facie* elements to establish liability are

the same under both statutes").

In addition, Searle has presented evidence sufficient to create genuine issues of material

fact as to whether Streeter has deprived her of federally protected rights under the Equal

Protection clause of the 14th Amendment, more specifically, her right to be free from invidious

discrimination on the basis of sex.  *See United States v. Virginia*, 518 U.S. 515 (1996).  Under

the equal protection clause, the Supreme Court "carefully inspect[s] official action that closes a

door or denies opportunity to women." *Id.*, 518 U.S. at 532. Streeter, as the police chief of Salisbury, systematically closed doors and denied opportunities to women, as shown above.

Where Searle has demonstrated intentional discrimination against female employees of the Salisbury Police Department by Streeter, individually and in his capacity as the police chief of Salisbury, "the burden of justification is demanding and it rests entirely on the State." *Id.*, 518 U.S. at 532. Defendants must demonstrate an "exceedingly persuasive" justification for their disparate treatment of women and men. *Id.*, at 533. Defendants cannot sustain this burden, and summary judgment should be denied. Moreover, Defendants must show that the discrimination challenged serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives." *Nguyen v. Immigration and Naturalization Service*, 533 U.S. 53, 60-61 (2001), *quoting Virginia*, 518 U.S. at 533. Here, unlike in *Nguyen*, Defendants have failed to advance any governmental objectives that were to be advanced by denying equal employment and compensation opportunities to women or by sexually harassing women. As such, Searle has been denied equal protection.

Searle has also presented sufficient evidence to create a genuine issue of material fact as to whether Streeter, and other Salisbury employees, were acting under color of law when he violated Searle's rights under Title VII and the Equal Protection clause. *See Gomez*, 446 U.S. at 640. "[A] public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988). Public employees who enforce unconstitutional policies or customs do so under the color law. *Wulp v. Corcoran*, 454 F.2d 826 (1st Cir. 1972).

Moreover, Defendants' argument that Streeter is qualifiedly immune from Searle's §1983 and tort claims, *see* Defendants' Memo. at page 28, fails because he violated Searle's clearly

established rights under Title VII and the Equal Protection clause. To determine whether an official is entitled to qualified immunity, courts must follow a two-part test. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). The first inquiry must be whether a constitutional right was violated on the facts alleged by the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Wilson*, 526 U.S. at 609. In the case at bar, Searle has presented detailed and cumulative evidence of unlawful discrimination in violation of Title VII and the Equal Protection clause.

The second prong of the qualified immunity determination is whether the right violated was clearly established. *Saucier*, 533 U.S. at 201. In the case at bar, the relevant objective question is whether a reasonable police chief would have understood that (1) systematically denying women the opportunity to work similar jobs to men; and (2) creating a hostile work environment by sexually harassing women, would have violated Title VII and the Equal Protection clause. *See*, *e.g.*, *Anderson v. Creighton*, 483 U.S. 635, 636 (1987).

For the reasons set forth in Argument §§I and II, *supra*, any reasonable police chief would have understood that the challenged conduct violated Searle's clearly established constitutional and statutory right to be free from discrimination on the basis of her sex. *See Swain v. Spinney*, 117 F.3d 1, 9 (1st Cir. 1997). As such, Defendant Streeter is not entitled to qualified immunity.

### IV.    Searle Has Presented Genuine Issues of Material Fact Supporting Her Claims Pursuant to the Federal Equal Pay Act.

In order to establish a *prima facie* case under the Federal Equal Pay Act, the plaintiff must show: "[1] that her employer was subject to the Act, and [2] that she was paid less than her male counterparts who were performing work requiring substantially equal skill, effort, and responsibility under similar working conditions." *McMillan v. Massachusetts Soc. for*

*Prevention of Cruelty To Animals*, 140 F.3d 288, 298 (1st Cir. 1998). Once the plaintiff has

shown a *prima facie* case,

> [d]efendants must then prove by a preponderance of the evidence that the pay
> disparity can be explained by a legitimate factor such as seniority or performance.
> *See Corning Glass Works v. Brennan*, 417 U.S. 188, 195-96, 94 S.Ct. 2223, 2228-
> 29, 41 L.Ed.2d 1 (1974); *Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833,
> 843 (6th Cir.1997). Thus, in cases brought under the Equal Pay Act, the plaintiff
> need not show that the defendant was motivated by a discriminatory animus, as
> required in cases governed by the *McDonnell-Burdine* burden shifting framework.

*McMillan*, 140 F.3d at 298. The Federal Equal Pay Act provides an affirmative defense when

pay disparities result from a seniority system. 29 U.S.C. §206(d)(1)(i). Defendants argue that

this claim must be dismissed because Searle "has not identified any male reserve police officer

who actually received a higher rate of pay to serve as a dispatcher than she did." (Defendants'

Memo., p. 4). This argument fails, where the Salisbury Police Department hired male special

officers who would serve temporarily as dispatchers at the same rates of pay that the full time

female dispatchers received, without having to begin at the lower rate at which the women

dispatchers were hired. As such, Searle was paid equally with male fill-in dispatchers who

lacked seniority to entitle them to the same pay. (Resp., ¶80).

Defendants argue that the Salisbury Police Department did not employ any full or part-

time male dispatchers, so that Searle cannot show that her male counterparts were substantially

equal work. (Defendants' Memo., p. 5). *See McMillan*, 140 F.3d at 298. Proof that the

positions being compared are "substantially equal," turns on a fact-specific, multifactored

analysis. *See* 29 C.F.R. §1620.14. Job descriptions are relevant, but not necessarily

determinative of whether positions are substantially equal. *McMillan*, 140 F.3d at 299. The

court must also look to how the compared positions are actually performed. *See Seligson v.

Massachusetts Institute of Technology*, 677 F. Supp. 648, 654 (D. Mass. 1987). Defendants

argue that the male officers who served as dispatchers were not performing equal work because

the male dispatchers would "perform police patrols in the community [and] to work details."

(Defendants' Memo., p. 5).  This argument misses the mark because those male officers would

not have been able to perform police patrols in the community or to work details while

dispatching.  (See Resp., ¶19).  A rational juror would infer that the duties of a female dispatcher

were the same as the duties of a male fill-in dispatcher, while dispatching.

Finally, Defendants argue that Searle fails to take into account the benefits of full-time

employment compared with part-time employment.  (Defendants' Memo., p. 5).  While fringe

benefits may be taken into account for the purposes of determining one's wage, 29 C.F.R.

§1620.10, the value of such benefits is a genuine issue of material fact, *see Medina-Munoz v. R.J.*

*Reynolds,* 896 F.2d 5, 7 (1st Cir. 1990), and, therefore inappropriate for summary judgment.

### V.    Searle Has Presented Genuine Issues of Material Fact Supporting Her Claim For Intentional Infliction of Emotional Distress Against Defendant Streeter.

In Count VII, Searle asserts a claim for intentional infliction of emotional distress against

Streeter.  In order to recover on her claim for intentional infliction of emotional distress Searle

must demonstrate

> (1) that the actor intended to inflict emotional distress or that he knew or should
> have known that emotional distress was the likely result of [the] conduct, ... (2)
> that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds
> of decency' and was 'utterly intolerable in a civilized community,' ... (3) that the
> actions of the defendant were the cause of the plaintiff's distress, ... and (4) that
> the emotional distress sustained by the plaintiff was 'severe' and of a nature 'that
> no reasonable [person] could be expected to endure.'

*Agis v. Howard Johnson Co.*, 371 Mass. 140 (1976), *quoting* Restatement (Second) of Torts §46,

comment d (1965).  Such a claim cannot be founded on merely threats, indignities or insults.  *See*

*Edsall v. Assumption College*, 367 F. Supp. 2d 72, 80 (D. Mass. 2005).

The facts in the case at bar involve far more than simple bad manners or hurt feelings.

*See Doyle v. Hasbro*, 103 F.3d 186, 195 (1996).  Defendants argue that, as in *Conway v.*

*Smerling*, 37 Mass. App. Ct. 1, 8 (1994), Streeter's actions do not rise to the level of

outrageousness required for intentional infliction of emotional distress claim.  The comparison is

inapposite; in *Conway*, the court explains why the employer's conduct was not outrageous:

> They did not fire her, vilify her, or take steps to maximize her shame in the eyes
> of coworkers.  They did not harass her on the job or thereafter.

*Conway*, 37 Mass. App. Ct. at 9.  Here, Streeter's conduct triggered precisely the factors that the

defendant's conduct in *Conway* did not:  Streeter refused to let Searle work details or attend the

intermittent academy merely because she is a woman; he compensated Searle, who was entitled

to a higher rate of pay due to her seniority, at the same rate as men, who did not have seniority,

for performing the duties of a dispatcher; he harassed her on the job; he allowed Simmons to

harass her in the face of Searle's numerous complaints about Simmons' conduct; he

recommended Searle's termination in retaliation for her valid complaints about discrimination

and harassment; he falsified her "Disciplinary History;" he intimidated her when he parked his

car across the street from Richard's house.  *See* Argument, §§I-IV, *supra*.  In essence, Streeter

vilified her in the department.  *Conway*, 37 Mass. App. Ct. at 9.  No reasonable person should

have to endure the humiliation and shame that Searle endured.

The Defendants also argue that Searle's claim against Streeter for intentional infliction of

emotional distress is barred by the exclusivity bar of the workers' compensation statute.

(Defendants' Memo., at pp. 7-9).

> The workers' compensation exclusivity bar operates only where the plaintiff is
> shown to be an employee;  his condition is shown to be a 'personal injury' within
> the meaning of the [workers'] compensation act;  and the injury is shown to have
> arisen 'out of and in the course of …. employment.

*Green v. Wyman-Gordan Company*, 422 Mass. 551, 664 N.E.2d 808 (1996)(emphasis added).

That Act does not bar individual employees from liability for intentional torts.  *See Ruffino v.*

*State Street Bank and Trust Co.*, 908 F. Supp. 1019, 1049 (D. Mass. 1995), *Foley v. Polaroid*

*Corp.*, 400 Mass. 82 (1987).  Tort claims "will lie where the employee 'commits an intentional tort which was in no way within the scope of employment furthering the interests of the employer.'"  *Ruffino*, 908 F. Supp. at 1049-1050 *quoting O'Connell v. Chasdi*, 400 Mass. 686, 690 (1987).  Searle's intentional infliction of emotional distress claim is based, at least in part, on sexual harassment, which is "not remotely related to the employer's interests."  *Morehouse*, 989 F. Supp. at 65, *quoting O'Connell*, at 690 n.5.  As a result, Searle, "an employee who [was] subjected to intentional infliction of emotional distress stemming from sexual harassment by a co-employee, is not barred by the [Workers Compensation] Act from suing that individual," here, Streeter.  *Morehouse*, 989 F.Supp. at 65.

Moreover, the record is replete with evidence that, in addition to sexually harassing Searle, Streeter unlawfully discriminated against women and retaliated unlawfully against Searle in violation of Title VII and Chapter 151B.  "[P]roof of unlawful discrimination can be proof of actual malice; which is tantamount to proof that a supervisor was not acting on the employer's behalf."  *Edsall v. Assumption College*, 367 F.Supp.2d 72, 84 (D. Mass. 2005).  The egregious and unlawful discrimination, harassment and retaliation by Streeter against Searle merely because of her gender precludes a finding that Streeter was acting on the Town of Salisbury's behalf.  As such, Searle's claim is not barred by the workers' compensation statute, and summary judgment must be denied.

**CONCLUSION**

For the reasons stated above, Plaintiff Susan Searle respectfully requests that this Court

DENY the defendants' motion for summary judgment.

The Plaintiff
Susan Searle
By Her Attorneys,


/s/ Paul J. Klehm
James B. Krasnoo  (BBO#279300)
jkrasnoo@krasnooklehm.com
Paul J. Klehm  (BBO#561605)
pklehm@krasnooklehm.com
Krasnoo/Klehm LLP
23 Main Street, Suite One
Andover, MA  01810
(978) 475-9955

**CERTIFICATE OF SERVICE**

I, Paul J. Klehm, Esq., hereby certify that I have served a copy of the within document upon all counsel of record not served via ECF and upon all parties not represented by counsel by first class mail, postage pre-paid, on September 29, 2006.

/s/ Paul J. Klehm
Paul J. Klehm